IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| Sanjay Krishna, Maksim Piskunov, Florian Adolf, Daniyal Ahmed Faheem, Sabitha Kajuluri, Chanikya Sai Ram Gopisetty, Elena Kokueva, Idris Syed, and Natnael Bekele,<br><br>Plaintiffs,<br><br>v.<br><br>Julie Su, Acting Secretary, United States Department of Labor,<br><br>Defendant. | Case No.: 1:24-CV-10241-MJJ<br><br>**FIRST AMENDED COMPLAINT**<br>(Leave to File Granted on April 30, 2024) |

Plaintiffs now files this amended complaint and avers as follows: In 2004, Defendant U.S. Department of Labor ("DOL") declared it would decide PERM applications on a first in, first out basis: "We will process applications, including properly refiled applications, in the order in which they were filed under this final rule." DOL, Labor Certification for the Permanent Employment of Aliens in the United States; Implementation of New System, 69 Fed. Reg. 77326-01, 77343 (middle column) (Dec. 27, 2004). DOL intended to process at least 100,000 PERM applications each fiscal year within 60 days of filing. *Id.* But today, DOL doesn't decide PERMs in a first in, first out basis. And it takes (as of this filing) 397 days to decide a single PERM application. The data further shows DOL's processing has no rhyme or reason.

For the reasons below, this Court should compel DOL to make final decisions on Plaintiffs' PERM applications within 7 days.

## PARTIES

1. Plaintiff Sanjay Krishna is a citizen and national of India who currently resides in Watertown, Massachusetts.

2. Plaintiff Maksim Piskunov is a citizen and national of Russia who currently lives in Sunnyvale, CA.

3. Plaintiff Florian Adolf is a citizen and national of Germany who currently lives in Kennesaw, GA.

4. Plaintiff Daniyal Ahmed Faheem is a citizen and national of India who currently lives in San Antonio, TX.

5. Plaintiff Sabitha Kajuluri is a citizen and national of India who currently lives in Topeka, KS.

6. Plaintiff Chanikya Sai Ram Gopisetty is a citizen and national of India who currently lives in Little Elm, TX.

7. Plaintiff Elena Kokueva is a citizen and national of Russia who currently lives in San Clemente, CA.

8. Plaintiff Idris Syed is a citizen and national of United States who currently lives in Maryland Heights, MO.

9. Plaintiff Natnael Bekele is a citizen and national of Ethiopia who currently lives in Seattle, WA.

10. Defendant Julie Su is the Acting Secretary of the United States Department of Labor. In her official capacity—the only capacity in which she is sued—she is in charge of timely adjudication of permanent labor certification program.

**JURISDICTION AND VENUE**

11. This Court has jurisdiction over this case under 28 U.S.C. § 1331.

12. Under § 1331, this Court can hear causes of action under the Administrative Procedure Act ("APA"). *Califano v. Sanders*, 430 U.S. 99 (1977).

13. Under the APA, this Court "shall" compel Defendant to take action on an unreasonably delayed adjudication. 5 U.S.C. § 706(1).

14. This Court further has authority to enter declaratory relief under 28 U.S.C. § 2201.

15. Venue is proper in this case under 28 U.S.C. § 1391(e) because Plaintiff Sanjay Krishna lives in this district and division. And if venue is proper for one Plaintiff, it is proper for all Plaintiffs.

16. Plaintiffs also fall within the zone of interests that Congress sought to protect with the labor certification laws. *Kurapati v. U.S. Bureau of Citizenship & Immigr. Servs.*, 775 F.3d 1255, 1261 (11th Cir. 2014).

17. Beneficiaries of employment-based immigration benefit requests have standing to sue on the delay of those benefits. *See Matushkina v. Nielsen*, 877 F.3d 289, 293 (7th Cir 2017); *Mantena v. Johnson*, 809 F.3d 721, 732 (2nd Cir. 2015); *Kurapati v. United States Bureau of Citizenship & Immigration Servs.*, 775 F.3d 1255, 1261 (11th Cir. 2014); *Patel v. United States Citizenship & Immigration Servs.*, 732 F.3d 633, 638 (6th Cir. 2013); *Ruiz v. Mukasey*, 552 F.3d 269 (2d Cir. 2009); *Pandya v. Jaddou*, 581 F. Supp. 3d 476, 480 (E.D.N.Y. 2022); *Parcha v. Cuccinelli*, No. 4:20-CV-015-SDJ, 2020 WL 607103 (E.D. Tex. Feb. 7, 2020).

18. The "zone of interests test" dictates who has standing to sue, not the Defendant's regulations. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014) ("The zone-of-interests test is therefore an appropriate tool for determining who may invoke the

cause of action[.]"); *Texas v. Mayorkas*, No. 2:22-CV-094-Z, 2024 WL 455337, at *4 (N.D. Tex. Feb. 6, 2024).

19. The "zone of interests test" is not "especially demanding." *Texas*, 2024 WL 455337 at *4 (quoting *Lexmark*, 572 U.S. at 130). "The interests must be arguably within the zone of interests to be protected or regulated, and review is only denied if the plaintiff's interests are so marginally related to or inconsistent with the statute that it cannot be assumed Congress intended to permit the suit. In sum, the benefit of any doubt goes to the plaintiff." *Id.* (internal citations and quotation marks omitted).

20. DOL admitted this recently in a Rule 30(b)(6) Deposition. OFLC DOL Dep. at 81-87 (attached as Ex. A).

21. When asked whether DOL's regulations "are intended to protect the employee beneficiary of the PERM application," DOL responded: "Yeah. And our primary statutory responsibility is to make sure that terms and conditions are not adversely affecting similarly employed U.S. workers." *Id.* at 80:24-81:7.

22. Similarly, when asked whether the "attestations and the regulations [are] designed to protect foreign national employees who are the beneficiaries of a PERM application," DOL responded: "most of them are." *Id.* at 82:1-7.

23. The statutes require such an admission.

24. Whether a plaintiff falls within the zone of interest of a statutory cause of action is a question of statutory interpretation. *Lexmark*, 572 U.S. at 127.

25. PERM beneficiaries "arguably" fall within the zone of interests of the APA's unreasonable delay provisions to have standing in this case.

26. As it relates to delayed adjudications, the APA requires agencies to take into account the parties to an adjudication and issue a final decision within a reasonable amount of time: "With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b).

27. The APA further defines "parties" as "a person . . . named . . . in an agency proceeding." 5 U.S.C. § 551(3). Independently and more broadly, the APA requires agencies to issue "prompt notice" of a final decision to any "interested person." 5 U.S.C. § 555(e).

28. PERM beneficiaries are within the zone of interests of the APA because Congress sought to protect persons "named" in agency proceedings from unreasonable delays under § 555(b) and, more broadly, entitled any "interested party" to final agency action under § 555(e).

29. PERM beneficiaries are parties to the PERM applications because they are "named" in the ETA FORM 9089. *See* ECF No. 14 at 27-36. And the analysts who decide PERM applications review their backgrounds.

30. An ETA 9089 cannot be submitted without including the beneficiary's information. Even if he is not a "party," he is an "interested party" and, therefore, entitled to a final decision. *Id.*

31. To the extent this Court requires Plaintiffs to be within the interest protected by the INA, the INA seeks to protect the interests of PERM beneficiaries.

32. First, the statutes, regulations, and policy guidance regulating to non-immigrant employment-based visas intend to protect such workers. The INA first protects H1B workers through the Labor Condition Application ("LCA"). *See* 8 U.S.C. § 1182(n). All employers must complete an LCA and file it with the Department of Labor before seeking an H1B visa through the Agency. *Id.*

33. The LCA seeks to protect the H1B workers in various ways. On the LCA, the employer must swear that it will H1B workers the "actual wage" or the "prevailing wage . . . whichever is greater" that it pays all other individuals. *See id.* § 1182(n)(1)(A)(i); 20 C.F.R. § 655.731.

34. The DOL then has an administrative process that allows H1B workers to make complaints with the DOL for a violation of the LCA. *See* 8 U.S.C. § 1182(n)(2)(A). DOL also mandates that employers must pay the H1B worker regardless of whether the worker is in non-productive status; thus, the INA requires the employer to pay the H1B workers' wages regardless of whether they have current work for them to do. 8 U.S.C. § 1182(d)(2)(C)(vii)(I).

35. In fact, DOL recognizes congressional intent to protect H1B workers through the LCA process in its own regulations. 20 C.F.R. § 655.700 *et seq.* Thus, through the LCA process, the INA protects H1B workers' and their wages and thereby protects their American co-workers as well.

36. Second, Congress revealed an intent to protect PERM beneficiaries through two major acts of congress that amended the INA: the American Competitiveness and Workforce Improvement Act of 1998 ("ACWIA"), Public Law 105-277, div. C, tit. IV, 112 Stat. 2681 (1998), and the American Competitiveness in the Twenty-First Century Act of 2000 ("AC21"), Public Law 1-6-131, 114 Stat. 1251, as amended by the 21st Century Department of Justice Appropriations Authorization Act, Public Law 107-273, 116 Stat. 1758 (2002).

37. The U.S. Department of Homeland Security recognizes the protections that Congress intended for PERM beneficiaries through these statutes in a 2016 rulemaking. Final Rule, Retention of EB-1, EB-2, and EB-3 Immigrant Workers and Program Improvements Affecting High-Skilled Nonimmigrant Workers, 81 Fed. Reg. 82398, 82408 (Nov. 16, 2016) ("ACWIA

also included several measures intended to improve protections for U.S. and H–1B nonimmigrant workers.”).

38. Specifically, that rulemaking summarized the following protections that AC21 and ACWIA enacted for nonimmigrant workers: (1) H–1B extensions of stay under AC21 for PERM beneficiaries; (2) INA 204(j) portability; (3) H–1B portability; (4) Counting against the H–1B annual cap; (5) H–1B cap exemptions; (6) Protections for H–1B whistleblowers; and (7) Form I–140 petition validity.

39. The final rule implemented additional protections. *See* 81 Fed. Reg. at 82399-401. Each of these changes, based on AC21 and ACWIA, provide additional rights to H1B workers. *Id.* at 82408 (“ACWIA also included several measures intended to improve protections for U.S. and H–1B nonimmigrant workers.”). In addition to these summaries of the new protections, the Department of Homeland Security repeatedly noted that the intent behind them was to protect H1B workers. *See generally* 81 Fed. Reg. at 82416-475.[1]

40. In addition, 8 U.S.C. § 1324b proscribes a litany of unfair immigration related employment practices. This statute provides for special counsel to bring charges against an employer, and it allows an aggrieved worker to bring charges. *Id.* § 1324b(d).

41. This generalized protection appears to satisfy the zone of interests as recently explained in *Texas*, where the court determined the INA need not explicitly reference the interests at stake for a plaintiff to fall within the INA’s zone of interests:

> The Immigration and Nationality Act (“INA”) was established to provide a “comprehensive federal statutory scheme for regulation of immigration and naturalization” and to set “the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country.” That text, on its face, covers Plaintiff's claims and pled injuries. And

[1] Various other statutes provide protections to H1B workers. *See* 8 U.S.C. § 1184(c)(5)(A) (requiring an employer to pay the “reasonable costs of return transportation of the alien abroad” where an H1B employee is terminated prior to the end of their authorized admission).

> the mere fact that the INA does not explicitly reference State financial interests does not foreclose those interests being covered; to hold otherwise would require applying the "zone of interests" test with greater scrutiny than it permits.

*Texas*, 2024 WL 455337, at *4 (internal citations omitted).

42. Finally, DOL admits that the PERM process is at least in part designed to protect the beneficiary employer.

43. DOL admits that to protect the wages and work conditions of Americans it must protect the foreign national employees because if employers can treat foreign national workers worse it will harm the wages and work conditions for Americans.

44. Thus, to protect American workers, the PERM process protects foreign workers.

45. The INA therefore both specifically and generally intends to protect PERM beneficiaries. And therefore, Plaintiffs have standing to bring this case.

**LEGAL BACKGROUND**

46. Defendant Department of Labor ("DOL") plays a crucial role in the employment-based immigration system. 8 U.S.C. §§ 1154(b), 1182(a)(5); 20 C.F.R. § 556, *et seq*.

47. Congress only permits the U.S. Department of Homeland Security and the U.S. Department of State to issue employment-based second- and third-preference immigrant visas to noncitizens "after consultation with the Secretary of Labor." 8 U.S.C. § 1154(b).

48. During this consultation process, DOL must certify that the permanent employment of a noncitizen will not negatively impact the United States labor force:

> Any alien who seeks to enter the United States for the purpose of performing skilled or unskilled labor is inadmissible, unless the Secretary of Labor has determined and certified to the Secretary of State and the Attorney General that—
>
> > **(I)** there are not sufficient workers who are able, willing, qualified (or equally qualified in the case of an alien described in clause (ii)) and available at the time of application for a visa and admission to the United States and at the place where the alien is to perform such skilled or unskilled labor, and

> **(II)** the employment of such alien will not adversely affect the wages and working conditions of workers in the United States similarly employed.

8 U.S.C. § 1182(a)(5)(A).

49. DOL's Office of Foreign Labor Certification ("OFLC") administers the permanent labor certification program at its Atlanta Service Center. *See generally* https://flag.dol.gov/programs/perm (last visited April 8, 2024); 20 C.F.R. § 656.10.

50. The permanent labor certification program is a three-part process.

51. First, an employer must get a prevailing wage from DOL. *See generally* 20 C.F.R. § 656.40. This stage is called the Prevailing Wage Determination. *Id.* At the conclusion of this process, DOL tells the employer the wage level that it must offer and pay a noncitizen employee.

52. Currently, this process takes more than a year. *See* https://flag.dol.gov/processingtimes (last visited April 6, 2024).

53. Second, an employer must test the labor market to determine if there are any able and willing American workers who can and will fill the position at the prevailing wage. *See generally* 8 C.F.R. § 656.17(e). This stage is called the Labor Market Test.

54. To test the labor market, the employer must place a job advertisement with the relevant state workforce agency, the local newspaper of general circulation, and for professional positions—those requiring at least a bachelor's for entry into the profession—additional locations (online, job fairs, etc.). *Id.*

55. The timing of this process is controlled by the employer, and it can vary from 3 to 6 months.

56. Finally, if the labor market test identifies no able and willing domestic workers, the employer seeks permanent labor certification from DOL by filing online a Form ETA 9089

within the Permanent Electronic Record Management system. 20 C.F.R. § 656.17(a)(1). This is the third step.

57. If DOL certifies the position, the employer can then petition for an immigrant visa with United States Citizenship and Immigration Services ("USCIS") on behalf of their future permanent employee, and USCIS approves or denies the immigrant visa petition. 8 U.S.C. § 1154(b).

58. Companies submit their requests for permanent labor certification through an electronic system called the "Program Electronic Record Management" or PERM system. PERM is the technological platform where employers file an ETA Form 9089, Application for Permanent Employment Certification. But stakeholders and bureaucrats alike use the term PERM as a catchall for this entire process.

59. This case relates exclusively to this third step in the process—the PERM process.

*The History of PERM*

60. In May of 2002, DOL noticed a proposed rule to implement an electronic labor certification application. DOL, Labor Certification for the Permanent Employment of Aliens in the United States; Implementation of New System, 67 Fed. Reg. 30466-01, 30467 (May 6, 2002).

61. DOL sought to use computer automation to simplify, streamline, and speed up the PERM process:

> The process for obtaining a permanent labor certification has been criticized as being complicated, time consuming and requiring the expenditure of considerable resources by employers, SWA's and the Federal Government. *It can take up to two years or more to complete the process for applications* . . . The redesigned system we envision would require employers to conduct recruitment before filing their applications. . . . Employers would be required to submit their applications on forms designed for automated processing to minimize manual intervention to an ETA application processing center for automated screening and processing. After an

> application has been determined to be acceptable for filing, an automated system would review it based upon various selection criteria that would allow applications to be identified for potential audits before determinations could be made. In addition, some applications would be randomly selected as a quality control measure for an audit without regard to the results of the computer analysis.

*Id.* at 30466 (emphasis added).

62. The 2002 proposal sought to decide routine, non-audited Forms 9089 in 21 days:

> Computers would do an initial analysis of the information provided on the "machine readable" application form. Applications that could not be accepted for processing because certain information that was requested by the application form was not provided will be returned to the employer. Applications accepted for processing would be screened and would be certified, denied or selected for audit.
>
> Information on the form may trigger a denial of the application or a request for an audit by Federal regional office staff. The application may also be selected for audit on a random basis as a quality control measure. If an application is not denied or selected for audit we anticipate that the application will be certified and returned to the employer within 21 days.
>
> If the application is selected for audit, we will send the employer a letter with instructions to furnish required documentation supporting the information provided on the application form within 21 calendar days of the date of the request. If the requested information is not received in a timely fashion, the application will be denied.

*Id.*

63. The proposed rule expected employers "to file approximately 121,300 applications for alien employment certification." *Id.* at 30482 (second column).

64. Thus, in 2002, DOL expected to complete at least 120,000 per fiscal year in an average time of 21 days.

65. The final rule—implemented two and a half years later—codified this process, though DOL tempered its expectation of processing times to 45-60 days:

> The combination of pre-filing recruitment, providing employers with the option to complete applications in a web-based environment, automated processing of applications including those submitted by mail, and elimination of the SWA's required role in the recruitment process will yield a large reduction in the average

> time needed to process labor certification applications. . . . If an application has not been selected for audit, and satisfies all other reviews, the application will be certified and returned to the employer. The employer must immediately sign the application and then submit the certified application to DHS in support of an employment-based I-140 petition. We anticipate an electronically filed application not selected for audit will have a computer-generated decision within 45 to 60 days of the date the application was initially filed.

DOL, Labor Certification for the Permanent Employment of Aliens in the United States; Implementation of New System, 69 Fed. Reg. 77326-01, 77328 (Dec. 27, 2004).

66. The final rule—again two and half years later—projected employers would file 100,000 PERM applications per fiscal year. *Id.* at 77376.

67. DOL's Final Rule also declared it would process PERM applications on a first in, first out basis: "We will process applications, including properly refiled applications, in the order in which they were filed under this final rule." *Id.* at 77343 (middle column).

68. Thus, under its final rule in 2004—and the technology available in 2004—DOL intended to decide approximately 100,000 routine, non-audited PERM applications on a first in first out basis within 60 days of their filings.

*Today's PERM Program*

69. Today, under the same rule—with modern technology—DOL decides approximately 105,000 PERMs per year in an average of 397 days on a "month processing" methodology.

70. All PERM certifications take place at DOL's Office of Foreign Labor Certification ("OFLC").

71. The OFLC has 12 employees that decide routine, unaudited PERM applications full time. In addition, it has 6 "flex" employees that spend at least 6 months out of the year deciding routine, unaudited PERM applications full time.

72. Under a collective bargaining agreement, these analysts have daily performance goals of 35 to 42 PERM applications a day. Analysts meeting their daily performance goals decide a single PERM application in 11-13 minutes. These are the minimum production standards for PERM processing.

73. DOL OFLC analysts, therefore, decide on average 175 to 210 applications per week. Assuming four weeks in a month, DOL OFLC Analysts on average decide between 700 and 840 applications per week. Assuming 48 weeks in a year, each analyst decides between 8,400 and 10,080. But these completions represent the bare minimum an employee completes.

74. Most DOL OFLC Analysts decide an average of 50 PERM applications per day, deciding 250 per week, 1000 per month, and 12,000 per year.

75. Including the additional 6 analysts who assist with PERM full time for 6 months out of the year—and assuming 48 work weeks per year—DOL OFLC Analysts can decide between 126,000 to 180,000 per fiscal year.

76. In fact, from October to December 2023—a period of 38 workdays—DOL OFLC analysts decided 55 PERM applications per day.

77. DOL incentivizes these higher averages with bonuses, overtime, and promotions.

78. DOL also offers maximum workplace flexibility for its OFLC employees.

79. Further, DOL OFLC is looking to hire three additional analysts to supplement its workforce.

80. The analysts can make decisions so quickly because they are only reviewing the PERM application for completeness and accuracy. Analysts are not permitted or able to do outside research to test the accuracy. They do not look for fraud; in fact, no PERMs are denied for fraud.

81. Despite the rulemaking declaring a first in, first out-processing logic, DOL assigns these cases in a 5-step process.

82. Step Zero: Before the employer or its representative can even submit an ETA Form 9089, the PERM system tests each submission for completeness, basic compliance with the Form's timelines, and incompatible answers These digital submission checks ensure no incomplete applications are submitted.

83. Step One: Upon e-submission of a complete PERM application, first, the PERM system automatically sends an email to the employer submitting the PERM to confirm the employer intended on submitting an application. The employer has 30-days to respond, but employers typically respond immediately. This step is wholly automated.

84. Step Two: Next, the PERM system pulls out between 10 and 15% of all applications because they are being held for OIG investigations, their substance triggered pre-determined audit parameters, or they are subject to random audit. DOL constantly changes its predetermined audit parameters, but the percentage of PERM applications immediately separated for audit stay constant around 10 to 15%.

85. The applications that are selected for holds or audits are sent to DOL contractors for resolution. The applications on hold or delayed for audit are not passed on to the 12-18 DOL employees who adjudicate only non-audited PERM applications. These "flagged" cases do not slow down adjudication on the non-flagged, non-audited PERM applications.

86. The remaining 85 to 90% of the applications that are not selected for audit are then placed on a digital "shelf." They are then organized and segregated by the calendar month which they were submitted. So, all cases filed in January 2023 sit together, those filed in February 2023 are separated and sit together, and so on.

87. They currently sit there for approximately 13-14 months. Nothing happens to them during this time.

88. Step Three: A supervisory employee assigns the cases for the next submission month to the 12-18 analysts. There is no set time for when it assigns these cases. Rather, it is based on current workload. For example, when the OFLC has only 1000 or so cases pending certification from February 2023, the supervisor will go ahead and assign the cases from March 2023. There is no rule, policy, or limitation on how long the analysts can take to decide a single month of Forms 9089.

89. Part of the assignment policy is to group Forms 9089 submitted by the same employer and assign them to the same analyst.

90. Step Four: Each analyst decides their cases. Again, it takes between 8 and 13 minutes for an analyst to decide a single PERM. They do not look for fraud. Rather, they look for completeness, internal consistency, and facial red flags. At the end of the process, the analyst either certifies, denies, or flags the case for an audit.

91. Step Five: The final action is recorded in the system and the system automatically sends out an e-notice to the employer. This is the end of the process.

92. This process is not recorded in any regulation, policy manual, or public information.

93. Rather, DOL only claimed to adjudicate PERM applications through this elaborate process in response to litigation.

94. DOL currently reports that, using this process, it takes 397 days on average to decide non-flagged, non-audted PERM applications. *See* https://flag.dol.gov/processingtimes (last visited April 5, 2024).

95. This figure—397 days—reflects "the average processing time for all PERM applications for the most recent month." *Id.*

*The OFLC's Resources have Increased*

96. The OFLC's budget has increased by more than $20,000,000 over the last decade:

| Fiscal Year | Budget for OFLC |
|---|---|
| 2014 | $61,973,000 |
| 2015 | $62,310,000 |
| 2016 | $62,310,000 |
| 2017 | $62,310,000 |
| 2018 | $62,310,000 |
| 2019 | $62,310,000 |
| 2020 | $68,810,000 |
| 2021 | $77,810,000 |
| 2022 | $79,810,000 |
| 2023 | $83,810,000 |

97. And there has been no drastic increase in the number of applications submitted, though its productivity varies substantially:

| Fiscal Year | ETA 9089s Received | ETA 9089s Decided |
|---|---|---|
| 2017 | 105,034 | 97,603 |
| 2018 | 104,360 | 119,776 |
| 2019 | 113,014 | 102,655 |
| 2020 | 115,133 | 94,019 |
| 2021 | 120,660 | 108,264 |
| 2022 | 141,951 | 104,600 |
| 2023 | 158,987 | 116,427 |

98. Submission volume and resources do not justify the 397-day wait time to do an 8-minute adjudication.

99. DOL would suffer no real harm if it was ordered to decide 10 PERM applications immediately because it would take less than an hour and the OFLC has the ability to identify particular cases, pull them, and issue decisions on them.

*DOL Does not Follow Any Rule of Reason*

100. DOL publishes historic and quarterly performance data.[2]

101. When the audited cases, denied cases, expired cases, and outliers are removed from DOL's data set, the data reveals highly variable adjudication times with unusually long delays:

| **Decision Length Statistics (Certified, Non-Audited Cases, 2014-2022)** | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | All |
| Sample | 14,985 | 24,802 | 43,379 | 51,821 | 52,012 | 61,254 | 62,229 | 52,651 | 17,293 | 380,426 |
| Mean | 191 | 182 | 97 | 100 | 94 | 83 | 167 | 186 | 285 | 154 |
| Median | 187 | 190 | 96 | 88 | 92 | 68 | 174 | 182 | 271 | 150 |
| SD | 37 | 72 | 32 | 47 | 30 | 44 | 44 | 63 | 61 | 48 |
| Skewness | 26.9 | 18.5 | 26.4 | 12.9 | 6.6 | 8.0 | 3.3 | 6.8 | 1.9 | 12.4 |
| Kurtosis | 1,094.3 | 480.1 | 1,315.2 | 437.5 | 282.4 | 221.1 | 67.6 | 61.5 | 3.0 | 440.3 |
| Outliers | 116 | 271 | 566 | 194 | 326 | 365 | 314 | 613 | 1,915 | 4,680 |

102. It is telling that since the end of FY 2022, the processing times have grown by another 120 days.

103. Similarly, DOL consistently decides later-filed PERM applications before earlier-filed PERM applications.

| **Line Jumping Per Year** | | | | |
|---|---|---|---|---|
| Year Submitted | Mean Skipped | Median Skipped | Mean Skip Rate | Median Skip Rate |
| 2014 | 1,010 | 565 | 36% | 30% |
| 2015 | 1,387 | 716 | 39% | 37% |
| 2016 | 1,540 | 1,030 | 40% | 38% |
| 2017 | 1,697 | 865 | 39% | 34% |
| 2018 | 1,586 | 557 | 34% | 28% |
| 2019 | 743 | 189 | 26% | 12% |

[2] DOL discloses quarterly performance data at https://www.dol.gov/agencies/eta/foreign-labor/performance (last visited April 8, 2024).

| | | | | |
|---|---|---|---|---|
| 2020 | 991 | 211 | 25% | 11% |
| 2021 | 1,340 | 610 | 34% | 27% |
| 2022 | 1,112 | 372 | 36% | 26% |
| 2014 - 2022 | 1,272 | 504 | 33% | 25% |

104. DOL does not decide these applications in the order received. At all. There is no "line" therefore for PERM applications. And DOL engages in rampant "line jumping."

105. Further, even when the "Month Processing Method" is taken into account, there remains wild variability between decision times among applications submitted in the same month and line-jumping remains rampant.

106. Nearly 25% of cases submitted in the same month are decided more than a month before or after the mode month—the decision month for most PERM applications submitted in the same month. This means thousands of applications that are submitted in the same month are decided at least a month before or after their "decision month." This indicates that, to the extent DOL has a month processing method, it does not follow it.

107. Similarly, even taking into account the month processing method, each routine PERM case can expect to be skipped 114 times by PERM applications filed in the following month.

108. Despite claiming to have a processing logic, such high variability indicates that DOL does not decide non-flagged, non-audited cases in compliance with any rule.

109. It further reveals DOL has no guardrails, limits, or controls governing the actual time it takes to decide a single PERM application.

110. The lack of any consistent processing mechanism is further reflected by looking at how long it took DOL to decide PERM applications that were submitted to the OFLC on the same day.

111. Today, DOL reports its decision time to be 397 days as previously mentioned.

112. Because this decision time is the result of an arbitrary decisionmaking process, the delay is unreasonable.

113. This delay harms the beneficiaries of PERM applications in various ways.

114. First, DOL's data reflects that a significant portion of PERM beneficiaries are specialty occupation workers ("H-1B"). This visa can only last 6 years. However, H-1B workers can get one-year extensions if their employer gets a PERM approval before the beginning of their fifth year in H-1B status. Because PERM now takes nearly a year, these delays often prevent H-1B applicants from getting this extension.

115. Second, H-1B workers who have an approved I-140 Immigrant Visa Petition can get indefinite extensions of their H-1B while they await an immediately available immigrant visa number. But a vast majority of H-1B workers can only apply for an immigrant visa *after* DOL issues them a PERM. The nearly one year wait harms these workers.

116. Third, these delays prevent beneficiaries from applying for adjustment of status when visas are immediately available. This prevents them from acquiring lawful permanent residency and delays their residency periods for naturalization.

117. Fourth, the PERM delays prevent career advancement because employers often do not promote employees while the PERM is pending because the job duties may change and put at risk the PERM process and related immigrant visa application.

118. Finally, these delays harm the employers because they are deprived of the consistent labor force for highly skilled workers in a tight labor market.

*Introduction of the FLAG System*

119. In April of 2023, DOL announced it would start accepting Forms 9089 through its updated website called the Foreign Labor Application Gateway ("FLAG").

120. OFLC began accepting the New ETA Form 9089 in July of 2023 through the FLAG system.

121. As of February 26, 2024, however, the OFLC had yet to start processing cases submitted through the FLAG system.

122. Further, as of February 26, 2024, OFLC had yet to create any training materials, memorandums, internal guidance, power points or other similar material related to adjudicating Forms 9089 in the FLAG system.

123. DOL has taken no steps at all to adjudicate any PERM applications filed on or after July 2023.

124. DOL is unlawfully withholding any decisions on July 2023 PERM applications.

125. And it cannot until it establishes such policies.

*No. 1: Plaintiff Sanjay Krishna*

126. Plaintiff Sanjay Krishna is a citizen and national of India, but he has lived in the United States for years.

127. He has been in "H-1B" status for 6 years.

128. His H-1B status expired on February 13, 2024. Since then, he has been unable to work and will not be able to work unless or until DOL decides his PERM.

129. Mr. Krishna is a beneficiary of a PERM application filed on July 14, 2023. DOL assigend it receipt number G-100-23195-190138.

130. Without a decision on his PERM, Mr. Krishna may have to leave the United States, and he will not be able to return for months or possibly years, while his employer applies for an

immigrant visa, gets it approved, applies for a new H1B, gets it approved, and then Mr. Krishna gets the new visa at a consulate and travels to the United States. Further, while Mr. Krishna is physically in the United States, he cannot get work authorization again unless or until he meets an exception or DOL decides his PERM application.

131. This adds additional costs to Mr. Krishna and his employer that would not otherwise be necessary.

132. Mr. Krishna will not be able to work during this time.

133. This will hurt his career, and it could cost him his position.

134. During his time outside of the United States or without work authorization, he will be required to continue to pay for his bills in the United States—rent, insurance, utilities, etc.

135. There is no way for Mr. Krishna to remedy the harm to his career or get reimbursed by the Defendant for these financial losses.

136. In order to file the PERM, the employer has to show that there is not a US worker ready, willing, and able to do the position. Tthis harm will be felt significantly as his employer will be without a key resource.

137. The harm to both Mr. Krishna and his employer will be irreparable.

138. The harm is irreparable.

*No. 2: Plaintiff Maksim Piskunov*

139. Plaintiff Maksim Piskunov is a citizen and national of Russia, but they have lived in the United States for years.

140. He has been in “H1B” status for years.

141. In fact, he will hit his 6 year max on 30-Sep-26.

142. Maksim Piskunov is a beneficiary of a PERM application filed on 17-Nov-23. DOL assigend it receipt number G-100-23321-510403.

143. Without a decision on his PERM, Maksim Piskunov cannot apply for his immigrant visa or adjustment of status. This will slow down his lawful permanent residency, which in turns slows down his accrual of time for naturalization.

144. This adds additional costs to Maksim Piskunovand his employer that would not otherwise be necessary.

145. This will hurt his career, and it could cost him his position.

146. There is no way for Maksim Piskunovto remedy the harm to his career or get reimbursed by the Defendant for these financial losses.

147. The harm to both Maksim Piskunov and his employer will be irreparable.

148. Further, Maksim Piskunov cannot change employers, cannot travel internationally for fear that a consulate will deny his H1B renewal, and the mental anguish. Mr. Piskunov is also concerned that these delays will require him to return to Russia where he is concerned he may be treated differently due to his Western education, political opinions, and beliefs.

*No. 3: Plaintiff Florian Adolf*

149. Plaintiff Florian Adolf is a citizen and national of Germany, but they have lived in the United States for years.

150. He has been in "L1A" status for years.

151. In fact, he will hit his 7 year max on August 28, 2024.

152. Florian Adolf is a beneficiary of a PERM application filed on 12-Apr-23. DOL assigend it receipt number A-23090-21514.

153. Without a decision on his PERM, Florian Adolf will have to leave the United States, and he will not be able to return for months or possibly years, while his employer applies for an immigrant visa, gets it approved, applies for a new L1A, gets it approved, and then Florian Adolf gets the new visa at a consulate and travels to the United States.

154. This adds additional costs to Florian Adolfand his employer that would not otherwise be necessary.

155. Florian Adolfwill not be able to work during this time.

156. This will hurt his career, and it could cost him his position.

157. During his time outside of the United States he will be required to continue to pay for his bills in the United States—rent, insurance, utilities, etc.

158. There is no way for Florian Adolfto remedy the harm to his career or get reimbursed by the Defendant for these financial losses.

159. In order to file the PERM, the employer has to show that there is not a US worker ready, willing, and able to do the position. Given that Florian Adolf will not have to leave the US, this harm will be felt significantly as his employer will be without a key resource.

160. The harm to both Florian Adolf and his employer will be irreparable.

161. Further, Florian Adolf will suffering the following harm: Mr. Adolf has been required to leave the United States quite a bit recently to recapture time on his L1A.

162. During this time, his wife is pregnant and living in the United States. The PERM delay has caused significant periods of family separation while his wife is pregnant. This is causing significant mental anguish and harm.

*No. 4: Plaintiff Daniyal Ahmed Faheem*

163. Plaintiff Daniyal Ahmed Faheem is a citizen and national of INDIA, but they have lived in the United States for years.

164. He has been in "H1B" status for years.

165. In fact, he will hit his 6 year max on 28-Feb-28.

166. Daniyal Ahmed Faheem is a beneficiary of a PERM application filed on 7-Sep-23. DOL assigend it receipt number G-100-23250-327361.

167. Without a decision on his PERM, Daniyal Ahmed Faheem will not be able to apply for his immigrant visa and adjustment of status. This will slow down his acquisition of a green card and time to naturalize.

168. This adds additional costs to Daniyal Ahmed Faheemand his employer that would not otherwise be necessary.

169. This will hurt his career, and it could cost him his position.

170. During his time outside of the United States he will be required to continue to pay for his bills in the United States—rent, insurance, utilities, etc.

171. There is no way for Daniyal Ahmed Faheemto remedy the harm to his career or get reimbursed by the Defendant for these financial losses.

172. In order to file the PERM, the employer has to show that there is not a US worker ready, willing, and able to do the position.

173. The harm to both Daniyal Ahmed Faheem and his employer will be irreparable.

174. Further, Daniyal Ahmed Faheem will suffer because he can't change employers, his life is in limbo, and the uncertainty causes significant mental anguish and strain.

*No. 5: Plaintiff Sabitha Kajuluri*

175. Plaintiff Sabitha Kajuluri is a citizen and national of India, but they have lived in the United States for years.

176. He has been in "H1B" status for nearly years.

177. In fact, he will hit his 6 year max on 30-Sep-27.

178. Sabitha Kajuluri is a beneficiary of a PERM application filed on 27-Jul-23. DOL assigend it receipt number P-100-22144-204252.

179. Without a decision on the PERM, Sabitha Kajuluri will not be able to apply for an immigrant visa or adjustment of status. This delays accrual of permanent residency and citizenship.

180. This adds additional costs to Sabitha Kajuluriand his employer that would not otherwise be necessary.

181. This will hurt his career, and it could cost him his position.

182. During his time outside of the United States he will be required to continue to pay for his bills in the United States—rent, insurance, utilities, etc.

183. There is no way for Sabitha Kajulurito remedy the harm to his career or get reimbursed by the Defendant for these financial losses.

184. In order to file the PERM, the employer has to show that there is not a US worker ready, willing, and able to do the position.

185. The harm to both Sabitha Kajuluri and his employer will be irreparable.

186. Further, Sabitha Kajuluri will suffer harm to their career, cause mental anguish, and delay important life decisions.

*No. 6: Plaintiff Chanikya Sai Ram Gopisetty*

187. Plaintiff Chanikya Sai Ram Gopisetty is a citizen and national of India, but they have lived in the United States for years.

188. He has been in "H1B" status for nearly years.

189. In fact, he will hit his 6 year max on 30-Sep-25.

190. Chanikya Sai Ram Gopisetty is a beneficiary of a PERM application filed on 22-Jan-24. DOL assigend it receipt number G-100-24022-656855.

191. Without a decision on his PERM, Chanikya Sai Ram Gopisetty will not be able to apply for an immigrant visa or adjustment of status. This delays accrual of permanent residency and citizenship.

192. Further, because DOL's PERM delays continue to increase in length, Gopisetty will have to leave the United States, and he will not be able to return for months or possibly years, while his employer applies for an immigrant visa, gets it approved, applies for a new H1B, gets it approved, and then Chanikya Sai Ram Gopisetty gets the new visa at a consulate and travels to the United States.

193. This adds additional costs to Chanikya Sai Ram Gopisettyand his employer that would not otherwise be necessary.

194. Chanikya Sai Ram Gopisettywill not be able to work during this time.

195. This will hurt his career, and it could cost him his position.

196. During his time outside of the United States he will be required to continue to pay for his bills in the United States—rent, insurance, utilities, etc.

197. There is no way for Chanikya Sai Ram Gopisettyto remedy the harm to his career or get reimbursed by the Defendant for these financial losses.

198. In order to file the PERM, the employer has to show that there is not a US worker ready, willing, and able to do the position. Given that Chanikya Sai Ram Gopisetty will not have to leave the US, this harm will be felt significantly as his employer will be without a key resource.

199. The harm to both Chanikya Sai Ram Gopisetty and his employer will be irreparable.

200. Further, Chanikya Sai Ram Gopisetty is facing uncertinity and anxiety on reaching the end of the limit because of the time lines. It further restricts his job portablity for moving between companies. And finally, his wife cannot work on her H4 unless or until he has an approved immigrant visa.

*No. 7: Plaintiff Elena Kokueva*

201. Plaintiff Elena Kokueva is a citizen and national of Russia, but they have lived in the United States for eight years.

202. Elena Kokueva is a beneficiary of a PERM application filed on 14-Aug-23. DOL assigend it receipt number G-100-23227-263994.

203. Without a decision on his PERM, Elena Kokueva will not be able to apply for an immigrant visa or adjustment of status. This delays accrual of permanent residency and citizenship.

204. This adds additional costs to Elena Kokuevaand their employer that would not otherwise be necessary.

205. Elena Kokuevawill not be able to work during this time.

206. This will hurt his career, and it could cost him his position.

207. During his time outside of the United States he will be required to continue to pay for his bills in the United States—rent, insurance, utilities, etc.

208. There is no way for Elena Kokuevato remedy the harm to his career or get reimbursed by the Defendant for these financial losses.

209. The harm to both Elena Kokueva and his employer will be irreparable.

210. Further, Elena Kokueva will suffer uncertainty and her job is at risk.

*No. 8: Plaintiff Idris Syed*

211. Plaintiff Idris Syed is a citizen and national of United States, but they have lived in the United States for years.

212. He has been in "H1B" status for nearly years.

213. In fact, he will hit his 6 year max on 18-Oct-24.

214. Idris Syed is a beneficiary of a PERM application filed on 3-Nov-23. DOL assigend it receipt number G-100-23307-478851.

215. Without a decision on his PERM, Idris Syed will have to leave the United States, and he will not be able to return for months or possibly years, while his employer applies for an immigrant visa, gets it approved, applies for a new H1B, gets it approved, and then Idris Syed gets the new visa at a consulate and travels to the United States.

216. This adds additional costs to Idris Syedand his employer that would not otherwise be necessary.

217. Idris Syedwill not be able to work during this time.

218. This will hurt his career, and it could cost him his position.

219. During his time outside of the United States he will be required to continue to pay for his bills in the United States—rent, insurance, utilities, etc.

220. There is no way for Idris Syedto remedy the harm to his career or get reimbursed by the Defendant for these financial losses.

221. In order to file the PERM, the employer has to show that there is not a US worker ready, willing, and able to do the position. Given that Idris Syed will not have to leave the US, this harm will be felt significantly as his employer will be without a key resource.

222. The harm to both Idris Syed and his employer will be irreparable.

223. Further, Idris Syed will suffer harm because his PERM is expiring before he is eligible for the 1-year extension. It is also preventing him from changing jobs and hindering his career growth. The delay is taking a toll on his mental state and causing depression.

*No. 9: Natnael Bekele*

224. Plaintiff Natnael Bekele is a citizen and national of Ethiopia, but they have lived in the United States for years.

225. Natnael Bekele is a beneficiary of a PERM application filed on 13-Sep-23. DOL assigend it receipt number G-100-23256-344232.

226. Without a decision on their PERM, Natnael Bekele does not have a path to permanent residency. She cannot apply for an immigrant visa or adjustment of status.

227. This adds additional costs to Natnael Bekeleand his employer that would not otherwise be necessary.

228. Natnael Bekelewill not be able to work during this time.

229. This will hurt his career, and it could cost him his position.

230. During his time outside of the United States he will be required to continue to pay for his bills in the United States—rent, insurance, utilities, etc.

231. There is no way for Natnael Bekeleto remedy the harm to his career or get reimbursed by the Defendant for these financial losses.

232. The harm to both Natnael Bekele and her employer will be irreparable.

233. Further, Natnael Bekele cannot leave the United States and visit her country of nationality because she is an applicant for asylum. Without PERM, she cannot apply for adjustment of status that would provide her travel authorization to meet her family in a third country. Having spent 8 years in the U.S. as a pending asylee, the separation from her family has taken a toll, leaving her struggling both mentally and emotionally. Further, her company's potential round of layoffs makes this pursuit even more urgent.

**FIRST CAUSE OF ACTION**
**(APA – Unlawful Withholding)**

234. DOL has a required, discrete duty to issue final decisions on PERM applications.

235. DOL has failed to take any steps to decide PERM applications filed in or after July of 2023.

236. DOL has no policies, procedures, or rules for adjudicating, processing, or deciding PERM applications filed within the FLAG system.

237. DOL has failed to take any steps to ensure it can make decisions on FLAG-based PERM applications.

238. DOL cannot make final decisions on FLAG-based PERM applications because it has no policies in place.

239. DOL is breaching its duty to make a final decision on PERM applications.

240. These applications have been pending at the longest 9 months.

241. They cannot get decisions unless or until DOL takes steps to develop policies, train its adjudicators, and start issuing decisions.

242. All of Plaintiffs' PERM applications were filed after July 2023 within the FLAG-based PERM application system.

243. DOL cannot and will not decide Plaintiffs' PERMs because it has no policies in place to decide them.

244. DOL is therefore unlawfully withholding action on Plaintiffs' PERM applications.

245. This unlawful withholding is not substantially justified.

**SECOND CAUSE OF ACTION**
**(APA – Unreasonable Delay for PERM decision)**

246. In the alternative, Plaintiffs' PERM applications are unreasonably delayed.

247. DOL has a required, discrete duty to make a final decision on Plaintiff's PERM application.

248. This Court "shall" therefore compel DOL to issue a final determination on Plaintiffs' pending PERM applications because DOL has "unreasonably delayed" final decision. 5 U.S.C. § 706(1).

249. In evaluating an unreasonably delayed agency action claim, courts often consider the six factors set out in *Telecomms. Rsch. & Action Ctr. v. F.C.C.*, 750 F.2d 70, 80 (D.C. Cir. 1984) (TRAC):

> (1) the time agencies take to make decisions must be governed by a "rule of reason"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the

> court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*Id.* at 80 (internal citations omitted).

250. DOL's PERM decision delays that are more than 60 days are unreasonably delayed.

*No Rule of Reason*

251. DOL's 2004 rulemaking declared its rule of reason would be a first in first out processing logic: "We will process applications, including properly refiled applications, in the order in which they were filed under this final rule." 69 Fed. Reg. 77326-01, 77343 (middle column).

252. There is no dispute DOL does not follow a first in, first out processing logic.

253. Thus, DOL does not follow the rule of reason it declared in its rulemaking and therefore it has no lawful rule of reason.

254. To the extent DOL is not bound by its final rule, DOL has no policy, rule, or mechanism that governs, regulates, or controls the time it takes to make a decision on a particular PERM application. *TRAC*, 750 F.2d at 80. A rule of reason requires more than a description of how a benefits application goes from filing to decision because, in hindsight, an agency can always describe the path an application took through an agency.

255. DOL has no policy that governs how long it takes to decide a PERM application.

256. To the extent the Court finds that a rule of reason need be no more than processing logic, DOL has no rule of reason for FLAG-based Forms 9089 like Plaintiff's. DOL admits it has taken no steps to create any training materials, memorandums, internal guidance, power points or other similar material related to adjudicating Forms 9089 in the FLAG system.

257. DOL, therefore, has no policies or rules of reason for adjudicating FLAG-based Forms 9089 like Plaintiff's.

258. To the extent DOL will use its month processing goal to adjudicate FLAG-based Forms 9089, DOL's month processing method is not a rule of reason because it violates DOL's command to follow a first in, first out processing in its initial rulemaking: "We will process applications, including properly refiled applications, in the order in which they were filed under this final rule." 69 Fed. Reg. 77326-01, 77343 (middle column).

259. Further, to the extent DOL's month processing method is a cognizable rule of reason, DOL does not follow it.

260. DOL's public data reveals that at least 25% of all non-audited, non-flagged PERM applications are decided before or after the month they are expected to be decided by the data.

261. DOL's public data further reveals that the average non-audited, non-flagged PERM application gets skipped over 114 times by PERM applications filed in the next processing month.

262. The decision Data's variability in the decision times and extensive "line jumping" problems reveal it follows no consistent adjudication policy.

263. DOL does not decide PERM applications in a line. It does not decide them on its purported month processing methodology.

*Congress Expected Much Better*

264. DOL interpreted Congressional intent in its 2004 rulemaking.

265. DOL therefore interpreted Congressional intent to make a decision within 60 days on a PERM application.

266. DOL wholly ignores this intent.

267. Further, at a minimum, Congress expected DOL to make a decision in a timely enough fashion to ensure DOL would protect the American labor force. 8 U.S.C. § 1182(a)(5)(A).

268. Specifically, Congress required DOL to determine and certify that there are insufficient workers "available *at the time of the application for a visa and admission* to the United States and at the place where the alien is to perform such skilled or unskilled labor." *Id.*

269. Employers can file for an immigrant visa immediately upon receiving a certified PERM. Thus, Congress intended for the labor market test to be temporally proximate enough to PERM certification to ensure that the labor market test was a timely test of whether American workers were not available.

270. A labor market test takes place after the employer receives the prevailing wage determination, but before the PERM application.

271. An employer can file the PERM application no earlier than 30 days after the end of the completion of the ads and other labor market test steps. This "cool down" period ensures potential employees will have a month to apply after seeing the last ad for the position.

272. When the employer files the PERM, it represents that it completed the labor market test and no willing and qualified applicants were hired.

273. DOL intended to certify these labor market tests through the PERM process in 60 days. This would best ensure that no major fluctuations in the market would change the results of a labor market test at the time of certification.

274. However, DOL now issues PERM Decisions more than 13 months —397 days—after the employer finishes the labor market test. By delaying this basic function for so long, the certification cannot take into account the market fluctuations that occurred during that year. And DOL's unreasonably delayed certifications will be based on a labor market test that is at least 14 months old. DOL's delays here wholly undermine the purpose of the permanent labor certification.

275. For example, if an employer filed a PERM in March of 2020 and DOL did not look at it until April 2021, the labor market test would show no impact from the COVID 19 pandemic. DOL's delays wholly undermine Congressional intent for a timely certification. Thus, their delays are unreasonable.

276. These delays in fact hurt the American labor force, which is the purpose of DOL's role in this PERM process.

*These delays impact the Beneficiaries' Health and Welfare*

277. A PERM delay impacts a beneficiary's health and welfare.

278. For most nonimmigrants lawfully working in the United States, a pending PERM provides no benefits. It must be approved for any extensions, work authorizations, or other interim benefits to apply.

279. Once approved it permits the beneficiary to file an immigrant visa and an adjustment of status application (if current).

280. If not current, it permits the nonimmigrant in the United States to have indefinite extensions of nonimmigrant status.

281. These impacts go to an individual very immigration status in the United States.

282. Without a PERM decision, Plaintiffs may have to leave the United States, causing family separation. And it is causing irreparable harm their careers.

283. The PERM delays therefore impact beneficiaries' lives, health, and welfare. They are not merely an economic regulation.

*The Delays Harm Beneficiaries*

284. The APA requires agencies to consider the impact of delays on the parties to the application: "With due regard for the convenience and necessity of the parties or their

representatives and within a reasonable time, each agency shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b).

285. DOL refuses to take into account the interests of the employer or employee who are the interested parties in a PERM application.

286. The OFLC Administrator admitted it gives no regard to the employer or employee's convenience or necessity:

> Q Does DOL have the ability to adjudicate these in a way that gives due regard for the convenience and necessity of the petitioning companies?
>
> A The convenience or necessity of a - - No.
>
> Q Does the Department of Labor give due regard . . . for the convenience and necessity of the beneficiary employees, when it's looking at how to adjudicate these?
>
> A No.

OFLC Dep. at 107:10-16, 107:22-108:1.

287. To the extent DOL is permitted to wholly ignore the convenience and interests of the party, DOL's delays greatly harm PERM beneficiaries.

288. First, it deprives noncitizens of the ability to apply for an immigrant visa.

289. Second, it deprives noncitizens who have immigrant visas immediately available of the ability to apply for adjustment of status, work authorization, and advance parole. This prevents them from applying for lawful permanent residency.

290. Third, it deprives certain nonimmigrants of the ability to apply for extensions of nonimmigrant status, which deprives them of work authorization, lawful status in the U.S., and may lead to family separation.

291. Fourth, it hurts noncitizen employees' careers by causing gaps in work authorization, limits an employer's ability to consistently promote noncitizen employees, and leads to disparate treatment of noncitizen and American workers.

292. Plaintiffs reallege here all claims of harm alleged above.

293. DOL's delays hurt PERM beneficiaries. And DOL expressly ignores any of their concerns.

*Expediting Adjudications will not Harm DOL's Interests*

294. DOL does not follow a first in, first out. There is no line. And it does not follow a month processing methodology.

295. Rather, DOL has no rhyme or reason to its adjudications. Ragusa Report (attached as Ex. B).

296. Thus, compelling adjudication will not cause impermissible "line jumping" because there is no line, line jumping is part of the DOL's process, and there can be no out-of-order adjudications when there is no order.

297. DOL further admits an order compelling agency action on this application will harm it:

> Q . . . If a judge said this is unreasonable, make ten decisions, would that impact the office's foreign labor certification?
>
> A . . . I would basically tell a staff person the judge's order these same cases be adjudicated. You are to go search for them in the PERM system, which would be in the waiting queue, and they would have to e assigned to an analyst and they would be worked immediately.

OFLC Dep. at 1345:6-21.

298. This would then take between 8 and 13 minutes for each application. *Id.* at 136.

299. It would have no negative impact.

300. Further, DOL has sufficient resources to make timely decisions on PERM Applications.

301. The chart below provides a comparison between the number of applications DOL has received in the past five fiscal years and the number of PERM applications it can decide in 46 weeks a year with 12 full time analysts and 6 part time (50%) workers:

| Fiscal Year | ETA 9089s Received | ETA 9089s Decided | 35 per day | 42 per day | 50 per day |
|---|---|---|---|---|---|
| 2017 | 105,034 | 97,603 | 120,750 | 144,900 | 172,500 |
| 2018 | 104,360 | 119,776 | 120,750 | 144,900 | 172,500 |
| 2019 | 113,014 | 102,655 | 120,750 | 144,900 | 172,500 |
| 2020 | 115,133 | 94,019 | 120,750 | 144,900 | 172,500 |
| 2021 | 120,660 | 108,264 | 120,750 | 144,900 | 172,500 |
| 2022 | 141,951 | 104,600 | 120,750 | 144,900 | 172,500 |
| 2023 | 158,987 | 116,427 | 120,750 | 144,900 | 172,500 |

302. Even taking off 6 weeks of a year to take into account federal holidays and leave, OFLC has sufficient resources to, consistent with its collective bargaining agreement, decide all PERM applications submitted with a very short backlog.

303. Further, DOL has taken steps at cost avoidance—such as emailing the certified PERM, rather than printing and mailing it—which gives them additional resources.

304. PERM delays are not a resource issue. Therefore, compelling DOL to decide Plaintiff's PERM application will not harm DOL's OFLC.

305. There delays are unreasonable.

306. These delays hurt Plaintiffs.

307. These delays are substantially unjustified.

**PRAYER FOR RELIEF**

308. This Court should take jurisdiction of this case;

309. Declare all delays beyond 60 days as unreasonable;

310. Order DOL to take administrative action on Plaintiff's pending application within 7 days; and

311. If DOL audits Plaintiff's application, order DOL to issue a final decision on the PERM application within 10 days of the Plaintiff's response to the audit; and

312. All other orders necessary for justice.

May 3, 2024

Respectfully submitted,

BERNARD P. WOLFSDORF (107657)
Wolfsdorf Rosenthal LLP
1416 2nd Street
Santa Monica, CA 90401
Tel: (310) 570-4088
bernard@wolfsdorf.com

STEVEN A. BROWN
Reddy Neumann Brown PC
11000 Richmond Avenue, Suite 600
Houston, TX 77042
713.429.4793
steven@rnlawgroup.com

*appearing pro hac vice*

KRYSTAL ALANIS
Reddy Neumann Brown PC
11000 Richmond Avenue, Suite 600
Houston, TX 77042
713.457.5703
krystal@rnlawgroup.com

*appearing pro hac vice*

s/Brad Banias
BRAD BANIAS
Banias Law, LLC
602 Rutledge Avenue
Charleston, SC 29403
843.352.4272
brad@baniaslaw.com

*Appearing pro hac vice*

Attorneys for Plaintiffs