IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

C/A No. 1:23-cv-03629-MLB

JADIEL BAR CARDOSO, ET AL.,

Plaintiffs,

vs.

JULIE SU, ACTING SECRETARY,

U.S. DEPARTMENT OF LABOR,

Defendant.

REMOTE ZOOM DEPOSITION OF

U.S. DEPARTMENT OF LABOR

By and Through its FRCP Rule 30(b)(6) Designee:

BRIAN DAVID PASTERNAK

DATE: March 4, 2024

TIME: 12:25 p.m. - 4:17 p.m.

LOCATION: All Parties Various Locations (Remote Zoom Deposition)

REPORTED BY: Lorraine B. Whiteley

Legal Eagle

P. O. Box 5682

Greenville, SC 29606

864-467-1373 / depos@legaleagleinc.com

This transcript may not be reproduced, emailed to another party or transcribed in any form or by any means, electronic, mechanical, photocopying, recording or otherwise, without the prior written permission of the Court Reporter.

A-P-P-E-A-R-A-N-C-E-S

For the Plaintiffs:

By: Bradley B. Banias, Esquire
BANIAS LAW, LLC
602 Rutledge Avenue
Charleston, SC 29403
(843) 352-4272
brad@baniaslaw.com
(VIA ZOOM)
By: Steven A. Brown, Esquire
REDDY & NEUMAN, P.C.
11000 Richmond Avenue, Suite 600
Houston, TX 77042
(713) 953-7787
steven@rnlawgroup.com
(VIA ZOOM)

For the Defendant:

By: R. David Powell, Esquire
ASSISTANT UNITED STATES ATTORNEY
600 United States Courthouse
75 Ted Turner Drive, S.W.
Atlanta, GA 30303
(404) 581-6000
r.david.powell@usdoj.gov
(VIA ZOOM)

Also Present: Edward Waldman, Esquire (via Zoom)

INDEX TO EXAMINATIONS


| BRIAN DAVID PASTERNAK, sworn | Page |
|---|---|
| Examination by Mr. Banias | 4 |
| Examination by Mr. Powell | 147 |
| Re-Examination by Mr. Banias | 156 |
| Reporter's Certificate | 158 |
| Attestation Page | 159 |


EXHIBIT INDEX

None proffered.

PROCEEDINGS

= = = = = =

(U.S. DEPARTMENT OF LABOR, by and through its FRCP Rule 30(b)(6) designee, BRIAN DAVID PASTERNAK, having been first duly sworn as hereinafter certified, testifies as follows:)

= = = = = =

E-X-A-M-I-N-A-T-I-O-N

BY MR. BANIAS:

Q All right. Good afternoon, Mr. Pasternak. Thank you for being here with us. My name is Brad Banias and I, along with Steven Brown who's also on the deposition somewhere, will be -- well, we represent the Plaintiffs in this case.

And thank you for being here remotely. I am hopeful that we can get through this in a rather quick manner. This is pretty dry stuff so if you need to take a break -- or a nap -- just let me know.

But before we get started, could you say your full name for the record, please?

A With spelling or without?

Q With spelling at the end, please. Just your last name is fine.

A Okay. Brian David Pasternak, P-A-S-T-E-R-N-A-K.

Q Great. And where are you physically located right now? What city?
A Columbia, Maryland, just north of Washington, D.C.
Q All right. And before we get into the substance, I just kind of want to do some introduction and explanations, answer any questions. So have you sat for a deposition before?
A Previously; yes.
Q Okay. Was that in a personal capacity with something not related to work or was it always with your role as a Department of Labor employee?
A Professional capacity.
Q Okay. Very good. And if you can remember, how many depositions have you done?
A Only a couple: One, maybe two.
Q Okay. And were those in the last five years, ten years?
A Ten.
Q Ten? Okay. Were either of those depositions designated as, quote, 30(b)(6) depositions?
A I couldn't -- couldn't recall.
Q Okay. Well, let me get to that in a second. Just so you know, you know, this isn't a game of "gotcha." I have no intent to try to ask questions you

don't know the answers to. That's not the purpose of this; this is a fact-finding mission for us.

If you answer yes or no, I do need you to answer verbally "yes" or "no" so that the court reporter can hear.

A Okay.

Q And if Mr. Powell objects, we'll let him make his objection for the record. And unless he instructs you do not answer, I will re-ask the question and you need to answer, and we'll deal with that with the court in motions, later on.

A Sounds good. Understood.

Q Okay. Like I said kind of in jest, if you need to go to the bathroom, if you need to take a break, if you need a snack, just let us know. Okay?

A Will do.

Q The other thing is from here, forward, you're not allowed to speak with Mr. Powell about the contents of this deposition. Okay? You can, you know, talk about the weather, talk about spring training, but -- and I trust Mr. Powell knows that, too; he wouldn't ask any sort of questions or lead you into that primrose path. But I just want to make it clear. Do you understand?

A Understood.

Q All right. So tell me what you understand a

"30(b)(6)" deposition to be.

A I'm answering questions about factual matters related to the -- the -- the case at hand, based on my experience, knowledge of administrative programs that I have. So I -- I mean that's -- I've just been called in to answer questions. I don't -- I don't -- I don't have the expertise of law so I just simply state the -- the things, the facts that I know is, as best I can.

Q Okay. I do want to make sure we're on the same page with this. So Rule 30(b)(6) of the Federal Rules of Civil Procedure allows plaintiffs to identify topics that the Agency itself -- different than Brian Pasternak, right -- will designate proper employees to answer on behalf of the Agency.

So testimony in a 30(b)(6) case is testimony of the Department of Labor, not Brian Pasternak. Do you understand that distinction?

A Yes.

Q Okay. And are you aware that the Department of Labor has identified you for three topics to discuss today?

A Yes.

Q And have you looked at those topics?

A I have.

Q Okay. And do you agree with the Department

of Labor that you are knowledgeable and able to answer those questions?

A Yes.

Q Okay. Good.

What have you done to prepare for today's deposition?

A Reviewed the questions, conceptualized what I think will be appropriate factual responses to them, maybe compiled some data and reports to support answers that I provide. Consulted with my legal counsel.

Q Okay. When you say you compiled "some data and reports," can you be more specific? What does that mean?

A To answer questions about, say, the proportion of costs related to our budget spending on PERM that is information that I have to obtain from budget reports. So compiling information or to answer your question would be things that are readily available to me that I can pull from, to -- to answer your question.

Q Okay. Have you provided those to Mr. Powell?

A No.

Q Okay. All right. And you mentioned legal counsel. Is that internal Department of Labor kind of in-house counsel or is that someone you hired separately?

A It's a Department of Labor Solicitor, also.
Q Okay. And who did you speak with there?
A Mr. Waldman, who's on here, and -- and Mr. Jeremy Marshall who works with Mr. Waldman.
Q You said "Jeremy." What was the last name? I'm sorry.
A Sorry. Marshall. Marshall. M-A-R-S-H-A-L-L.
Q All right.
A Yeah.
Q Okay. So now I want to discuss with you kind of your background -- and again, biographical information, just so we're all on the same page. So why don't -- I find it easiest just to let you say, hey, can you tell me your educational and professional background, and let you go. And if I have any questions at the end, I'll just ask. Would that be okay?
A Okay. That's fair. Sure.
Let's see. Education, then to work experience. Bachelor of Arts in History, University of North Carolina at Wilmington, 1993. Masters of Public Policy from the College of William and Mary, 1997. Following graduate school, was employed as a policy adviser for the State of Maryland, the Governor's Workforce Investment Board. The Governor at that time

was Parris Glendening.

Served a few years there and in that capacity and then became a Senior Policy Adviser and then Deputy Assistant Secretary for Employment Training with the Maryland Department of Labor, Licensing and Regulation.

The division was responsible for administering the employment and job training grant funds that come from the United States Department of Labor to the State. And, you know, among the various programs in the division was -- Foreign Labor Certification was a part of that.

Was in that job starting in January of 1998 and then left to come to the federal service, United States Department of Labor, Employment Training Administration, in May 2003. And at that point I was in the Office of Performance and Technology. Was again sort of a Senior Program Analyst, then graduated to become Supervisor.

Basically, my responsibilities there were to manage the production and performance measurement system for the Employment Training Administration's employment and job training grants to all the states, State Departments of Labor. That was about a $3 billion investment. It was me and a team.

And then around June 2006, I became a Senior

Manager hired in the Office of Foreign Labor Certification and originally hired as a Program Director. That's kind of the informal title over the PERM and Temporary Labor Certification programs. And served in that capacity for many years, between managing both programs.

And then, as the office had more resources for a while, you know, a dedicated Director of PERM was hired and I was focusing on temporary visa programs. Ultimately -- oh, let's see.

Around October 2018, I became the Deputy Administrator for the office and then sort of acting Administrator for a year, so. And then by January 2019, I became the Administrator of -- of -- of the entire office, just responsible for all of the, you know, policy, regulations, the -- the budget preparation, spending, contracts, correspondence, resource allocation for managing all of the non-immigrant and immigrant visa programs that we had, plus the prevailing wage programs.

So I guess roughly, to summarize it, I've -- I've been in this Foreign Labor Certification space at the federal level consistently since June 2006. But for a while, at the State level when I was there at the Department of Labor, Licensing and Regulation where we had foreign labor kind of under us, probably another

three years on top of that, so. Yeah.

Q Okay. You sound like the perfect man for the job.

A I don't know about that.

Q So -- and I know you said this in your answer here. But can you just say concisely, what is your current title?

A Oh. It's just the Administrator for the Office of Foreign Labor Certification. Yes. Yep.

Q In the Department of Labor hierarchy, who is above you? Who do you report to?

A The -- so we -- I report to a Principal Deputy Assistant Secretary in the Employment Training Administration, and that individual reports to the Assistant Secretary for the Employment Training Administration. To the best of my knowledge, the Assistant Secretary reports to the Deputy Secretary of Labor. Yeah.

Q On that chain, going up, where did the -- are either of those three people you just referenced -- or three positions, I should say -- are those political appointees or are those career civil servants?

A The Deputy Secretary -- the Principal Deputy Assistant Secretary for ETA is not a career position. It's a -- I don't know the classification of it. But

it's definitely not confirmed by the Senate, but it's a -- sort of a Schedule C or something. But it's more of a political position.

The Assistant Secretary requires confirmation from the Senate. Yeah. And the Deputy Secretary is a little bit the same way: Their confirmation by the Senate and the Secretary of Labor is confirmed. Yeah.

Q And all of these positions are currently filled?

A No.

Q Okay.

A The -- yeah. The Assistant Sec -- the only one that's not is the Assistant Secretary for the Employment Training Administration. The President put a nomination forward many years ago but that -- that has not come through.

Q Gotcha. And as the Administrator of the OFLC -- for the court reporter, that's Office of Foreign Labor Certification -- who is directly -- who are your direct reports? Who reports to you?

A I have two Deputy Administrators, so. There's two positions under me that are two Deputy Administrators. The individuals by name, one is Brandt Carter: B-R-A-N-D-T, Carter. The other one is Kathy Valerin, V-A-L-E-R-I-N.

Q And do one or both of them oversee the office that's going to be responsible for doing the PERM?
A Brandt. Brandt Carter is the -- is -- is -- or the Deputy Administrator which sort of focuses on, you know, what we'll call processing center operations. So he is sort of the -- the overall Director for all of the immigrant/non-immigrant visa programs.
Q Okay.
A Yeah.
Q And --
A And he --
Q -- is there --
A Sorry. Go ahead.
Q Go ahead. I'm sorry. I didn't mean to interrupt.
A No, I think maybe the next question you were gonna ask is whether there is a Senior Manager in charge of the -- solely for the PERM program. And that position is vacant. But Brandt Carter was the PERM Program Director so. He has -- he's the Deputy Administrator now, and so he's gonna be trying to fill his position.
Q Gotcha.
A Yeah.
Q Okay. Does your office -- I should say you, as the Administrator, do you provide program leadership

and policy guidance through the PERM process?
A Yes. For all of our programs, really.
Q Okay. And does your -- when I say does "your" office, I guess I should reference: Does OFLC develop regulations and procedures to implement the responsibilities of the Secretary of Labor under the Foreign Labor Certification programs?
A Yes.
Q Okay. And have you, personally -- or I shouldn't say personally. Excuse me. Strike that.
Have you worked on notices of proposed regulations?
A Yes.
Q Okay. And in this role, are you -- have you drafted documents for filing in U.S. District Courts?
A No. I -- that -- our Solicitor's office would likely do that. I do not draft documents to file in court other than Declarations and that sort of thing.
Q Okay. Have you drafted Declarations for filing in federal court?
A Yes.
Q Okay. How many have you done in the last let's say five years?
A Maybe ten.
Q Okay.

A Not that many.
Q Not that many. But you would -- you're not surprised when you're asked to do it, but it's not every month?
A No. It's just -- you know, I feel like it's a part of the job, if I have to do it. But it is not something that we commonly do.
Q Okay. Are you aware of litigation that relates to the PERM process around the country?
A I don't -- I think maybe you have to be more specific with the question. I'm not sure what you're asking, sir.
Q Completely fair. I should have said this at the beginning: If I ask a question that makes no sense, just say, hey, Brad, that makes no sense.
A Yeah. I just need to figure out how specific you're talking about. This --
Q Yeah. No. I --
A -- specific case?
Q I'm just trying to get a feel for what your job as the -- you know, the Administrator is. And it sounds like you are involved in litigation when it comes against programs that you oversee. Is that correct?
A Okay. That -- yeah. I mean the -- the lawsuits are come -- would either have myself named on

them, they could have my Principal Deputy Assistant Secretary's named on them, the Secretary of Labor named on them.

But they're all being sort of handled by our Solicitor's office so they -- they would keep me informed if they need me to be involved in some way through like a Declaration or something around it.

Q Okay. And if your -- if you sign a Declaration, that mean you've read it?

A Yes.

Q Okay. And you've edited it?

A Yes.

Q Okay. And I know this is a silly question to ask, but when you sign Declarations under oath, you're telling the truth; correct?

A Yes.

Q Okay.

Okay. Have you ever been arrested?

A No.

Q Okay. Have you ever lied to a court?

A No.

Q Okay. And do you intend to tell the truth today as we go through the topics?

A Yes.

Q Okay. Well, we're going to go ahead and jump

into kind of the substance here. And I'll let Mr. Powell -- I'll kind of give little bookmarks here, say topic one, topic two, to make sure were on the same page.

So we're going to start with topic one that's been identified generally as PERM processing. And for purposes of the record, can you tell me, in your words, what -- when I say "PERM," what is PERM?

A It -- PERM is a -- it's kind of a little bit of a term of art for us. PERM is an acronym. Actually, it's called Program Electronic Record Management system, which doesn't really mean much; it's just sort of the technology platform that's used to receive applications from employers who are sponsoring or requesting to sponsor foreign beneficiaries for permanent employment in the United States.

So when we think of and talk about the concept of PERM, the acronym is actually referring to a technology platform. But it's -- it's kind of colloquially referencing the permanent, you know, immigrant system in this country under the Immigration Nationality Act that really, in our world, has two big components of it.

One is, the employer has to obtain a Prevailing Wage Determination for the job, and then they

have to go through pre-filing recruitment, other types of documentation steps, to then file a PERM application with us, so.

When I hear people say PERM, it makes me think of a technology platform. But I understand it is the green card system they're talking about.

Q Okay. So if we use the word Labor Certification Application, is that a meaningful term to you or -- because I do want to distinguish between the technology and the actual application.

A Yeah. If -- if you say PERM Labor Certification, I'll know that that is the actual certification we're providing. If you say PERM system, I will know that that's the system.

Q Okay.

A That's the technology. Yep.

Q Gotcha. What is the purpose of the PERM Labor Certification process?

A Well, it's -- it's to carry out, really, the -- the statutory mandates that are provided to the -- to the Labor Secretary from the Immigration Nationality Act which really doesn't permit the admission of a foreign beneficiary unless the Labor Secretary can certify that a qualified American worker is not available for the position at the time and place needed by the

employer whose sponsoring, and then that the terms of conditions of employing the foreign beneficiary won't adversely affect the wages and working conditions of similarly-employed U.S. workers, so.

Our process in PERM is employer-based; it's employer-focused. It's focused on its job opportunity, its terms and conditions, in order to determine whether or not no American workers are available and not going to be adversely affected.

Q You mentioned kind of two statutory goals that you say the INA looks to the Secretary of Labor to enforce. Is that correct?

A Correct.

Q Okay. Does the INA -- or does the Department of Labor have a role in enforcing the American Competitiveness in the 21st Century Act? Or AC21 is what it's commonly referred to.

A Pertaining to which part of it?

Q To the portability provisions that are related to PERM, to the additional extensions that are related to PERM.

A Well, you know, I -- I mean we do not get involved. We don't really -- we don't collect information beyond sort of identifying information for the foreign beneficiary and their qualifications for the

job that the employer's trying to sponsor them for. We don't have a statutory mandate to look at visa admission status. Our office really doesn't have much expertise or knowledge into the -- in those things, at all.

So the -- the quick answer is, no; we don't have any role around -- around the visa admission status or the current status of foreign beneficiaries.

Q Is the Department of Labor aware of the consequences of a PERM labor certification under the Immigration Nationality Act?

A It -- generally. And it's -- honestly, it's sort of no -- I won't say it's no different. But it's more -- when we're administering non-immigrant visa programs like the H-2A or H-2B, these are program -- those visas are for temporary non-immigrant purposes.

So when the visa expires, we know that there's a certain amount of time that workers are afforded to leave the country. Right? To -- to orderly make them -- make their way out of the country.

We -- we are generally aware that employers who may have workers that they are employing in H-1B visa status, or potentially like L-1s, could, based on the -- the timing of filing, a PERM application could extend those, those time frames. But we're not involved in the extensions or anything, and employers make independent

decisions about when to do those filings.

Q And I want to be careful how I ask this question. You mentioned the H-2A and H-2B program.

A Yes.

Q If one of those temporary workers absconds, and I understand that's a term of art under the statute and under the regulation, does the employer have a duty to contact Department of Labor?

A In those programs, because there's also a visa status assigned to the beneficiary H-2A or H-2B visa, the employer is responsible for reporting terminations and abandonments to our office and also to the Department of Homeland Security because the Department of Homeland Security really deals with the visa status of a worker.

And, obviously, for our benefit, we are -- we have a wage/hour division that enforces those temporary labor certifications that may call into question the employer's obligation to offer, for example in H-2A, the three quarter guarantee on the work contract and, also, whether the employer is in fact required to pay the outbound transportation and subsistence for the worker back home, you know.

So we have a different --

Q The reason -- I'm sorry. Do you have a

different reason for why we receive those notices than, say, what DHS may do with them? And again, I'm not going to go down the H-2A, H-2B rabbit hole too much because it's a very different program that --

A Because the questions here were for PERM. Yeah.

Q They will be.

When you say you have a wage and hour division that enforces H-2A and H-2B, what do you mean by that?

A The -- the wage/hour division has authority under our regulations. In H-2A, they have authority under the statute. In H-2B, they have authority delegated to them by the Department of Homeland Security to enforce the terms of the labor certification that we've issued.

So they have a right to investigate employers randomly, in a targeted fashion based on complaints, to determine whether or not employers are actually carrying out the terms and conditions of the certification that they are being given for their worker -- for their visa workers or the visa holders, the H-2A or H-2B visa holders, but also if there's any U.S. workers that are in what's called "corresponding employment," so those foreign workers on -- on those work contracts.

So their mandate is really either from the statute or it's been delegated because the statute sort of granted it to the Department of Homeland Security, that they delegated it to the Wage/Hour Division.

And that's about as much as I can say on that because I don't -- the Wage/Hour Division does not report to me. I don't know much more about it, so.

Q And this will be my last question on this H-2A/H-2B issue, I promise: When you say that the Wage; and Hour Division has the authority to go out and do investigations, is that at least partially designed to protect the foreign national worker?

A I think that -- I do not want to speak for Wage/Hour. They go out and enforce the terms of the work contract for everyone who's employed under the work contract, they -- irregardless -- regardless of -- of visa status.

I mean they just simply do not -- when you go into -- when Wage/Hour goes on site, they are enforcing the terms of the contract for everyone who's under it. So that may include, certainly, visa holders. Yeah. To ensure they're getting the -- the work guarantees they've been -- they've been promised and they've been certified by -- by our office. Yeah.

Q So I think the answer is yes, then: That

Wage and Hour Division is authorized to enforce labor protections for foreign nationals?

MR. POWELL: I'm going to object. Beyond the scope, and asked and answered.

BY MR. BANIAS:

Q You can go ahead and answer, Mr. Pasternak, please.

A Yes. To the extent that H-2A workers or H-2B workers are employed in the country on the terms of the work contract and Wage/Hour conducts an investigation or enforcement of the work site, they're going to ensure that those foreign workers are receiving the work guarantees no differently than any other worker in corresponding employment is.

Q Okay.

I mentioned the AC21. And it's probably the same answer, but did the Department of Labor have a role in enforcing the American Competitiveness and Workforce Improvement Act or -- commonly known as ACWIA?

A Well, I'm not -- we're not the office in charge of enforcement, so; we just handle the labor certification side of it. The Wage/Hour Division does have some enforcement responsibilities under the H-1B visa program.

So to the extent that the -- the AC Act gave

them -- had more requirements or created conditions under which they could do enforcement actions or investigate, then, yeah; they would. But that's not going to be something I can talk about other than just knowing that they have some enforcement responsibilities given to them by the statute from -- from the H-1B program.

Q Okay. Let's get more specific into the PERM process. The PERM labor certification process you described serving two purposes: One, to ensure there's no qualified American workers and, two, to protect the work conditions for American workers. Is that a fair summary?

A Yeah. I mean we're ensuring that the terms of the employment, the wages that the employer's gonna offer, the other terms, our -- you know, not -- are not going to adversely affect similarly-employed American workers. So I think that's fair.

Q Okay. How does -- within the confines of the PERM labor certification process, how does DOL, in your office, ensure that employment will not adversely affect the wages or conditions of workers similarly situated in the U.S.?

A Well, certainly in the wage piece, we have an entire business process set up for employers to receive Prevailing Wage Determinations. It's a process that has

existed for -- since, I think, the late 1990s. And employers are required to specify a job opportunity, outline the job requirements, education, experience, training, that sort of thing.

And in the PERM program, depending upon the requirements, they -- they may receive a Prevailing Wage Determination based on sort of one of four levels. So in our view, we believe the wage part of the statutory determination can be satisfied by the employer obtaining a Prevailing Wage Determination and offering no less than that.

Working conditions and terms of employment -- you know, I mean obviously we're focused a lot on whether or not the -- the terms and the qualifications of the job are normal to the occupation.

If they are beyond the normal, employers have a right to request a business necessity justification saying, you know, in our business we have specialized software or whatever that, you know, requires workers to be able to perform these tasks and that sort of thing.

So there's opportunities for employers to -- to demonstrate business necessity. And, you know, as long as they're able to justify those requirements -- it could be a foreign language requirement or something that's inherent to the job, you know -- really, we are

looking at whether we -- we, along with the employer, can -- can fundamentally see whether those are sort of normal and accepted requirements.

And so excessive things might be, you know, the job normally requires a Bachelors but in our company we require a Masters degree; they could demonstrate that it's a business necessity to have one. We still don't believe that that's adversely affecting American workers, if it's -- if it's normal for the -- for that company, so.

And all that's kind of disclosed on the PERM application, as well. So that's kind of how we sort of satisfy those: By looking at those job requirements and terms that they're offering on the application.

Q Is it a fair summary to say that you protect the conditions -- work conditions for Americans, loft workers -- by ensuring those exact same conditions are offered to foreign nationals?

A Yeah. I mean the -- the -- the reverse is kind of like making sure that you're not imposing on American workers, particularly because it leads to the advertisements. You're not imposing requirements that are excessive in order to sort of weed out or screen out, you know, otherwise potentially-qualified American workers for the purposes of hiring a foreign worker.

So I think -- a little bit -- sort of they go together a little bit with the recruitment process because I think we -- we're trying to help the employer understand their actual minimal requirements for the job in order to determine if there is a qualified American worker and -- yeah, you know.

Q Is there a different office or is it your office that enforces the terms of those certifications?

A To the best of my knowledge, there is not. The Wage/Hour Division does not have statutory responsibility over the PERM labor certifications outside of the Fair Labor Standards Act.

Q What are the obligations under the Fair Labor Standards Act?

A Minimum wage law. This is something that I will not -- I'm not an expert on. But they enforce the terms of federal minimum wage protection and that sort of thing. But they -- they do not have authority to enforce the terms of a PERM labor certification that's granted.

Q So if the -- and I'm not -- if this is the wrong term, please tell me what you would prefer me to use. If the beneficiary or the employee of a certified -- labor certification application goes to work and the conditions are completely different than what were certified, does that individual have a remedy with

the Department of Labor?

A They do have a remedy with my office. They may file a complaint with the Inspector General. They could -- they could file a labor complaint with Wage/Hour, but Wage/Hour would likely go in and look at -- look at the other terms of the work around the Fair Labor Standards Act. I honestly do not -- can't answer that question.

Q Okay.

A Sorry.

Q Let's take a step back. And I understand that this is going -- this might be what we talk about for the next hour or so. Can you describe to me the path that -- the path to labor certification, from the initial filing by an employer to the certification?

A Okay. So I believe that there are five basic steps when an employer submits an application to when we are issuing a certification or issuing a case action, but I'll certify everything, but when we're issuing a case action on the application. I mean apart from being selected for -- for audit examination.

The first step, once the application is submitted it will receive an electronic sponsorship questionnaire via email which gives the employer 30 days to respond.

Basically, the email is going out to sort of -- you know, they -- sort of -- it's kind of an integrity check, meaning it's -- it's verifying with the employer. Because a lot of our applications are filed by immigration counsel, and agents were just going out to the employer and verifying that they are aware that an application has been filed on their behalf, confirming, you know, the job opportunity, and also to verify that they're sponsoring a foreign beneficiary for permanent employment.

If the system -- and this is all electronic, so. If the system does not receive a response in seven days, the employer will receive another email reminding it to respond. Another three reminders every seven days could be sent to the employer until the 30-day timeframe elapses.

If the employer responds or not, the system -- the PERM system -- records the responses or non-response in an electronic case file which is reviewed by an analyst once it's assigned to an analyst. And that sponsorship process kicks off very quickly after the case is submitted.

So once it's completed, and sort of due to the high volume of pending permit applications we have, the application will then remain unassigned, kind of in a

waiting queue, until the month in which the PERM application was ready for assignment can be assigned to our analyst.

So I think, you know, step number one is you -- we sort of are dealing with a sponsorship review process which is electronic. No staff are involved there. And then once it's completed, it sort of sits in a waiting queue, waiting for the resources to become available to -- to work that month.

The second step is sort of case prep for assignment. While our analysts are fully-engaged, working down the current processing month that we're on, we take a -- a data set of all the pending permit applications for the -- for the next month of assignments. They're extracted -- a subset of data from them, not the cases; there's just a subset of data.

And we use an automated matching routine that, you know, filters the data set based on any predetermined audit tiers. Certainly, anybody -- anyone that sort of fails sponsorship review could have other integrity issues.

An example might be the Office of Inspector General has requested, you know, based on an active investigation, that a -- that a case or -- maybe a case or to be placed on hold, which they have the authority to

do. And so that's all happening. Again, no cases have been assigned as yet to any analysts while the analysts are in full-time, productive work.

And to sure -- to ensure like consistent processing, all of the matched PERM cases -- so these are all the cases that match one of the audit tiers or -- or have some other integrity issue, they're placed in an assignment queue for contractor processing analysts to handle, and then all of the non-matched PERM applications are placed into an assignment queue for the federal immigration program analysts to handle.

So that the end of that second step really prepares everything for the third step which is assignment.

So when the pending PERM workload for the current processing work month reaches -- you know, the goal is around a thousand or less applications left. The supervisor which is like certifying officer, or a lead analyst, will start electronically assigning out all of the non-matched pending PERM applications for the new processing month that's coming as equally as possible, to -- to all the available immigration program analysts.

If applicable, like an analyst may receive a group assignment of PERM applications filed by the same employer during that processing month. We have found

that that's actually more efficient and creates a better consistency in the standard of review. The contractor team lead will receive and assign, in a similar manner to their contractor -- contractor processing analyst, all of the matched PERM applications.

So at this point, analysts have their cases, they're closing out the prior month and they're starting to go into the new month. They're free to organize and utilize the electronic assignments in any way to make -- for that new month, to make their processing easier, to achieve their daily production standards.

And then four -- step four is -- is the review phase. I mean before working new -- newly-assigned PERM applications for the month, the analyst assesses the status of other assigned PERM applications from the prior month that remain pending, and they have to include a case note as to whether it needs to remain pending final action.

And an analyst basically performs a review of the PERM application in the areas of completeness and accuracy, looking at job qualifications and requirements, kind of like what we were talking about a little bit around whether they're normal to the occupation.

They're looking to make sure that the prevailing wage that's being used with the job is the

correct one, it's valid, that it's been used to complete all the recruitment steps, the -- the two mandatory ones, the State job order and the other discretionary ones. And they're looking to make sure that the foreign worker's education, training and experience meet the employer's actual minimum requirements for the job.

So there is a reference checklist that's available to the analyst, but that's just a helpful tool. They're not required to complete those checklists, in part because we have some pretty experienced people. And so it's actually a lot more efficient for them to review these applications and sort of make a decision on them.

And then, of course, once they finish that review, they're ready to issue a -- a decision. So the immigration program analyst will make a decision in the electronic PERM system to certify, deny, audit or withdrawal. Withdrawals are usually based on the employer requesting it. If our analysts don't -- they're -- they don't unilaterally draw cases. We don't get a whole lot. But they're usually based on the employer's request, anyway.

All the decisions that they issue at that point are recorded in the electronic case file in our PERM system. And where email addresses are provided on the PERM application, they are issued electronically both

to the employer and the employer's authorized representative by our correspondence team. And that comes out of a daily printing queue.

So the analysts are making these decisions and they are effectively electronically kind of sending them to a printing queue area for a group of three -- typically, three to five contractors, to actually send out the correspondence. And that final step for certification usually is done the same day or kind of next day.

Q Okay.

A I think I'll pause there.

Q Take a drink of water.

Okay. So, thank you. So I want to kind of go back through those and just add a little -- some questions.

A Okay.

Q So the PERM system, electronically automated, is responsible for step one: That is, the -- sending out a document to the employer saying are you actually doing this, and then receiving the response?

A Yeah. Sponsorship; yeah.

Q Okay.

A Yes.

Q So it would seem to me that if there's any

delay in that process, it would be the responsibility of the employer.

A If -- if there is; yes. Exactly. I mean the -- our experience is typically employers know who they're sponsoring for permanent employment, so. I mean it -- it is something that is just a -- a -- a good integrity check to do.

But again, we give them 30 days. But, honestly, employers routinely respond quite quickly and it's just a -- again, because we have so many cases in our system, the 30-day time period doesn't delay anything because they're pretty much getting through the sponsorship process electronically and then they're sort of sitting in a waiting queue. Yeah.

Q Okay. So step one -- and again, I just want to make sure. This is the computer working, not necessarily contractors or employees?

A It's -- it's a -- it's a computerized email that goes out immediately and it sends the employer to like a questionnaire that they complete. And they submit it. And if those questions/responses -- or non-responses -- obviously, our server coordinates against the electronic case file that's associated with their submission. Yeah.

Q Okay. And then so once the employer sends

back in a response, it automatically goes into step two, as you described it?

A No. The -- the two is actually when we're ready to prep cases to start working them. So the -- what I was trying to say is when they're done with that completion step -- because we had so many cases in -- that have been filed in the system, they effectively are kind of sitting in a big holding queue or waiting queue, at that point.

Nobody -- nobody's doing anything with the case because the analysts are all working the current processing month and we're waiting to queue up the next processing month because of all the volume in the system. So they're basically kind of sitting in a -- in sort of a -- like a holding pattern or a waiting queue.

Q So -- okay. So after the employer sends in their response, I mean how long does it typically sit in that waiting queue?

A Well, so we just moved into February 2023 filed cases last week. And our analysts have been actively working February filed cases very quickly, when they get assigned. So once the assignments go out, the cases are worked relatively quickly.

So that means, for example, that case filed in February 2023 got through -- let's say hypothetically

it took them 30 days to get through the sponsorship process. So we're into April of 2023, that they finish the sponsorship review step. So from April 2023 until last week, they had to sit in the waiting queue.

Q Okay. So using that example, nothing's happening with those applications while they're there?

A No. There's nothing we can do with them. They're just -- because we're working all the cases in the current month and we're watching the analysts's production to get under -- or close to or around a thousand.

And, you know, a thousand is roughly about three to four days -- I don't know how many analysts I've got. Three to four days of production work. So that's when we're ready to like start to assign new cases out. So we -- there's really nothing going on probably for -- I mean now we're up to, what, about a year or something on these cases, 11 months.

Q So step two, where they get -- as I understand it --

A Yeah.

Q -- there's more pre-processing to get the ones that you guys identified as problematic, and then the ones that don't match some sort of OIG hold or some sort of integrity measure, you --

A Okay. I'm sorry; do you need me to repeat that one? Because I'm happy --

Q Well, let me -- just let me try again. So when does that happen? When does step two happen? While they're in this -- through a hold or when they're assigned?

A So -- okay. So your question -- so, for example, we just moved into February 2023 cases last week. So what we were waiting for was for the January 2023 cases to get down to a thousand. And when they get down to a thousand, we start assigning out.

But several weeks in front of that, we will start to go through the motions of identifying the February 2023 cases. So that -- that case was filed in February of 2023. By about the middle to the end of February this year, we were starting to pull those cases out of the waiting queue.

I mean they -- they weren't technically out of the waiting queue. We're pulling an extract of data from that queue so that we could get a sense of the volume that was filed in February of 2023. And that's when the matching is kind of done, sort of going outside the system -- because we use access databases to do all of that. We're running -- matching routines against them to see if they hit any of like our audit tiers or the

integrity -- like the IG thing I was mentioning.

So they -- they are pulled out. And then they are run against a matching routine. And that would create a matched list and a non-matched list. And, yeah, the matched list goes to the contractors -- will ultimately go to the contractors -- and the -- the non-matched list will go to the federal stack.

Q So by the time it's assigned, that's already happened. It's just kind of --

A Yes.

Q -- pre-processing for assignment?

A It is -- it is case -- I call it case prep for assignment. That's -- that's what we call it.

Q Okay.

A So it's basically trying to do -- so -- and, honestly, it's to save -- the other consequences, I'd have to have every analyst do it as they are getting an assignment, which is horrifically inefficient.

So to pull an extract of cases out of the system to run the matching routines against them while they're already fully-engaged working the current month, allows us to make the assignments out so they just roll into the next month. That's the purpose of doing it; yes. But it is definitely done before and completed before those assignments hit them.

Q Can I ask why the matched cases go to contractors and the unmatched go to the actual DOL staff?

A Yeah. Well, that's for efficiency purposes, too. In our world, a labor certification decision is an inherently federal function. So when we have matched -- you know, matched cases, those may be cases that, you know, we may be interested in selecting for audit, but they could be cases placed on hold like -- I'm just using the IG as an example, but it can happen.

Basically, to -- to sort of prep the case for like an audit letter, to go research whether or not and go check to make sure is this still really on hold with the IG or there's some other question, that's a lot of administrative work that I would much rather see a contractor do rather than a fed do. And what I'd like to do is focus the feds on reviewing those cases and taking the case actions.

So I think, you know, for all -- for all intents and purposes, the contractors -- we try to get them to focus on cases that while we need some administrative work to sort of double-check or, you know, just to make sure and verify, and contractors are performing a review of that case anyway because all of their work has to go to the feds to be validated and moved out.

So it's just easier for us, from the business process standpoint, to basically tell the contractors, look, these require a little bit of administrative action. Please focus on this, plus review the case, and then send us the recommendations and we'll take a look at it. And then just let the feds focus on the -- what I'll call the non-matched cases and actually perform the review and issue the action.

Q Is the regulator -- or the applicant's employer aware that it's gone one way or the other?

A No.

Q Okay. Does the unmatched cases, in your experience -- or, excuse me -- the matched cases take longer to do than the unmatched cases? And I don't mean just administrative work, I mean the overall processing time.

A The overall processing time? To clarify --

Q If two cases -- let me give you a hypothetical, if that's okay. If two cases get filed on January 1st, one goes the matched route, one goes the unmatched route --

A No.

Q -- are they likely to get a decision at the same time?

A No. Because there -- there may be material

differences between them because of the matching process that the contractor needs to take some different action with them or recommend a different action to the feds, and they may have to spend time doing some research of those case facts, whatever it might be. Yeah.

Q Okay. And those disparities aren't reported anywhere?

A Disparities? I mean it's just work -- it's just work that's being done. So it's like if it's a disparity, it's a necessary step to actually have the contractor verify that it needs to stay on hold. And it may take a week or two, possibly, for the Inspector General to tell us, yep, they'll stay on hold or whatever it might be.

And, plus, they're asking the contractors to go ahead and draft like the audit letters and things like that. So in the -- in the end, somebody's got to draft the audit letter. I mean it's like -- so if I'm going to have somebody do it, I might as well have a contractor do it, not spend the feds' time kind of doing that on -- on these matched cases. And the feds can focus on the cases that need to get a pure review.

Q In this separation between the matched and unmatched, is there any percentage that you want to call matched? In other words, you say we want 15 percent of

this batch to go to the matched category, 85 percent to go to the unmatched?

A No.

Q What is the experience --

A Can't do it. Can't do it because we don't know what is coming in every month, don't know the volume that's coming in every month. We don't know the circumstances of the cases that are coming in every month. So we don't sort of -- we can't speculate as to how many or what proportion of cases are going to be flagged or be matched.

And then even if they are, we can choose -- particularly for like the audit tiers and things like that, we can choose to audit some, none or all. It's kind of like -- it's a -- it is, in essence, a bit of a balancing act because the extent to which we make decisions about what proportions of cases to audit.

I have a separate team that work audits. And so we don't necessarily need audits going out for two or three years, so we're pretty careful about doing that. And, plus, it's not -- you know, it's not always the case that when we say, oh, yeah, we're gonna audit a hundred percent of this kind of case that hits this flag or this tier or whatever. It's possible that it's like four cases filed that month.

Then other tiers, it could be like 600. And it's just -- for us, we can choose to ratchet up or back like the -- the percentages. They hit a tier. Some -- in some years, it could be a hundred percent. And in some years, it could be 30 percent or 25 percent or something like that. In some years, we deactivate tiers all together.

So even though you might have, you know, a matched list, they may not be actually selected for -- for audit. So the -- there is a -- there's kind of a balance that -- that we have to play with the -- the staffing on the audit line, for example, to make sure that they're not getting completely overwhelmed with all of the audits.

Because, in essence, sometimes when you audit on a particular tier, you -- you don't need to audit everything for a long period of time and you may select cases for a period, and then you're satisfied that there is some compliance here. Which is, really, what we're trying to do, is just trying to assess compliance. That's all.

And so we don't need to necessarily keep auditing things over, you know, really, really long periods of time. But -- yeah.

Q So you were describing --

A Sorry. I didn't answer your question. You asked about percentages. My experience has been that we have been sort of fluctuating between -- anywhere from ten percent to 17 percent of the, you know, incoming cases that are being flagged and selected for audit.

It -- in other words, it is not an overwhelming majority of the work load in PERM. The -- so it's -- it's just not. And I think that we've been sort of comfortable with that. But it -- it -- it goes up and it goes down, and it's -- it's down right now, so. It's just not -- it's not a high proportion.

Q I think you said that you could change the audit tiers each year. Is that a yearly decision or is that a monthly decision or a quarterly decision?

A It's sort of an as-needed decision. There's no timeframe to it.

But, you know, the -- the -- the Director, the Program Director or -- and the certifying officers or the supervisors, particularly the one in audit who was actually conducting audits, is, you know, periodically gonna provide feedback about compliance and kind of say, you know, it looks like we're getting pretty good compliance here, you know, maybe we ratchet this back some. They may make recommendations.

It's kind of a free-flowing discussion.

There's no sort of rigid structure to it because I mean at the end of the day, we have the reg or the authority to audit cases at -- at discretion, based on criteria -- and, also, randomly, for sort of quality control purposes.

So I feel like it's all a very discretionary activity with -- you know. Again, the thought is that the -- the balance -- and maybe if you were, you know, thinking about one kind of limiting factor to auditing things like that, is sort of the -- you know, the amount of work that's going into audit.

Q So if a case gets sent -- gets flagged, goes to the contractor, the contractor writes up the audit letter, sends it back to DOL staff, does that audit letter go out immediately or does it wait until -- well, I think you've been using the term "processing month."

A Okay. So they're all in the same processing month. So if the contractors are sending back-up through their team leads over to us, the whole list of cases that they've made all these recommendations on, those get assigned to feds to take a look at them.

Sometimes all of the contract -- because right now the matched list is really small, like one or two contractors are working this thing. So it's not a really big number. And so there's like one fed who will

be designated, maybe one or two if that person's out, to kind of handle the contractors' recommendations as they're coming through.

As long as it's all in the same processing month or even, you know, they're -- it's one of the earlier ones, then all of a sudden the IG, you know, has said, nope, you can release this, for example. And it could be an older case. It'll come back through and it'll get worked.

So I think we try to make sure that the -- the core analysts have their set non-matched work load that they're working on, try to have the contractor issues come back through to one or two designated people. But it doesn't mean the C.O. can't filter them out. But they tend not to because it's just easier to handle all the contractor recommendations together.

Q Okay. I guess -- okay. That makes sense. Is there a possibility that it gets sent to a contractor, the contractor does the work very quickly, it goes to the federal employee and they issue that well before the unmatched list?

A "Well before?" Well, we were -- any -- anything that is in an active processing month can be issued at any time.

Q Okay. And you may have answered my question,

is because step two, as we've described it, only really starts about six weeks or so before the processing month -- or two months, let's say, the preparation that -- these are all going to at the same time --

A This is --

Q -- even --

A This is a -- it's really, like I said, two -- two -- two weeks that we are sort of assessing how the current month is coming down. When it -- so they can see -- my -- my supervisor can see how quickly they may start getting down to one thousand. So around that number, that's when the assignments actually go out for the new month.

So it takes about a week to two weeks to do all -- you know, a little bit of that prep work. Nobody's being impacted because no assignments have been made. To do all the matching and everything, get the matched, non-matched lists organized, out to their leads, so that when the thousand -- when we reach the thousand, the assignments go -- get loaded into people's queues.

Q Okay. So the month processing as you've described it, that's an assignment rule; is that correct?

A "An assignment rule?" Yes. It's a processing practice that's been in the organization; yes.

Q But it doesn't dictate when they get final

decisions; it dictates when they get assigned?

A Exactly. When we start opening up cases for review. And part of that is cases have different merits to them, different case facts, et cetera. So some cases are going to head to audit, some are going to get denied, some are going to get certified. Some will be placed on hold because there may be an investigation.

So you may get, you know, different results, outputs, from when we start opening up all the cases; yes.

Q Okay. Thank you. So -- and we've been going for an hour so I do want to ask if you want to take a little break or keep pushing forward.

A I'm okay. We're -- we're on a roll, so.

Q Okay. Truly, tell me. I don't want to keep you going and -- you know. You're doing good.

A No, that's okay. I appreciate it. Yeah. So keep rolling.

Q So let's get to step three. So let's assume that they've been assigned. I guess maybe we should start with this. Once they're to step three, you referred to the C.O.s as "supervisors." So that's a Certifying Officer. So who is below a Certifying Officer?

A What do you mean by "lowest?" I'm sorry.

You mean the lowest grade person or the low -- what does that mean?

Q Good question. What is the structure of below a Certifying Officer?

A Oh, okay. Okay. That's a fair question. So pretty much each of our teams in our organization, it really doesn't matter if you're working immigrant or non-immigrant visa applications, we have GS12-level Immigration Program Analysts, you know. I don't want to say that these people are worker bees, but they are the -- the folks who are assigned full-time work to work cases, for sure.

And there is a lead Immigration Program Analyst that is a grade above them, which is a GS13. And the lead does work cases, too. But the lead has other responsibilities. They may help coordinate assignments. They may help reassign cases from one of us to another because, you know what, we get people who get sick and we get people who are on vacation.

And sometimes the leads help handle the contractor recommendations, so. And sometimes the leads are doing all sorts of things. They're helping to draft -- you know, just like the NOW language or, you know, that sort of thing.

So the leads are kind of like an adjudicator

except they've got some slightly enhanced responsibilities. But they don't have the authority to hire, fire, supervise or to assess the appraisal production capacities of the individual staff.

That is kind of the Certifying Officer, which is kind of called a supervisory Immigration Program Analyst from the bureaucratic title. And that's a GS14 position, and it's a supervisor.

And so most of our supervisors -- it's not common for everyone. But for most of the organizational units, what I call like adjudication teams, usually you have one GS14 and then you typically have one or two leads, 13s, and then you'll have GS14s. And sometimes the teams can be -- have five or six GS12s. Some teams have eight. It just depends on where they're at in our organization.

So I hope that helps.

Q Yes. Absolutely. So when these cases are assigned in step three -- we'll say -- I'll even be more specific. The non-matched cases get assigned --

A Yeah.

Q Are they being assigned to a Certifying Officer team or to the individuals who are doing the day-to-day work as you described it?

A Yeah. They're -- they're -- the Certifying

Officer or the supervisor and/or the lead are -- are actually distributing the cases to the 12s. So they're distributing them to the Immigration Program Analysts, you know.

And the contractor has a somewhat similar structure on their end. You know, we don't employ a lot of contractors in this section, but they have like a program supervisor, they have a program lead, and then they have what they call a Case Processing Analyst, or I call them Contractor Processing Analysts.

But they have a similar kind of structure. So on the match side, they're kind of doing the same thing. They have a lead who is making the assignments to the available Contractor Analysts. Yep.

Q Okay. So how many C.O. teams do you have on PERM?

A There are -- on PERM? My gosh. So we have one team on appeals, one team on supervisor recruiting, one team on audit. We have two teams on what I'll call the non-audit cases, right, where the analysts review cases. And then we have a flex team. Okay?

Flex team is kind of the -- the staff -- and, for the most part, a lot of our staff are cross-trained to work immigrant and non-immigrant labor certification applications. So this flex team is kind of available to

-- to actually help other teams either in PERM or in other visa programs.

And so right now I have a flex team that is assigned to PERM, but it's working H-2B cases because of the January 2024 peak filing bubble. And we have regulatory processing times over there, so -- and they have been doing that for several years. And so they're actually over there, and they won't be back over until probably about spring, May or so.

And they'll -- when they come back they're going to be working basically with the other two C.O.s in the analyst review or the non-audited area.

Q Yeah. Okay. So --

A In total, it's about 45 staff.

Q Forty-five staff. Okay. And out of that 45 staff, it sounds to me there are about -- I think you said like five to eight GS12s on each team. And if there's two of them doing non-audit cases, that's about ten to 16 folks working these, day to day?

A Okay. So I'll give you the numbers.

Q Okay.

A You were asking me, how do you prepare for a deposition? You're asking me a question that's actually later on, in another section. But you asked me about how many people do we have working these cases. Right? So

we're kind of -- we're jumping to that question; is that correct?

Q That's correct.

A Okay. So in PERM, we've got a total of 45 staff. For the non-audited cases, we have 12 federal staff responsible. That includes two 14s; right? That's the supervisors or Certifying Officers. So that's 12. And then we have another team of six. That's the flex team I was talking about. So that's the team that has one 14, they've got a 13, and they have 12s. But it's six of them. So that makes 18.

But that team of six is not working PERM cases because of the critical need to handle the regulatory processing times in the H-2B peak season filings that came in January 2024. We have three vacancies in our organization and we're actively recruiting for those vacancies now.

The audit team has nine staff and that includes one -- one supervisor or Certifying Officer, and there's one vacancy on that team. The supervisor recruitment team has a total of seven. So again, they have one GS14. There's one vacancy on that team. And then the appeals team has a team of seven, and that's including sort of one supervisor. And they have no vacancies, so; they're kind of fully-staffed.

So on the labor certification component of the PERM process, we roughly have that in our organizational structure, with the exception of those six staff who are working H-2B cases.

The program also has a prevailing wage step, as you're aware, that has to be completed before an employer can even initial pre-filing recruitment and file an application. So, you know, the balancing act in PERM, when we're looking at work load demands in PERM, you cannot ignore the prevailing wages that are coming in, the termination applications come in.

Because if we don't sort of have stabilized or reasonable processing times there, we're -- the employer is, literally, stuck. I mean they can't go anywhere until they get a prevailing wage determination.

So we've had to create an entire sort of national prevailing wage center where in any given year, 85 to 90 percent of the wage determinations that are coming in are related to PERM. And we have 48 federal staff, and that is a -- that includes a GS15 Program Director, there's four Certifying Officers or GS14 supervisors there, and the rest of them are bargaining employees who work wage determinations.

That program has, obviously, a lot more staff because unlike PERM, they have received -- well, we

received a record number last year, a quarter of a million applications for prevailing wage determinations, just in that program alone. And that's way more than double than what we had in 2014. We had 130,000 wage requests in 2014, but last year we had a quarter of a million that we had to get out.

So, yeah. I think that -- if that helps, the -- the staffing of our office for PERM as a program is really separated in two component pieces: The prevailing wage piece and then the labor cert piece. And, of course, everything else is -- in our organization is in the non-immigrant visa -- visa program space.

Q And because they're separate, am I correct that the 12 -- and we'll say 18 including the flex team, when they're back from H-2B --

A Yeah.

Q -- those don't have any --

A There's two vacancies.

Q So they don't have any responsibility for prevailing wage determinations?

A No; they don't. Because we need them kind of -- I mean we need them right on PERM, focused exclusively on PERM. If anything, we would be trying to examine whether prevailing wage determination analysts can flex over and help with PERM adjudications.

So, you know, management-wise, I have to deal with the -- the allocation and the constant, it almost feels like, reallocation in periodic seasons of staffing resources, to handle different work load demands throughout the year in the organization. Some of them have very extreme peak seasonal filing patterns and everything else.

But the prevailing wage function is -- is critically important. If we get the processing time stabilized at a reasonable level there, then I -- I could -- I can move people over to PERM to help draw down processing times in PERM. Yeah.

Q Do you agree that the Department of Labor has a duty to make PERM decisions in a reasonable amount of time?

A I just don't know what "reasonable" is to people.

Q That's fair.

A If you say 60 days, I -- you know, you meet with the State and they want a decision in a week. I -- I just think it's -- you know, we are given a certain amount of budget resources from the Congress to handle all the workload demands that we have.

And, you know, I hate -- I hate to say -- I mean unlike, you know, Homeland Security and State who

can charge user fees and are a little bit independent from Congress where they can increase fees to help maybe add more staff to help with workload demands or charge like a premium processing fee to expedite certain cases regardless of maybe what those facts are, I just don't have the authority to independently do that.

And so I think, you know, the -- the reasonableness of -- of processing times really falls on a conversation of how much value that the Congress places on processing in the permanent green card application process where Congress has not expressly articulated processing time expectations, maybe like they did -- they have done in H-1B or like in the H-2A program.

Q But you do agree that the DOL, taking all that into account, has a duty to make a decision within a reasonable amount of time, whatever "reasonable" means?

A I -- I think we -- we have an obligation and a duty to administer the program with the resources we are being given, in as effective a manner as possible. And if that results in a reasonable processing time, then, yes.

And I think when somebody asks me are you processing things in a reasonable amount of time and I'm saying to people we are doing the best we can with the resources we are being given, given the well-documented

workload increases that we have been communicating consistently every year since 2014.

Q Do you agree that DOL has a duty to make a final decision on a PERM application?

A Yes. We should not be holding the -- those cases for -- for reasons unless it is related to fraud, willful misrepresentation. We have the Inspector General; that sort of decision would be out of my hands. But other than that, I expect my analysts, when they get assigned cases, to review those cases and take an action on them.

Q Okay.

A Which is why they have --

Q That's what I was gonna -- excellent segue, Mr. Pasternak.

A Okay.

Q Tell me about the daily processing goals.

A Yeah. So the analysts themselves have -- well, I should back up. Like all of our positions are -- they are what are called bargaining positions. So they are covered by the -- the bargaining unit. So there are unions, obviously, in the Department of Labor, there's unions in other federal agencies, where we sort of negotiate with the unions about production expectations, basic performance expectations of the analysts.

It's not always a wonderful conversation. But the unions over many years have agreed that because of the -- the -- the need for us to make decisions on cases, either in the immigrant or non-immigrant context, they have agreed that production standards are appropriate.

So an analyst -- the -- the analysts that are working the sort of non-audited, you know, cases -- I call them analyst review cases. But they are basically non-matched -- you know, non-audited cases. They're expected to issue 35 to 42, you know, final case decisions per day.

Q So sort of -- you've asked in another part, and I do not want to jump ahead. But --

A Well, I answered that question. Is that -- I've answered the question. They -- in analyst review, they are expected to do 35 to 42 final case decisions per full work day. In audit, they're supposed to do six to eight case decisions per full day. Audit cases are way more intensive than non-audited cases, for obvious reasons. The only thing that the analysts in the non-audited cases are looking at is the 90A9 itself.

And then appeals can be very complex. Lots of documentation. Those analysts can do, at a minimum, three case actions per day, per full work day.

Q Going to the -- what I'll call "routine" cases, non-audited, non-matched, 35 to 42 per day. Do you keep track of how long it takes per application?

A Oh, yeah. So at -- so at the end of each work day, an analyst has to report to the lead and the supervisor their daily production for the day. I mean, obviously, we have to do that because we do performance appraisals for the analysts. So we do have reports that the analysts have to fill out for any -- for all their production time, and they also have to account for like any non-production time.

You know, generating reports is kind of non-production time. I mean they have to spend, you know, 15, 20 minutes a day at the end of the day, doing that. They've got breaks and lunch and, obviously, things of that nature.

But if you -- you know, just -- for the purposes of this discussion, we have those production standards. And if the analyst is working a seven and a half hour work day, that equates to reviewing a PERM case and making a case action every 11 to 13 minutes.

Now, we looked at actual production results from October to December 2023, just this last quarter. And we had 38 work days, and our analysts worked, on average, 55 case actions per day: Obviously, above the

42. So that last quarter as an actual, analysts were taking about eight minutes to review a PERM application in order to make a case action decision.

Now why would it be 52, you might ask? And I don't mean to ask myself questions. But, you know, a person working in any work environment wants to exceed. They want to excel. They -- maybe they'd like a bonus. Maybe they'd like -- whatever. We just find that analysts typically want to perform more than 42. Not all the time. But, you know, generally, more than 42.

The other is, we do offer overtime pay. We can't mandate overtime to federal analysts, but we do offer overtime. We've been doing it for the last couple of years, last two or three years, and it's worked really well. And it just allows people who want to make a little bit extra, to be able to do a little extra.

The other is that we offer maximum workplace flexibility for our staff. Full-time telework is available. That has led to -- these are the intangibles, by the way, of administering a program, that leads to retention. I mean I'm just -- you think I'm lying. It -- your -- you think I'm telling a story. It's -- it leads retention of employees, improved morale, reduced commuting times, less cost to me for transit subsidies and everything else.

And the reality is they're actually working cases much -- much better at home than having to transport themselves to a physical office and then go home.

And, obviously, the reason why we can do all that is -- is because we have electronic filing systems, we have electronic processing systems, and we issue all of our decisions kind of electronically unless the employer obviously wants -- wants to get stuff done by mail.

Q I used to live in the District before all of that fun stuff and so I can understand how that would -- not having to drive in D.C. can really improve morale.

A Yeah. My commute is 20 minutes. Twenty miles as the crow flies, and my commute is an hour and 25 minutes one way.

Q Yep. Come on down to Charleston. I drive my golf cart to work.

So when those analysts do a case action, is that the end of it or does it have to be reviewed before it goes to --

A No. The --

Q -- the applicant?

A For the federal staff, the -- because it's an inherently federal function, the analyst will take the

action, certify, deny, send to audit. But if the employer requests withdrawal, then the action's taken.

So the analysts -- when they're done with the review which is like the fourth to the fifth step I mentioned, they are electronically recording the decision and it's moving to what -- what I'm call -- you know, because it's an old PERM system. The system's been around since 2005.

But it moves to a thing called a printing queue which there's no such printing going on anymore because it's all email traffic. Right? So it moves to a printing queue, and it's always ha -- I can't break it because I'd have to break the whole system.

So the analyst decision goes to a -- a printing queue where there are a dedicated group of contractors. Right now I got three, and I'm putting two more on in part because, you know, in the coming months I'm going to be adding more people onto the non-audited business line. There's going to be more output going. They're there simply to manage the queue and get the correspondence out.

So once the Fed makes the call, it moves out. The contractor recommendations go to the feds, and then they move out. Yeah.

Q Okay. So, really, we were describing more

between steps three and four in our last discussion as you described --

A Yeah. I put --

Q Assignment and then review?

A Assignment, review -- right. Yes. I mean assign -- right. They get the assignment and then now they're -- the feds are free to kind of organize their queue. Because we're doing things by processing month, so they may group all the cases filed by Pasternak, LLC, and they'll -- he'll -- they'll -- I will work those in a bundle and may move on to other ones.

And that's when that eight minutes or the 11 to 13 minutes I was talking about, which is the basic meets standard, production standard for staff, that's when that's kicking off. And then at the end of each of those 11 minutes or 13 minutes or whatever, I'm taking those -- the -- the actions against those cases and they're moving to the print queue. Yeah.

So it's kind of weird. It's like the -- the review step and the decision step, they're two different steps, but they're happening right at the same time with -- or not the same time, but right after the analyst is done, the decision is made and it's moving to the print queue. Yeah.

Q Okay. And the print queue -- it sounds like

what you're describing, the print queue is pretty much automated through the electronic service?

A Yeah. I -- yeah. Back in the day, before we had electronic -- so the one thing -- I mean you asked questions about what kind of mechanisms and systems are in place to -- you know, to prevent unreasonable delays. I think that was one of your questions. This is one of the things I was going to talk about.

Like when the COVID-19 pandemic hit, we were printing physical certifications, I mean on this blue security paper that came from this contractor, from the Treasury Department. It was, you know, designed to like promote the integrity of the labor certification.

And the reality is, in the COVID-19 pandemic, I needed to send people home. I couldn't bring them into the office. And I couldn't shut down PERM. I couldn't shut down any of the other visa programs. So in PERM, we turned the physical print queue into an electronic print queue.

And so we found a way to re-use the -- the printing queue in a -- in a way to issue the correspondence out to the employer and the representative electronically. Coupled with that -- because, obviously, the Inspector General would have been upset because it -- some of the blue security paper came from a fraud rule

that we had done in 2007, there was a lot of talk about integrity and fraud and everything else.

Because I knew that the Inspector General would probably get bent out of shape about that, I ended up negotiating a data sharing agreement with DHS -- USCIS -- to give them direct access to our labor certification system so that they can pull all the labor certification data independently into their system so that when the petition comes through and they record the labor cert. number, they will see whether or not the employer has changed the foreign worker or changed something about it.

They'll have an independent copy of all of my electronic data in their system. So they could actually render another PERM cert. on their own just because I gave them access to my system.

So I had to do that and then build in an integrity piece so that people couldn't futz around. That's not a professional word. So that people could not change -- unscrupulous reports could not change parts of it to substitute Pasternak for Powell, you know, that kind of thing, and that CIS could catch it if they -- if it came in.

Because you'd have to file the paper with CIS, anyway. Right? Like CIS doesn't do anything really

electronically. So you've still got to file the paper with them. But now they have an independent electronic copy of the very document I issue.

Q Did that change necessitated by COVID, did that require --

A Yeah.

Q -- additional resources?

A Yeah. Well, no. It -- it didn't, actually, because we had already had a system that was generating the PDF of the PERM cert. that the -- the contractors in print queue were literally sending to a printer where the blue security paper was. So --

Q All right.

A -- all I said was stop doing that, and we're going to start issuing it out and emailing it out to the -- to the employer. It was a very minor change, actually, to just take the email addresses associated with the cert. in that queue and just kick it off to the employer. That was -- that was actually a great thing.

And I'll just say like I think -- you know, for all the tragedy of the pandemic, that was the one thing that really was a benefit to us because that then allowed me to, you know, reduce the administrative support contracts. My mail costs and mail delivery costs went to nothing. I got rid of the printers. I mean that

sort of saved space, et cetera. So it really -- it really did help.

Q Okay. So the analyst review -- and we'll go through this one topic and then we'll take a little break.

A Okay.

Q The analyst review, what are they -- so when I -- sorry. Strike all of that.

When an analyst receives an unmatched no-audit PERM application, what are they charged with reviewing? What are they looking for? What are their analyses? You said there were checklists; they don't have to use them. But what are they looking for to make a decision?

A Yeah. I mean I -- yeah. When I was trying to explain it -- first of all, they -- they're required to review the application. I mean for all these non-matched cases, there is no supporting documents. I mean you -- you just have to review the 9089.

And I -- I was trying to -- and this may sound like it was overly simplifying. But, you know, they are required to check for completeness and accuracy. Some of that is helped out by the fact that our electronic filing system tries to provide what we call like data validation edits to the outside, the customer.

So when they're completing the application before it's even submitted, you know, required fields got to have something in it.

We have some logic edits, you know, that -- that say things like, you know, it appears you're entering in a date that is 270 days from the filing date; you're supposed to do your recruitment between 30 and 180, I mean. So we -- we -- we have some logic edits for employers that help -- help with accuracy.

But the -- but there can be typos, there can be interchanging of dates and things like that that maybe the flags don't catch. So they are looking for completeness and accuracy.

And then like the other places that they are focused on is sort of the employer's job requirements: The primary requirements, the alternate requirements. Is the employer truly specifying the actual minimum requirements for the job, and, you know, are those requirements normal to the occupation? If they aren't, you know, it could be that there's a business necessity reason for it that might warrant an audit or not.

Sometimes we already know because we've audited in the past for certain kinds of requirements and we've audited for business necessity; we know it all kind of checks out. So we don't keep auditing on the same

thing over and over again. So analysts will just look for whether they're -- they're normal.

Obviously, the recruitment is a big thing with us. Right? So they're -- we're looking to make sure that the two newspaper ads have been done two different Sundays. Is the newspaper in a general circulation? Did they give us the name of a newspaper that actually is out of circulation at the time that they put the dates in? Don't get me wrong; people have done that.

Have they done the minimum required, you know, extra steps, that kind of thing? Still checking for, you know, timeframes, to make sure everything is -- is fine.

And then, of course, the foreign worker. And the whole reason why we collect basically what I call a "resumé" of a foreign worker is we're just making sure that they -- their education, their work experience, their training, all meets the minimum requirements, you know, the actual minimum requirements for the job.

And, you know, I -- I would just say like the check -- the reference checklist and things like that, you know -- I -- I think I mentioned the Prevailing Wage Determination. We're looking to make sure it's valid. Is it the right one for this job, is it -- you know, that

kind of thing. Have they specified the area of intended employment correctly? That's something the electronic system doesn't check, so we look at that.

But I think, you know, as you -- as I just sort of explained, a lot of their training and everything is from the regs. I have a dedicated training officer for PERM for any new employees or refresher training. We -- we have mentors for new employees that we do check their work for a period of time to make sure they're reviewing everything and haven't missed things. So you can call it shadowing, mentoring, whatever you want.

But as you can see, I mean even with all of that, eight minutes a case. Eight minutes.

Q Do the -- are they looking for fraud, the adjudicators?

A How do you find fraud on the face of an application with no other information to consult with? That is exceptionally challenging. And you'd have to have other external information available that could prove that the -- the data that you see in front of you has been falsified.

Q But do they look for fraud, the analysts?

A Nobody's -- I think the -- looking for fraud, it -- I don't under -- I don't think -- if you asked one of my analysts are we looking for fraud, they would say

-- probably say what are you talking about? Because we don't have information at our disposal, if we're looking at an application that what I'm looking at is untruthful.

The employer's attesting that everything on it's true and accurate. So unless the analyst has something about it, like something about that employer or something, they're looking at these -- they're looking at what is disclosed to us. We are trusting, because it's an attestation-based submission. And they're looking at compliance with regulatory requirements.

They -- that's what they're doing. Because if they were looking for fraud, I don't think we'd be taking eight to 11 minutes a case.

Q Are any PERMs denied for fraud?

A Not to my knowledge.

Q The attestations -- and these are regulatory; correct? The attestations on the -- the actual PERM form?

A Yeah. They're all specified, I think, yeah, in the reg. Yep.

Q If an employer submits the PERM labor certification application and agrees to those attestations, is it fair to say there's a job offer available to the beneficiary -- or a job available to the beneficiary?

A Is it fair to say? I'm trying to understand your question. So the employer has gone --
Q Let me just read the attestation that I'm --
A Okay.
Q -- talking about. I'm looking at 20 CFR 656.10(b) which is the sub-regulation or the subparagraph titled Attestations. Subparagraph five says the job opportunity does not involve unlawful discrimination by race, creed, color, national origin, age, sex, religion, handicap or citizenship.
If an employer submits a PERM labor certification application, signs off on that --
A Right.
Q -- does the Department of Labor have any reason to believe that that employer is going to violate that attestation?
A None, unless we have some objective independent evidence from somebody else that -- that -- that is -- that is the case that -- of what's happening. And --
Q Okay. No; I mean the -- another one of -- I'm sorry.
A No, no. That is the answer. We -- we just have in front of us -- because it's an attestation-based program, we have a -- an employer who's hereby certifying

to the following conditions. And we trust those, unless we know something or have evidence that demonstrates otherwise.

Q Okay. And the employer will be able to place the alien on the payroll on or before the date of the alien's proposed entrance to the United States. That's an attestation. So Department of Labor would trust and believe that unless they had third-party evidence otherwise?

A Yeah. I think because PERM, at the time it was -- was -- was enacted, they probably envisioned that people were literally coming from abroad, you know. Because -- you know, most people are on H-1B visas so they're kind of already here working in the United States.

Q So with that list of attestations, when they submit them -- is it fair to say when the Department of Labor is certifying, if they certify it, it would be an indication that there is a job offer available to the foreign national, and a foreign national who has a separate set of attestations will take the job?

A Yeah. And I would just say like our sponsorship check helps. And that first step I talked to you about, about the sponsorship review, that does help revalidate in some way that the employer -- yep, I did

file this. Yep, I did. I am sponsoring this individual for permanent employment with our company.

So I think that the sponsorship -- the attestation plus the sponsorship check I think helps give our staff an assurance that they mean what they say, understanding that there's a lot that happens further down the road that's past us that I'm not even aware of.

And so I -- I feel like at the time that they're filing and they're making the representations, I don't -- I don't -- I don't think that our staff would have any reason to -- to not -- to not question them unless they had some evidence that they were just lying to us.

Q Would you agree that some of those attestations are intended to protect the beneficiary employee of the PERM application?

A I -- I don't know if I can answer that. Can you ask it one more time? The -- like the non-

Q Okay. Let me be more specific. Let me be more specific. If an employer has to swear to Department of Labor they will not involve unlawful discrimination in that future employment, does that benefit the company or the beneficiary employee?

A Well, I mean it has to benefit the company because they're prohibited from discriminating against

people in employment. So I mean at some level, it does. If -- if -- if anything, it also protects American workers because you're being assured that you weren't disqualified in applying for a job simply because you're an American citizen, because citizenship is in there. And there -- there are companies who may target recruitment for the purposes of hiring a foreign beneficiary and not an American worker.

So I think the discrimination provision that's there is equally protective of all parties if it's dutifully carried out.

Q Does that provision protect beneficiary foreign nationals of PERM applications?

A I -- I can't say yes or no. I don't know the answer to what -- what you're asking. I -- I guess what I'm saying is I feel like it's protective of all parties. That could include the foreign beneficiary because even the foreign beneficiary's from some other nationality. So consideration for employment with the company, whether it's an American worker or a foreign worker, is supposed to be non-discriminatory.

Q I guess I don't understand the difficulty in this question. Is it a -- I think it's a yes or no of whether this protects --

A As against the --

Q -- the beneficiary employee. I understand you don't want to say yes because you think it hurts the case. But I need to know --
A Oh, no, no.
Q -- Department of Labor's stance on this.
MR. POWELL: Hold on.
A Oh, no, no, no.
MR. POWELL: Hold on. I'm going to object. Stop.
BY MR. BANIAS:
Q Continue, Mr. Pasternak.
MR. POWELL: Well, I'm not -- I haven't objected yet. It's argumentative --
MR. BANIAS: We don't have speaking objections in federal court. Thank you.
MR. POWELL: But it's argumentative --
BY MR. BANIAS:
Q Go ahead, Mr. Pasternak.
MR. POWELL: You can rephrase the question about the regs, if they provide that. But we're not here to get his opinion.
MR. BANIAS: I agree.
BY MR. BANIAS:
Q So, Mr. Pasternak, as the designated 30(b)(6) witness on the PERM process --

A Yes.

Q -- the regulations are intended to protect the employee beneficiary of the PERM application?

A Yeah. And our primary statutory responsibility is to make sure that terms and conditions are not adversely affecting similarly-employed U.S. workers.

The only information I collect on these beneficiaries is their identifying information and their qualifications, to determine that they're even meeting the actual minimum requirements of the employer. We are taking at face value the statements the employer is making.

None of my staff, including me, actually will render an opinion about who-all is being protected. But you asked me do I feel like, in my personal opinion, that foreign workers are being protected? It's a non-discrimination provision in employment. It is common to any business in the United States.

So I -- it is -- inside or outside the PERM context, to me, I just don't see the distinction. That's the point I'm trying to make.

Q Okay. As the representative of the Department of Labor, are the attestations and the regulations designed to protect foreign national

employees who are the beneficiaries of a PERM application?

A So I -- I believe that -- that most of them are. But most of them are related to whether there's a strike or lock-out at the job which is really guaranteed to protect U.S. workers. I mean to make a broad statement about all the attestations, I don't know.

And Congress enacted some -- we have some in regulations. It -- it's just the nature of the employment, that we're looking at for the employer to attest that they are not discriminating.

And the -- and the consideration of workers for these jobs, in my view, is kind of like -- the discrimination I'm focused on is the discrimination against American workers for the job because it goes to the recruitment, which then goes to the statutory mandate to make sure there's not a -- a minimally-qualified American worker for the job.

So that's what we are focused on. I just do not look, and neither do my staff look, at these attestations in the context of a foreign beneficiary benefit, other than the fact they're being sponsored, they're being named for the employer.

And so when we satisfy the other statutory mandates, we give the employer a certification. And then

they go to DHS and deal with the foreign worker status and everything else, which I just don't get involved in and we just don't have any expertise of.

Q And I -- so the employer has to attest the offered wage equals or exceeds the prevailing wage under 20 CFR 656.10(d)(1)?

A Yeah. Yeah.

Q Is that in part -- and does that, in part, protect foreign national employee beneficiaries?

A The wage requirement in the Prevailing Wage Requirement was designed to carry out the statutory mandate that the terms of employment are not going to adversely affect similarly-employed U.S. workers.

And so when we give employers a prevailing wage in that occupational classification which they're seeking to sponsor a foreign worker in the area of intended employment, we are assured that they're going to pay the foreign worker at least that, and that it's not going to adversely affect similarly-employed U.S. workers in that area. That -- that -- that's what it's for, to us.

Q Okay. Do you agree that if an employer fails to agree with any of the attestations listed in that regulation, that the PERM will be denied?

A Yes. But they don't really have an ability

to individually self-select which ones that they want to comply with and which ones they don't. So what's going to end up happening is they're actually not going to file the application.

Q And again, I'm more interested in the law rather than the actual form at this point. Because I agree with you: There's one check box, "yes" or "no" --

A Yeah.

Q -- on the form.

A Yeah. And so if they don't check that, they're just simply not going to get certified because they have to -- to -- to make the assurances. That's just part of the program.

Q Okay. I think you mentioned this, that there is information about the foreign national on the PERM labor certification application?

A Yeah.

Q Can you just say "yes" or "no?" I'm sorry.

A Oh, I'm sorry. Yes.

Q Okay.

A Yeah.

Q And if -- if -- you received third-party information and learned that the foreign national lied and provided false information, would that be sufficient to deny it?

A If we could prove it?
Q Correct.
A Yes. Particularly if it's around requirements and they were saying they had a Masters degree and they really didn't, and the employer's actual minimum requirements was a Masters degree. We'd have to deny the application.
I mean I'm using that as an example. But that's -- that's the area where we look at the foreign beneficiary's information. Yeah.
Q Okay. So when an analyst certifies, implicit in that is we've reviewed the foreign national's section and information and, to our knowledge, it's accurate?
A Yes. I mean we -- it -- on the form we will take, again, what is disclosed to us as being truthful and accurate and attested to by the -- by the -- the employer and/or, you know, the person who prepared the application.
Which the employer is ultimately -- because, remember, the signatures and everything will occur after certification. So they're attesting that they're going to agree to these things, things are truthful and accurate, and then -- yes.
Q And one of the employee attestations which they do sign after the certification is that they'll take

the job if it's certified; correct?

A Yes.

Q Okay. And I know that in today's world, with the backlog from certain countries that are major users, that never comes to fruition.

A I can't -- and I think that, again, that's actually the point of the fact: That because of the other downstream visa admission status issues which we have no jurisdiction over, when they're making those assurances and signing those, they're signing them at a point in time.

I mean they -- they are saying, you know, that this is my intention. And if things happen in a different part of the immigration system because of visa regression and everybody's into wait queues there and all this other stuff and that downstream federal agency permits portability or whatever, that's all on them and not on me.

We've -- they've satisfied for us what they needed to do because the signatures are heading to certify a DHS, so -- on the -- on the 989.

Q But you would agree that for certain applications that be filed with USCIS, they cannot -- certain ones cannot be filed until the PERM is certified? PERM application, excuse me.

A Cert -- certified, and they -- they make the appropriate signatures and send it off to DHS. Yeah.

Q So it is a necessary antecedent to certain immigration benefits petitions?

A I'm sorry; say that one more time.

Q A certified PERM application is a necessary step, and even an antecedent step, to filing certain forms with the Department of Homeland Security?

A Yeah. Particularly in two of the 5-EB classifications; right. Yes.

MR. BANIAS: Okay. Let's take -- it's 2:16 on my computer. Let's come back at 2:30. Is that okay with you, Mr. Powell? Is that okay with you, Mr. Pasternak?

MR. POWELL: That's fine, if the witness is okay.

THE DEPONENT: Yep.

MR. POWELL: Fine.

MR. BANIAS: Just for what it's worth, I am confident we'll be done by 5:00.

MR. POWELL: Okay. Great. That's good. We'll reconvene in 13 minutes.

MR. BANIAS: Thank you.

(At this point there is a break in the deposition.)

BY MR. BANIAS:

Q Okay. All right. We'll go back on the record. All right. Mr. Pasternak -- and I will take full responsibility for this. So that we keep our Ms. Whiteley happy, we need to make sure we don't speak over each other. That's primarily on my end, so I'll do a better job. I have to ask you just to be a little mindful about that. Sound good?

A We're good.

Q All right. Okay. Just a couple of kind of follow-up questions on the -- what I would call topic one, the processing, and then we'll -- I think two and three will go much quicker.

We talked about the processing, the daily processing numbers. Are there things in place where -- are there mechanisms in place to ensure that one application does not get unreasonably delayed by a particular analyst?

A So I'll say a couple things. One is I think at a very high level -- I'll point out maybe eight general things, although a couple I've actually already mentioned.

One, the fact that the business process itself is supported by an electronic submission, review, you know, correspondence, decision-making platform, it really does help, and it's helped tremendously to -- to

not create undue delays in processing based on a paper-based system. And we used to be a paper-based system, you know, a long time ago. So I think just in and of itself, that has helped.

I did mention the transition for the certs and everything and the sharing of data with the DHS as well during the pandemic.

The mail-in applications, which are really rare now, they all come to our headquarters. We keep them away from the -- the analysts. They come to the headquarters here in Washington, D.C. where we have a couple of contractors who date-stamp them, scan them, and they send them to contractors to have them data-entered electronically. So they basically become an electronic record.

And the priority date or the filing date they're given is the date they were received in our office, not the date they're entered, so that they aren't at a disadvantage to any of the other electronically-filed applications.

I mentioned the automated validation checks. I mean obviously, the external checks for the PERM application do help the analysts, and it kind of keeps them from having to look at every single field for accuracy or completeness because we have a pretty robust

set of validation notes on the outside using the, you know, Microsoft access databases, to help automate matching routines for potential audit cases and other kinds of actions and having -- you know, as I said before, having other contractors perform administrative tasks keep that away from the Feds.

And I mean if we didn't have those access, you know, databases and -- and electronic matching, we'd have to otherwise have a -- sort of a paper-driven manual process.

The other is we use a template language for audit notification or -- or denial correspondence so that analysts, they can use those to help prepare case actions and adapt them to the case facts of the case that they're adjudicating. It's a little more efficient. It definitely cuts down on creative writing exercises from the analysts and it -- it promotes better consistency, I think, in -- in the communication of decisions that are going out.

And, also, I think I mentioned the -- the daily production standards also help make sure, you know, that the analysts are not, you know -- all right, we have good people that work for us. We're just making sure that analysts are not sitting on cases.

The daily production standards are designed

to make sure that we are getting at least a -- within a range, which I mentioned to you, 35 to 42, you know, for those non-audited cases. Just making sure that we're getting some production that we believe is -- is reasonable for the analysts to -- to do.

And, again, that's kind of equating to about an 11 to 13-minute review per case. But in actuality, like just sort of looking at last -- the last quarter of -- of calendar year 2023, they were actually doing maybe an eight -- you know, an eight-minute review per case.

So I feel like that, plus the maximum telework and the availability of overtime, actually do help. And, you know, again, I -- I don't -- I don't know where -- where we'd be without the -- sort of the ability to do a lot of this stuff electronically and press a button and send it to the print queue and then move on to your next case and let a --

You know, a correspondence -- small correspondence team kind of issue the decision helps because it -- it means the analysts can just keep focusing on reviewing one after the other.

Q Are there any automated processes that highlight cases that are sitting on analysts's desks? I think you used the phrase "not sitting on cases."

A Yeah. So -- so, yes. There is a -- every

week there is a extract of cases that are done by the contractor in our system that are kind of cases that were -- were in the -- so when we -- so we moved February 2023, so they'd be pulling cases prior to that, you know, just to make sure if there's any -- we kind of call them "straggler cases." But they are cases that appear to still be pending without an action.

And the analysts -- there's two different levels. We have analysts in their individual queues go back to revalidate that those are -- still need to be placed on hold. And each one of them have to get a case note to say whether or not it needs to still remain on hold for whatever reason. And it doesn't happen very often.

But there is a -- what I call kind of like a -- like a -- like a database extract of cases that are older that are kind of run to see that -- whether we have any kind of little straggler cases, I guess.

Q And that's run each week, you said?

A Yeah.

Q And so you would define "straggler case" as --

A Really --

Q -- making sure -- yeah. Go ahead, please.

A I feel like the court reporter's going to --

going to fine me out here. I apologize.

A straggler, in our view, is really any case that remains pending before the -- the -- the published month that we have kind of moved into. So, you know -- and I -- you know, and I just say this: Like it does mean -- like when we just moved into February, I know it sounds strange, but we would consider like a January 31, 2023 filed case to be a, quote, straggler.

So I mean literally one day before the processing month we're moving into, that case is kind of called a straggler so it moves out onto this extract. But, obviously, we'd be worried about any other older cases -- December, earlier January cases -- that might still be hanging out there. Yep.

Q If there are December 2022 cases still out there, they would show up in this report; correct?

A Yeah.

Q Okay.

A Yes.

Q And -- yeah. Thank you.

And you would check to see if they were on a hold from the contractor. And if they were, they would stay on that hold list?

A It's a -- if -- if they're -- yeah. So if they're on hold, generally. So it could be a case

assigned to a fed or a case assigned to a contractor, so. It's really any case assigned to anyone. It's just being generally pulled out of the system and it's being checked again.

Q Okay. Do you have any sense of the number of cases that are on that straggler list that are not on holds?

A No; I don't. You -- I don't. That -- that's going to vary from day to day. I don't -- don't know. Or week to week as we pull it, so.

Q If a case that has not been indicated it's appropriate to have a hold on shows up on that straggler list, does it get prioritized?

A Yes.

Q How does that work?

A Well, the team lead or the certifying officer will identify the case as being one of the -- one of the older ones, older stragglers, and they will send a case note to the analyst saying this case needs to be worked. Yep. It becomes kind of a high-priority case.

Q Are there any other mechanisms like that besides this? And, again, I think I asked this; I'm not sure. I probably missed it. How often do you run the straggler report? Is that the beginning of each month when the assignments are made?

A Yeah. It's -- well, the -- the reports run each week. But it starts to evolve as we move into the next month. Right? So it -- it'll start to -- well, know, cases that get, you know, adjudicated because they're no longer supposed to be on hold, those come off and kind of the new ones come on.

So it's like every time you move into a new processing month, the straggler report gets relatively large because, again, we -- we're just now including cases filed in the last week before we moved into the new month. And so I think, you know, it gets big. But then it goes down pretty quickly.

Q And this is something that I'm more curious about. When you read these regulations -- again, admittedly, 2002, 2004 -- they seem to indicate that the technology is going to be doing a lot of the analyst's work. It seems like the system that's developed is they are cutting out the inefficiencies of paper, but analysts are still doing the analyzing. Is that accurate? Would you agree with that?

A Yeah. Because I think that the department -- you know, obviously, I wasn't around in the office when these rules -- I've done a lot of rules in the depart -- in this office, but not -- not the PERM one.

There may have been, at some point in time.

Because, remember, they were proposing these rules because of the -- the old PERM program was resulting in years and years of backlogs.

And they were done in different regional offices around the country. Our -- when I worked for the State, our cases were going to Philadelphia, for example, to be worked, and they were pulling cases from the different states in that region by month for us to mail them to them.

So I -- I think that, in many respects, the thinking of the department in the rule was to create a structure that was obviously more modernized, a little more efficient than -- and a -- and a -- and more centralized, quite frankly. That was a big deal: More centralized than the old system.

And I do think that the thinking back then was -- at least as I observed, was based on, you know, a feeling that we could infuse the business process with technology to make it a little more efficient.

But again, you -- you know, when you get to the final rule stage after all the comments and probably some other internal deliberations, you know, there's -- there's still that pesky reg language that says applications will be screened. It doesn't say electronically screened, it says screened.

So I feel like at the end of the day there had to be -- there had to be a balance and there had to be some sort of a compromise between how much a piece of technology can do versus what a person can do.

And as I mentioned before, the -- the -- the big things that are taken off the staff's plate have been those -- you know, I just don't want to dumb down anything. But you take away the four corners of the piece of paper for completeness and accuracy.

And the validation edits have helped relieve that so that the staff can focus on things that the electronic system, at least at that time when it was built out and -- and deployed, wasn't going to be able to do which was compare qualifications between the foreign worker and the -- and the job opportunities, actual minimum requirements that, you know, there was no database to run the requirements against the oNet System and that kind of stuff.

So I feel like, you know, to answer your question, there had to be a balance at the end of the final rule that you just simply couldn't do everything a hundred percent through an electronic robot.

Q On the DOL -- the PERM website, it says -- I'll represent to you that it says if your application was filed more than three months prior to the month

posted, you may contact PERM help desk for a status on the application at plc.atlanta@dol.gov. What does that mean?

A Well, we -- you know, we interact with stakeholders quite a bit, typically, you know, the American Immigration Lawyers Association. And they have a liaison committee and everything and -- you know. Any types of straggler cases, you know, they may raise with us and -- typically, the ones that they've expressed concerns about and the ones that we want to get, in case we've missed it.

I mean part of that is like whether we've missed it or not because within three months we feel like we're doing pretty good keeping up with the stragglers. But there may be instances where we have heard through stakeholders, you know, there was this one filed four months ago, five months ago, that still hasn't been worked.

We don't -- if it's on hold for something that we can't disclose, obviously, we're not saying anything because it may be for a reason that we can't really talk about. But, otherwise, we sort of have set with our stakeholders this sort of three-month kind of rule and said, look, you can, you know, contact us and if we've missed it, tell us, and we will take a look at it.

So that's how the three-month rule kind of came into effect.

Q Three months from when?

A The -- the processing month that we're working.

Q So I think we've talked about the Department of Labor now reports that February -- it's working cases in February 2023?

A Yes.

Q So to take advantage of this three-month rule, the application would need to have been filed in, let's say --

A Before --

Q -- the end of November?

A Yes.

Q So before December 1st, 2022?

A Yes. But that doesn't stop people from sending us email requests asking for status -- you know, case status inquiries, at any time. But --

Q Right, right. Okay. And it sounds like your response to those are either we can't tell you anything, it's pending an audit or something, or, oh, shoot, that got left on a shelf; we'll take care of it.

A Yes. I think the -- the help desk provides like a standard response back to the customer saying we

really appreciate your inquiry, we are looking into the matter, you know, kind of thing.

But I think if it's on a list that's that old -- for us, three months -- and it's -- somebody checks and for -- for whatever reason it needs to get worked, then it is high priority and it moves.

So the -- the next action is just simply taken with -- you know, with that case, so. I don't think our help desk responds by saying, you know, this case has been certified or anything. But they simply acknowledge it, we're researching it, and then the action -- it's a sign it's prioritizing. The action moves with that case. So the customer gets --

Q So does the OFLC have the ability to see an individual outlier case, prioritize it, and get a decision on it?

A If it's -- if it's older than our -- the current processing month that we're working on. Because we should have -- it should have been a part of the adjudication when we moved into that month or moved into the next month, and it's kind of straggling along. And it was one of the ones that we have opened up to work, yeah, we really -- we really need to do that. And we don't --

Q I guess my question is they have that

ability, they have that capacity, to find a case, prioritize it and get a decision?

A Yes, because it's a part of the case load that we were -- that's already been assigned to the analyst which means it's sitting in the analyst's queue somewhere.

Q So we've talked a lot about an assignment policy and we've talked about these daily quotas. Does the Department of Labor have an adjudication policy?

A Pertaining to what, exactly?

Q PERM applications. We know how they get assigned. But is there guidance instructions, rules on, how those get adjudicated and when those get adjudicated?

A The standard operating procedures for the analysts; yes.

Q What are those, sir?

A So -- so they -- the standard operating procedures are effectively the question you were asking about: How does a PERM case go from submission to certification? There's a standard operating procedure that governs these things. The analyst's review is governed by the regulations.

We have training officers, training slides, review checklists that they can reference, et cetera. Those are all a part of our standard policies and

procedures for reviewing cases.

Q So I guess I want to make a distinction. And maybe you don't like that, or maybe you don't agree that's a distinction -- and that's okay, too -- between assignment and -- what controls assignment, what rules control assignment, that process we went through versus --

A Yeah.

Q -- here are the set of things that we have in place to ensure these get decided in a particular way?

A I don't know what "a particular way" means. Analysts, as I said, in our case processing month are free to organize their queues and work cases the way that they want because we are opening up an entire month. Then they have daily production quotas.

So they know -- along with the training they receive, the training slides and the review checklist, they know they have minimum expectations per day for working cases.

Q What if they --

A That's --

Q -- go way below those?

A There may be reasons why they went way below those on any given day: Because they had to take leave or got sick, had to take care of a child. Performance

that has sustained over the course of a period of time is documented by the analyst who has to report their daily production, and it's a conversation that a supervisor has to have with that employee.

Q I just want to make sure I under --

MR. POWELL: Let me interject here just briefly. You may not have had a chance to see them, but I did send emails with the procedures and those slides that were just referenced this afternoon --

MR. BANIAS: Oh, cool.

MR. POWELL: -- early this afternoon. So I didn't -- I thought I sent -- the way you're questioning that you must not have noticed that. I think I sent you five different documents --

MR. BANIAS: Okay. I --

MR. POWELL: -- and two emails. Okay?

MR. BANIAS: I gotcha. Okay.

MR. POWELL: Do you want to stop and look at those for a minute or do you want to just go forward?

MR. BANIAS: We'll just keep going because I'm --

MR. POWELL: Okay.

MR. BANIAS: I'm almost done, truly --

MR. POWELL: Okay.

MR. BANIAS: On this, so. Y'all should be

proud of me: I turned my email off while I was doing this.

(Off-the-record conversation.)

BY MR. BANIAS:

Q So -- and again, maybe this has been implicit in what you've been telling me all morning -- or all afternoon. But when you announced February, we're now in February, did each analyst get -- and I'm making this number up -- 5,000 cases and say here is your lot for the month; go through them as you see fit. And then, on a day-to-day basis, we're seeing them, you know, do whatever, the 50 cases, 40 cases a day?

A You said it correctly.

Q Okay.

A Open up a month. We try to assign cases. If you and I are the only two analysts working it -- at all, you get half, I get half. We try -- in other words, my point when I was talking about the process is we try to assign them to people as equally as possible.

But we do take into consideration that maybe, you know, Powell, you know, Steamfitters filed a hundred applications and, for consistency and efficiency, I'm taking those hundred, right, out of the 500. So that that's the direction for the staff.

And then, obviously, we tell them you need to

be looking at any remaining January cases that need to be moved. Those get moved. And the straggler report -- and then, of course, all of that, picking up the stragglers, picking up the current ones, they have to meet the daily production standards; yes.

Q Do you know how many were opened up just recently for this new month?

A Nope. I do not.

Q Could you --

A I just -- I don't have -- I don't get the -- the actual numbers. I just see that the month is opening up.

Q Okay. I guess it's a -- I mean are we looking at 5,000, 10,000? Any idea, any consistency --

A I --

Q -- from month to month or?

A Well, PERM is an interesting animal. And it's been -- the monthly filings have been consistently growing. We've been getting from the last October to December of 2023, that last quarter, over 14,000 to 15,000 cases filed per month. That's a big number. That's 25 -- that's 16 to 17 percent higher than that same quarter last year. That's on our public website.

So we -- we -- the -- the percentage increased. The -- the -- the month-to-month, yeah, may

have been 8,000 -- 7,000, 8,000, 10,000 years ago is now in the 12,000, 13,000, and now I've seen 14,000 to 15,000 per month. So, it's -- these are big numbers. Yep.

Q So am I correct to say -- let's say there were 14,000 sent in last February, 2023. When you opened that month, that's the numbers you opened up to, plus the stragglers?

A Yes.

Q Okay. So it's dictated on what was submitted the --

A The whole month.

Q -- whole month that's identified? Okay. Okay.

A Yeah. The whole month, no matter how big or small it was; yes.

Q And then do you move forward to the next month on a month-by-month basis, or is it when you get that chunk done?

A It's when the -- the "chunk" -- I'll use your word -- chunk in February has been drawn down to about a thousand left.

Q Got it. Okay.

A Then -- then we -- you know, before that, before the thousand, we're looking at the next month to see what the filing looked like in that month. So

although it does not happen very often, you could have a really low filing month in, say, March 2023, and a semi-large one filed in April that could in total equal February, and we may open up two months at a time.

Very rarely does that happen, but it could happen. And part of that is to keep everybody fully productive if we think that it's -- it just doesn't make any like practical sense to separate month by month. But it doesn't happen very often.

Q Does DOL have the ability to adjudicate these in a way that gives due regard for the convenience and necessity of the petitioning companies?

A The convenience or necessity of a -- no.

Q Okay.

A I'm not sure what that would be. If you -- does -- no.

Q I -- I -- I think -- I -- well, I kind of -- ink -- I, well -- I kind of -- given the discussion we've had today, I assumed the answer would be no. That's just the language of the statute.

A That's correct.

Q Does the Department of Labor give due regarding and convenient -- for the convenience and necessity of the beneficiary employees, when it's looking at how to adjudicate these?

A No.

Q Okay. You've mentioned contractors a couple of times. How many contractors do you guys have? Does that fluctuate depending on workload or there's a consistent army of contractors?

A No consistent army of contractors. They fluctuate throughout the year. It's one group of contractors. PERM maybe has 12 at most because most of them are working -- helping with Prevailing Wage Determinations, and they're all in the temporary non-immigrant visa programs, handling the filing peaks that we're in right now. Yeah. They kind of fluctuate throughout the year.

Q And does that come from the same budget or is that a separate budget?

A Same budget. Same -- same -- same full appropriations. Yep.

Q So this might seem like a very general question. But in your opinion -- I should say from the Department of Labor's view -- what has caused the increase in the overall adjudication time lately from one year to one year and a month?

A Well, because we don't get the reasons on the incoming filing from the employer as to why are you filing -- filing now. We have signaled to Congress that,

you know, certainly beginning in 2014, 2015, in the budget request, that as the economy was beginning to recover out of the Great Recession which saw a pretty big drop in non-agricultural applications, and as the labor market was starting to tighten and the economy was starting to improve coming out of the Great Recession, we were seeing increasing numbers of applications coming in across the board.

And I attribute a lot of the workload that has been coming in to those kinds of conditions. And, of course, there's other things that impact that. Certainly, in H-2B there's been administration policy preferences to sort of increase along with Congress's policy preferences to increase the amount of visas available for 2-HB workers, for example, which has ballooned the workload that is coming into the 2-HB program, for example.

And just seeing more applications being filed for wage determinations. Which for us, we've got to work even though it -- the employer may never use it. Right? It may never amount into a -- a PERM request.

But anybody can come get a wage determination. And some people are shopping. You know, we had -- we had multiple people just coming in filing multiple prevailing wage applications thinking they might

get assigned to a different analyst and get a different prevailing wage. I mean it was wild.

So we -- we -- we sort of struggled with that part of it. And I think that, you know, some of that has fueled the -- the demand over the years in our office and -- you know. We -- and I just think it's no -- it's a pretty well-documented record with us, with Congress, about the resource issues.

Q So do you think it's an increase in volume that's caused the delays with the same amount of resources or do you think it's more resources than it is volume?

A Well, sadly, it's a combination of both. It -- it is dramatic rises in annual workload which are -- in some cases, like in PERM, have literally doubled in ten years. The funding hasn't doubled. In the H-2A program, it's quadrupled. There's no quadruple of funding there. It is more than doubled in the H-2B program.

As I mentioned, the prevailing wage program itself has gone from 130 to a quarter of a million applications in the same time period. So it absolutely is workload.

And then you just simply don't have, I think, with our budget requests that we've been sending in, you

just -- we're trying to tell Congress, here are some requests for funding that if we receive these, we can -- we can reduce these processing times or we can stabilize these processing times a little bit better.

I think the classic example was in 2016. Congress had -- based on our request -- and the PERM processing times were very high back then. I mean it was taking us 452 days to do an audit case, for example, several hundred days to do -- a couple hundred days to do a non-audit case. And the backlog was kind of growing.

And in 2016, Congress gave us a one-time transfer of funding from another account, put it in our account, and then gave us a directive to process 96,000 cases and reduce and -- and to accomplish a net reduction of 16,000 PERM cases, the backlog. Bring it down by 16,000.

And that -- in their directive they said hire temporary workers or temporary employees. So we, in '16, '17, we did exactly what they asked. We went on a hiring spree with the temporary contractors. The processing times went all the way down to 75, maybe 78 days for non-audited cases around 2017, 2018. And, obviously, audits came way down.

So we -- that was a pretty clear example of where workload was moving and that additional resources

could be used to actually drive down the processing times.

Now you know, the year right after that, money expired because it was temporary. We went to Congress with a -- with a budget request that said can you please put permanent money into our budget? And if you don't, you know, the money you gave us is -- is not sustainable to keep these processing times down because of the workload projections that we were envisioning.

Which -- I mean they've materialized. So -- yeah.

Q How many more analysts do you need to keep up with the volume? What do you think?

A Well, it's not what I think. I'm going to have to actually tell you what the department has submitted to the Congress for this fiscal year. It's in the public budget. And just so I make sure I get this right, because this was one of the things when you were asking me how do you prepare for the questions. I saw your budget questions, so I -- I didn't want to misstate.

But for the budget that's sitting on the Hill right now, we asked for just -- remember, I told you like in 2016, they gave us $13 million. Right? Look what we did with the processing times. We went from 200 whatever to down to 78.

So we asked for -- which is sitting on the Hill now -- $6.059 million to fund 35 additional staff to help stabilize processing times. And that was for all the programs, but we would place a focus on PERM because of where it's at. And, you know, in the year before that we asked for 19 specifically for PERM, at $3 million. We didn't get that.

And so as I sit here today, I still don't have a budget for the whole fiscal year appropriated by Congress which means my funding is the same this year as it was last year, with the workload still going on.

Q Is your funding higher than it was in 2004, do you think?

A Yes.

Q Okay. Are you aware that when they promulgated the rule, they expected 120,000 PERM applications a year?

A They may have; I don't -- I don't recall. But that's usually -- probably an estimate that they had come up with.

Q And you would agree -- well, are you aware that in the rule-making, they expected it, with that volume, to be around 60 to 90 days for a PERM decision?

MR. POWELL: I'll object to the form of the question, but you still can answer.

A Yeah. I -- I think that -- again, that -- yes. The rule's preamble was aspiring to accomplish an adjudication call based on certain assumptions about maybe how the electronic system was going to function, how much it was going to do for the staff, how much staff was going to be there, how much workload was going to come in. Yes; I would say that it was definitely an aspiring goal.

BY MR. BANIAS:

Q Oh, and I guess -- 120,000 is a lot, and on the numbers you were just providing --

A Yeah.

Q -- you know, it's 130,000 to 150,000 that you're expecting. But that's not a doubling of that number; right?

A Well, this is -- yeah.

Q It's about 30 percent more?

A That's -- yeah; that's right. That's not the -- the standard, though. You had people writing a rule that hadn't even implemented the program yet.

So that's where the real test comes: Is you had people aspiring to implement something, making certain assumptions that we all know many of those assumptions could be impacted by other things or could not be very accurate.

So what we look at is the amount of time it has taken us to work these cases. So there may have been, in the -- excuse me -- in the mind of someone way back then, that an electronic system would do -- I'm making this up -- 90 percent of the work, and that the staff only had to look to see if there were all the pages available in order to hit a decision so that every decision was given 30 seconds of review or five minutes of review, then that's probably true, probably could do that.

But that's not how the program actually rolled out. Again, before I came into the office, that's not quite how the program, in actuality, rolled out.

So again, I would just encourage you that those are nice aspiring comments based on a lot of assumptions that I don't think are quite as accurate as the actual experience under the rule that we have been experiencing.

Q You guys noticing any new rules related to PERM anytime soon?

A That would be on the Office of Management Budgets Regulatory Agenda which is publicly available. So, to my knowledge, there isn't a PERM regulatory action on the agenda.

The only thing that the administration has

pushed out that's public information is a request for information from the public about potentially expanding what is called Schedule A for science, technology, education and mathematical occupations to include artificial intelligence which is linked to President Biden's Executive Order.

Q Okay. I'll take your answer as a no, that the Agency's not working on promulgating a new PERM regulation.

A We are not.

Q Okay. The original rule -- and I'm talking about the rule, not the proposed rule. Did it require any particular adjudication rationale, any adjudication logic? Did it lay out this month processing that's going on?

A The regulatory text does not include that.

Q Okay. Does Department of Labor follow a first-in, first-out rule for adjudications?

A No.

Q Okay. If there's a standard deviation between two applications filed on the same day of more than 60 days, would that tend to indicate to you that there's no consistency in the month processing format?

A I don't think so without --

MR. POWELL: Object to form of the question.

And he can't give his personal opinion.

I mean you may still answer the question, though.

A Yeah. There -- there's no way to -- to make that kind of -- draw that kind of conclusion unless you're looking at the individual circumstances of each of those cases to why one of them may have moved through a process of requesting information of -- of some sort. It's hard to tell.

BY MR. BANIAS:

Q Have you reviewed the expert opinion provided in this case?

A Not in detail; no.

Q Have you reviewed it, generally?

A I only read a few lines of it. But that was not the scope of what I was preparing for, so I did not read it in total.

Q Okay.

A No.

Q Does the Department of Labor have in-house statisticians?

A The Office of the Assistant Secretary for Policy has a -- has economists on staff and the -- obviously, the Bureau of Labor Statistics has an army of econometricians --

Q Okay.
A -- that -- I mean I just -- it's honest -- an army of statisticians, economists and mathematicians.
Q And, to your knowledge, have any of them reviewed the expert report provided?
A No.
Q Okay.
A No. They -- to my knowledge, no one has reviewed that.
Q Okay. I'm moving on to kind of topic two. I feel like I've run -- I've beat the dead horse of how these actually happened, sufficiently.
And you have to understand, for what it's worth, Mr. Pasternak, I don't file PERMs so I'm a little bit on the outside. So if this is common knowledge, I hope you'll forgive me.
So what is -- is PERM a priority to the Office of Foreign Labor Certifications?
A A budget priority? Or what -- what's the -- you asked a question I think in the scope about budget priority. Is -- is your -- is it sort of revolving around that?
Q Sure. Excuse me. Yes. That -- yes, sir.
A Well, so I would say from a budgetary standpoint -- and this is a little bit of what I said

before. Unlike sort of Department of Homeland Security and State, the Department of Labor does not have the statutory authority to independently generate revenue from like user fees.

So, rather, we depend on annual appropriations from Congress to try and carry out, you know, the roles and responsibilities that are assigned to us across all the immigrant/non-immigrant programs.

So from an executive branch perspective, the department has consistently made it a budget priority to request from Congress, you know, adequate resources and/or authority to independently generate revenue, like through user fees.

And I know -- I recall as early as 2014, 2015, we were informing Congress about the growing labor cert. workload as the economy and labor market were improving.

We were concerned about the fact that we were having to have $1.2 million of our money transferred to the agriculture department at that time to fund the farm labor survey which the agriculture department previously funded, and that these kinds of limited resources were going to force us to focus on the temporary non-immigrant programs where there are mandated statutory regulatory processing times. And we were going to have to reduce

the level of support for the PERM program where we don't have similar mandates from Congress.

I mean these are all statements that I'm making that are -- factually can be verified in the public budget requests. So we were signaling to Congress pretty early on that the processing times and backlogs are going to grow.

Yes, at that time we were receiving 70,000, 80,000 cases. And then as I mentioned to you before, all of a sudden it became a budget priority in 2016, 2017, around the same time, that we kept asking for, you know, new authority to charge fees.

And we were actually saying we could -- we could charge a fee similar to DHS for expedited processing. I wouldn't even care what the circumstances are of the employer or the foreign beneficiary, if I can -- if they wanted to pay for an expedited processing for whatever reason they want, I would be willing to do one.

So we put all that out there starting in 2016. It's been in every budget submission until the one that's on the Hill right now, that we would do this under the guise of helping to improve speed and -- and quality of processing.

So we were, you know, consistently making this a budget priority. And the way that we -- and the

reason why I'm trying to -- and I'm not blaming Congress. The reason why I'm telling you about Congress is that we don't have sort of that independent ability to say, you know what, it looks like our backlogs are kind of growing and our -- our costs are increasing; we can adjust our fees or create this new fee structure for expedited processing.

You know, we just don't have that kind of independence that a DHS or a Department of State have. So in our world, it's almost like -- I don't want to say like a dance with Congress, but it's -- it's literally being persistently -- you know, being persistent in telling them and warning them about, you know, the funding, the potential performance consequences or the backlog growing of administration of our responsibilities if we aren't sort of getting more resources.

So I -- sorry if that was a little bit rambling. But I -- I feel like we have made it a budget priority. It's been communicated to Congress very consistently. And we just have to -- at the end of the day, whatever they give us, we've got to try to find a way to allocate it across the prevailing wage and all the immigrant/non-immigrant programs as best we can.

Q Okay. And maybe that last part that you just described, of the budget you are given, not the proposed

budget --

A Yep.

Q Is PERM a priority within that budget or is something else of higher priority?

A Yeah. This is -- this is a challenging question to answer. Unfortunately, Congress does not appropriate funding the DOL for each, you know, visa program. So I -- I -- it's hard for me to say, you know, of the big number, Congress is saying spend this much on PERM, spend this much on the CW-1 visa program, so.

Rather, Congress provides annual funding in one federal administration account, and then they have a separate funding in a State administration account. The State administration account, which is a portion of the overall total appropriation numbers that you would see when you look at the budget, it's designated by Congress as grants to State workforce agencies. And those responsibilities at the State are solely connected to the temporary non-immigrant visa programs.

So funding at the State level, you know, is doing things like reviewing employer job orders under H-2A and H-2B, doing inspections of housing for farm workers, that kind of thing.

So as an example, in the 2023 budget that we had received last year, I think our total appropriation

was something like $18.3 million or something. $23.3 million doesn't even come to us, it actually goes out the door as grants to states with -- without any benefit of using it for federal administration activity. So we face that kind of challenge from Congress when the money is kind of appropriated.

The second challenge to answering the question is that the department itself does -- this is not atypical, but does not maintain what I think we could call like an activity-based cost accounting system. Right?

So costs that are incurred by our organization are actually charged again against a single appropriation account. And there are lots of charges, lots of shared costs in the department: The working capital fund, I pay for the secretary's office and I pay a portion to Human Resources and the lawyers and the technology systems and infrastructure. So they're all kind of charged back to that single appropriations account without regard to how much of that is supporting PERM versus H-2B, H-2A.

So having said that, I think one area where we could -- where I'm trying to be responsive to your question, where we can estimate I think the percentage of our costs that are going to the PERM program is really in

the federal salaries and benefits area. Right? I mean I talked a little bit about, you know, the organizational structure of PERM and also with the prevailing wage center.

So, you know, in 2023, for example, if you kind of -- you know, you have to make some assumptions, but -- because we have people kind of moving around and that sort of thing. We looked at, in 2023, like three different staffing points of the year. And 21 percent of our -- all of our federal staff and staff salaries and benefits were going to PERM adjudications, and another 29 percent of those costs were going to the PERM prevailing wage adjudication.

So, you know, my straight answer to your question -- and I -- I apologize for the long-winded introduction -- is that if -- it's not an easy question to answer. But in a -- if you just look at sort of the federal salaries and benefits -- which again, as we -- you and I have been talking about, we -- we've been talking all about federal staff work. And that doesn't include the technology system and all that stuff because that's shared.

And PERM is two phases. It's prevailing wage and it's the labor cert. process, which I can't ignore the prevailing wage piece of it. If you take those costs

together, we're right at about 50 percent. I mean that's my -- that's the best answer I can give you that is factual, and it -- it's based on an area of costs that I'm comfortable talking about because everything else is just too shared and it goes against the -- the same big appropriation.

Q Okay. I think that's a very -- that's a great answer. I appreciate that because I don't understand the back story and, you know, I -- I'm here on a fact-finding mission.

A Yeah, yeah. No; I understand.

Q But it sounds like -- and again, I don't want to -- I want to make sure I'm understanding what you're saying. Between PERM and prevailing wage, 52 percent of the budget for OFLC is on those programs?

A Fifty percent -- when we estimated, looking at three different staffing points there -- because remember, we got people going on PERM and going off --

Q Right.

A -- PERM during the year --

Q Okay.

A -- because of the visa program. That if you looked at it in three different staffing points, we see that 50 percent of the federal salary and benefits, right, that are the cost of the program, not the total

appropriation, but -- but within the appropriation of all of the federal, you know, staffing and salary costs --

Which is really like $30 to $32 million of the whole bundle, right? Because you've got to take the 83 -- you gotta subtract out the $23.3 for their grants to the State that we didn't even get to see. And what's left, you got to run everything. It's really the federal salaries and benefits category, cost category. Yeah.

Q When we're talking about -- you were talking about moving -- well, the flex team moves between H-2 -- the temporary programs versus the PERM program. Are there any other staffing decisions like that when, say, the H-2A and H-2B are slower, where more people from that program get moved over to PERM? How does that work?

A Yeah. It's a good question. So the -- you know, the -- the staffing and resource allocation decisions are a collaborative sort of conversation as a management -- senior management team between myself, Deputy Administrators, and then, of course, we have 15 program directors.

Because just making unilateral decisions isn't very effective; you've got to bring the program directors in who are experiencing the workload. So we -- based on the workloads and different VISA programs, we have a little more. And again, because of the statutory

and regulatory process times -- that can't be lost because that's really where we will be sort of chastised by Congress to say, look, we gave you this money and we had these statutory processes; these have to be met.

So the H-2A program, which has quadrupled in the last ten -- ten years, is the area where we have the least flexibility, where hardly anybody moves off of that program throughout the year. And it's seasonal, but it is intense and nearly the whole year. H-2B is one where we flex people away from like PERM, over to H-2B.

And then when we get -- draw down the big January filings, like I was telling you before, we'll have that one team that's over there from PERM come back like around May, and they'll start working on PERM cases again.

And then, of course, we have the prevailing wage center. They have actually, in recent years, been able to draw down their processing times. So to the extent that I can keep them down, and it's a little -- a little nervous for me to move people away from the prevailing wage center because we got a quarter of a -- our largest year yet, a quarter of a million wage requests.

So if their workload stays constant or maybe goes down a little bit and they're able to stay on top of

it, I might -- I could possibly siphon off people away to help with PERM. So, yeah, those kind of resource decisions are kind of like almost kind of a month-to-month, quarter-by-quarter, you know, conversation with the senior management team.

See, you know, if we borrowed these people over here and brought them here, what's going to be the consequence to this -- this processing line over here? Yeah.

Q So five -- I think five Plaintiffs in this case filed -- well, are the beneficiaries of PERM applications filed in February of 2023.

A Okay.

Q Under everything we've been describing, you would expect them to get a decision in the next month. Is that correct?

A I expect them to get a decision because we've opened up February 2023. And however it happens, the analysts may be assigned those cases and may work those cases either immediately, or they'll work them for that month. And so, yeah; I would expect them to be adjudicated fairly quickly.

Q If we have Plaintiffs in March and May and you were required --

A March and May --

Q -- to make decisions on their applications, how would that impact the Department of Labor?

A Wait a minute. You're asking -- you're -- the question you're asking -- if I can rephrase it, and then you will tell me if I'm mistaken. You're asking me one of the questions that's in topic three, which is how would deciding -- I -- you say ten app -- ten PERM applications at -- at PERM DOL. But you're saying several that are basically ahead of the processing month that we're currently working?

Q Correct.

A In other words, you want me to bring those cases forward into the current processing month, even though they're not in the current processing month; is that correct? And you're asking me what harm there is to that?

Q Correct.

A Okay. So that is the question in topic three that you're asking. And, yes; I -- I do see harm here. And I see the harm in eight -- I'm going to classify it as sort of eight reasons.

The first is the authority question which we've been talking about. Adjudicating PERM applications based on the visa or admission status of a foreign beneficiary is simply not within the scope of our

authority. We've gone over the authority, which is expressly noted by Congress, of what we should be looking at. We are interested in the employer; it's an employer-based program.

We are, more importantly, working with the employer to determine whether there are qualified American workers to do the job and whether the terms of employment do not adversely affect similarly-employed U.S. workers.

Our adjudication authority from Congress simply does not extend to the consideration of personal circumstances of perspective foreign beneficiary or their family.

And even when we get inquiries from foreign beneficiaries about the status of their case, either directly to us or even indirectly to members of Congress, we have a longstanding practice to direct the beneficiary to consult with their sponsoring employer about which the initial filing of PERM is based.

So I think the harm that I see is, one, it's authority; two, we've talked about -- and you've seen me try to answer questions, not -- probably not so well, is a lack of expertise issue.

I mean because we are an employer-based adjudication process, we really do lack the knowledge and

expertise to review and consider the merits of visa or admission status of foreign beneficiaries.

The PERM application, you know what it discloses: It is identifying information. It's basically the foreign workers' resumé. I was just being kind of folksy about that.

But it's the foreign workers' qualifications. And we're particularly interested in the adjudication about whether or not their qualifications meet the actual minimum requirements of -- of the employer. And I just -- our staff simply do not have the expertise to take this kind of information into account.

We've talked about resources; that's my third harm argument. So not only do we lack the knowledge and expertise to adjudicate that, but performing this kind of unique adjudication would require us to reallocate existing resources away where we have backlogs, establish an entirely new business process that we can receive, analyze, take necessary actions -- presumably in an expedited manner -- related solely to the foreign worker's personal or family circumstances.

This would all need to be done without additional resources from Congress and would have, I would argue, an immediate negative impact on temporary non-immigrant programs where the employer's needs for

seasonal workers is measured in weeks and not months.

Four, I would argue that this is not a procedural change in processing. This is, rather, affecting the substantive benefits and rights of employers and foreign beneficiaries which, in my view, raise larger administrative procedural act questions and possibly rising to the level of public notice and comment rule-making.

Five, this will not be limited to ten applications. Once this is established -- it's a small world out there. This would no longer be limited to ten. With about 170,000 pending per applications, I can envision no shortage of foreign beneficiaries coming forward, with or without their sponsoring employer, requesting expedited adjudications.

And with no way to independently validate the foreign beneficiary's alleged urgent personal or family circumstances, such a process would be prone to overuse and misuse.

And the vast majority of employers who, over many years, have paid close attention to our monthly updates to prevailing wage and PERM adjudication times in order to file a timely PERM application and patiently wait for me to reach their month, they would decry that such an expedited process would be neither transparent

nor fair.

And I am also deeply concerned that this could politicize our process because foreign beneficiaries do go to their members of Congress. And I could envision members of Congress requesting expedited deal adjudication based on their constituents.

There is a moral hazard problem -- six -- that we have to consider. This can create an incentive for some employers to ignore or often avoid the processing times that we post all together and artificially hold the filing of the PERM application until the foreign beneficiary is within their last year of visa status.

And then they know -- because we'll pull cases forward, they'll ask the foreign beneficiary to separately request an expedited adjudication from us so that a much older PERM application can jump to the front of the line and then move on to DHS.

And then I got two last things because I thought about this for you. And I know you asked the question and I'm sorry, but there will be an impact on the temporary non-immigrant programs beyond these ten. The situation could have a negative spillover effect into these other programs.

And just -- you know, I was thinking about

this. One example that is probably very relevant is the H-2B program is also really oversubscribed by employers with respect to workload and has statutory mandated visa caps. But there are exemptions to those caps which are administered by DHS, USIS based on their expertise and knowledge, not our office.

And seeing what may be happening in PERM where DOL is now involved in expediting the final decisions on applications based on a foreign beneficiary's personal or family circumstance, if an H-2B employer is seeking to employ foreign workers in the second half of the visa cap year and those workers have already been admitted to the first half cap which makes them cap-exempt in the second half, the employer or the foreign beneficiaries could request that DOL expedite adjudication of their H-2B applications to prevent the H-2B workers from going out of status and having to leave the country because of portability, which is administered by DHS and not us.

And then I'll just end by saying adjudicating these ten applications in this manner simply does not solve the well-documented and underlying problem and challenges we have at DOL which is an inadequate level of Congressional funding to meet the workload demands which we have seen persistently increasing for the last ten to

12 years, that are outpacing the -- the resources we're getting.

I'm done. Sorry.

Q No, you're good. I appreciate that. But I do want to re-ask my question.

If DOL was compelled -- in other words, you didn't get to have these concerns about a unique process that we're not trying to force on you, if a judge said this is unreasonable, make ten decisions, would that impact the office's foreign labor certification? Let me ask, how would that impact?

A Operationally?

Q Yeah.

A To -- to move the ten cases?

Q Correct.

A Yes. I would have -- I would basically tell -- I would basically tell a staff person the judges order these same cases be adjudicated. You are to go search for them in the PERM system, which would be in the waiting queue, and they would have to be assigned to an analyst and they would be worked immediately.

Q And if they don't have -- if they don't have any flags, it would take eight minutes?

A What I was suggesting is it would -- they would get a review in the amount of time that the analyst

does spend under their standard production expectations. It would be probably like an 11 to 13-minute kind of review. And they would be, at that point, issuing action to certify, deny, withdraw. Can't imagine that would happen. And then assigning the case to audit, if it was flagged.

Q Okay. And that would take less than a full day's work for one analyst?

A For ten cases.

Q For ten cases. Okay. The published processing time -- I think right now it's somewhere in the 390s. Does your office calculate that?

A Yes. The -- the processing -- just so we're clear, the processing times that you might see on the flag system --

Q I think that's right, wherever it reports the day. And do you guys calculate --

A Yes.

Q -- that?

A Yes. It's -- it's calculated by a performance team that's in our office.

Q How do they calculate that?

A Well, I mean the -- an average time is based on all the adjudications that are being finalized in that month, regardless of the original filing date. I mean --

remember, we talked -- there are -- typically, it's all the adjudications that were in that filing month we were working. But there are some cases like stragglers and things that get factored into. We don't exclude them; everything gets averaged.

So it's the -- what I call the good, the bad and the ugly average. So we're not interested in like sugarcoating the -- the actual averages. So it's -- it's taking every decision that was issued in that month timeframe when we update the next month and just saying this is the average time currently that it's taking us to work through or issue decisions in -- in these cases.

And again, like the -- the -- the thing that you and I talked about before that is -- you know, it's hard to communicate to people but it's -- it's kind of a reality, is that the February 2023 case -- you know, the case is filed by these employers. They're kind of looking at the process and they were going, gee whiz, it's taking like over a year for DOL to get to this month that I filed in.

So the averages are going to look and include all the wait time in the queue. So it -- yeah. I mean -- and, plus, if I -- if I did anything differently, I think people would say it's an artificial processing time because I've been waiting for 11 months, so to

speak.

Q Okay. I just want to be very clear because some of your sister agencies report average times in very different ways. So it's really --

A Oh.

Q -- important to understand where that's coming from. When I say "sister agencies," I mean DHS -- yeah. It's all that kind of stuff, not DOL.

A I gotcha.

MR. BANIAS: Okay. I think -- can we take a ten-minute break? I'll come back and ask a handful of questions and then we'll be done.

Would that be all right, David?

MR. POWELL: Okay. I'm off mute. Yes. Except I might have a couple of questions.

MR. BANIAS: Yeah, yeah. Absolutely, absolutely.

(At this point there is a break in the deposition.)

BY MR. BANIAS:

Q Mr. Pasternak, again, thank you for your patience and preparation for today. I know it's no fun to prepare for a deposition, but it's much easier when the deponent has actually prepared, so thank you.

Two quick questions. You mentioned the savings from the going from mailings to email. Where did

you reinvest that savings into the OFLC?

A Well, a couple ways. It's put back into the technology because a lot of the savings that we -- and I don't -- I don't like to use the word "cost savings" because we use the term "cost avoidances," meaning there are costs to run the organization. You just avoid paying this, but you have to pay that.

So the avoided cost from a lot of the technology modernization and then moving to telework and that sort of thing has been put back into the staff. So it -- it ranges from giving them the computers and the equipment. We're first in line in DOL for new computers, new equipment, anything they need to work at telework to maintain their productivity.

We put it back into training. We -- we -- we do a lot of team building and things like that, too. I mean that's a normal part of managing an organization. And then technology enhancements, it goes back into that.

And we've been able to hire some additional staff from the savings. And a lot of the staffing has been -- because we've been having some pretty big backlog issues in the prevailing wage center in recent years, we've been adding staff there as well. And then we -- we added five more staff in PERM in that -- in that non-audit business line that we were just talking about.

As you probably noticed, I had two certifying officers on that line: One on audit, one on supervisor recruitment, one on appeal. So we added a -- a second team in AR with a supervisor and -- and a team.

So, yeah. I think as far as like reinvesting, those have been the major categories where we've been able to, you know, redirect those resources.

Q Okay. And just so I understand your answer, were any of those redirected to the PERM of the prevailing wage side or the PERM side like we've been talking about?

A Yeah. So we have -- we created the -- the new non-audit adjudication team in PERM, which is a supervisor with -- it's basically five. We got five extra people there. And then we added another team in the prevailing wage center, as well.

So again, like -- yeah. For the -- for the most part, the extra staff went there. And, obviously, we put some in H-2A because the workload is just going crazy and -- yeah. But PERM and the prevailing wage center, you know, if you look at it as a PERM program, which it kind of is in two pieces, that -- that they did gain some -- some staffing there.

Q Okay. My other question goes back to this assignment policy. So -- and let's just do a

hypothetical, if that's okay. If February opens up -- let's say March opens up, March 2023. and 10,000 new cases are there, and we have -- I think you said 12 line adjudicators, and we divide them all up evenly or quasi-evenly.

And Adjudicator A gets their load done in two weeks, but Adjudicator B is only a third of the way through after two weeks. How do you manage that situation? Does Adjudicator A start to help with the stuff from that month? Do they stop and work at other things? Do they get to take the rest of the month off?

A It really depends, I mean, because we have standard production expectations regardless of staff. And we're trying to evenly distribute the workload if they really are getting out of whack and it -- and "out of whack" means like one seems to be working -- you know, because again, at eight minutes a case or something, and this other one's working at ten or 11 minutes a case, so they're not working down their queue as quickly as the other, we're not really going to take much issue with that.

But if that same analyst like is off doing -- they're off, they're doing something else, we will have to reassign their cases to other analysts and redistribute the workload. But on the whole, we let the

staff decide how to work the cases in that processing month.

And we're looking at the big picture, we're looking at the total draw-down of the submissions from that month. We're looking at -- we're telling them you've got to deal with the stragglers. It's possible somebody's a little bit slower because they might be dealing with -- I don't know, maybe slightly more stragglers from the prior processing month than the other analysts. based on whatever circumstances those cases had.

But we're kind of like looking at the overall adjudication level to get near that 1,000 before we even think about moving into another month. And so, yeah, we can -- we can either -- the supervisor will either talk to you down, see what's going on. Maybe something's going on we don't know.

And we may have to redistribute some cases. Or it's possible that they've had some loss or some leave or something and we've got to get -- move them over because they're just going to get further behind, so.

Q So what -- I guess this is a related question, and maybe this is a better way to put it. What about the incredibly fast adjudicator who gets their work done in two weeks and nothing's going to be reassigned

for until that processing month moves forward?

A Oh, yeah. No. We -- if -- if there is a super reviewer, which we -- we don't really have somebody who is like doing it two minutes a pop. If we had somebody like that, obviously we would be looking at their quality, I mean making sure they're not rubber-stamping things, which there is a quality piece to it.

But we would end up having to redistribute work away from other analysts to them to keep everybody fully productive. Because if we move into the next month, he may work that month really fast compared to everybody else who's trying to pick up their stragglers now. Right? Because you move into a new month based on his standard, his speed, we're going to end up with more stragglers.

So if we had a super reviewer. we'd have to redistribute workload.

Q But that's not a problem that you're facing right now?

A No, no.

Q Okay. Okay. Hold on. Okay. I think -- okay. This is my last question. I guess you know, from an outsider, we're doing what we can to learn and challenge delays. You're the insider; you've created

this process. What do you think the solution is to get processing time down from a year to a few months?

A There's a few times I think when the government can look somebody straight in the face and say we just need more hands. This is one of them. And I will tell you, if I had been sitting here talking to you and I've got a paper-laden driven process with all sorts of processing centers, mail going everywhere, I think it would probably not be a credible argument because it would be easy to say, you know what, why don't you modernize the darn system and make things a little bit faster?

And I really do believe that we've tried to be as judicious as we can with these different competing statutory and regulatory mandates in these various immigrant/non-immigrant programs to -- to modernize as best we can.

But there's more we can do, which we're always looking at, and cutting down on all of these unnecessary administrative costs which are in our public budget submissions. We've told Congress we -- we're cutting down on administrative -- unnecessary administrative expenses, space and mail room and con -- administrative contracts, cross-training staff. We got flex teams. We're trying to move people around as best

we can.

And I do think we have reached a point where if we're not given more hands to work these cases and bring them down, we may have -- backlogs will be our friends for quite a number of years.

And I just go back to the example when it was a priority for Congress -- in like FY16, they gave us the money, they gave us a directive, and we actually exceeded their directive. They asked for a net reduction of 16,000 cases, and I think we ended up with a net reduction of nearly 25,000 cases with the money they gave us.

The thing we flagged for them was we could keep this low if you could transition that one-time bandaid of funding into our permanent appropriations and we could keep it that way.

So I feel like -- yes, I do think there was a missed opportunity in 2016, '17, '18, that when we got those processing times down to 78 days on average, I thought there was a missed opportunity there with the workload on the horizon to I think keep -- keep the momentum going, so to speak.

So I -- you asked a question about harm in 60 days. But we've been -- we -- there was a point where we were processing cases on average 78 days, and I never saw

any harm to it as long as Congress put a priority on it.

Q If a court ordered you, Department of Labor, and said we think six months is reasonable, anything beyond that's unreasonable without more budget, without more hands -- or I should say more money -- what would the Agency do to comply?

A Well, that's a brilliant -- pretty extreme hypothetical because the court would be ordering me to, basically, fundamentally reform an entire program, processing expectations for all cases and not just, you know, ten that you're asking about. We would have to figure out internally, which kind of mandates.

Again, it's -- you know, it's about priorities. What kind of mandates do are just simply immovable for us, and statutory mandates are one of them. And we would have to figure out to what extent does the court's order supersede our ability to meet statutory processing times or regulatory processing in other cases.

And if we -- my lawyers believed that that was something that could be compromised, in other words -- a good example might be, well, we're just going to have to take more people away from the H-2B program and those seasonal employers are just going to have to wait and they may not actually get a certification for their seasonal needs because we've got this court order

over here which was promulgated without any consideration of resources or workload volume or anything.

So somebody's going to have to pay the price. And I think that's the question, is what can pay the price for doing that? That won't land me in court with another petitioner wanting not six months, but they want 60 days or they want 30 days of processing on those kinds of visa applications or labor cert. requests.

So we -- my answer to your question is, we'd have to see what the court actually ordered. I'd have to consult with my lawyers about where's my flexibility to even not meet mandates somewhere. I'd have to staff it as best I could.

Q Okay.

MR. BANIAS: Well, I think that's all we have for the 30(b)(6). David, if you want to redirect, it's your show.

MR. POWELL: I think I do have just a little bit of follow-up.

E-X-A-M-I-N-A-T-I-O-N

BY MR. POWELL:

Q First, just -- you said that recently there was like a 50-unit-per-day average production by those 12 analysts?

A We looked at the actual output of our

non-audit cases in PERM from the October to December 2023 period which was the most recent quarter that just ended.

Part of the reason why we were doing that is, you know -- as you probably know, the Office of Inspector General has a program audit team and they're actually conducting audits on PERM and -- it's routine. And they asked for production level information.

And so, yes, we ran the numbers for that quarter which was the equivalent of 38 work days in that quarter. Which doesn't sound very much, but that is Thanksgiving and Christmas and everything else. So I lose staff who have use or lose, and that's the consequence of the merit staffing system.

But for -- across those 38 days when they were, you know, working in that analyst review team -- which does not include the six people that I talked about that are currently on H-2B, I mean that's not -- doesn't include them -- yes, their actual daily average was -- was 55 cases above even the high end of 42 on their performance management plans.

Q Okay. So let's say if they could keep the average up in the foreseeable month, the next few months, of 50 a day with 12 analysts, how many would they be able to successfully process in a month?

A Well, you're asking me to do math off my head

and --

Q Say that it's a 20-day, 20-workday month. About how many, at 50 a day PERM? Let's do it this way first.

A I'm sorry. I'm sitting here, you're asking me a question to -- to compute on the fly. Twenty -- 50 -- 50-day production in a 20-workday month with eight analysts --

Q Just for one. Just say for one analyst.

A A thousand a month. About a thousand a month.

Q A thousand a month. So if you had 12 analysts, after 12,000 -- if you've got more than 12,000 for the month, you would be having some more lag?

A Yes.

Q Your processing time would trend up further, sort of like --

A Yes.

Q -- what happened over the last month?

A Yes. The last quarter, we were averaging somewhere between 14,000 and 15,000 cases filed per month. So I would need analysts-at least, you know, 14, 15, 16 analysts, really exceeding -- consistently exceeding their production on every work day, to try to even keep pace with the incoming.

Q Okay. So let me think how to word this. Oh. You were asked about what harm would -- what would be the harm to the department if you were required to process some applications immediately. One thing I didn't hear you discuss is -- which is all -- in all the case law, is the courts talk about the impact on other applicants. Would that be -- would you not consider that a harm to the Agency itself?

MR. BANIAS: Objection.

BY MR. POWELL:

Q Okay. What impact do you think it would have on the Agency if you were required to start jumping people ahead of other people in the process?

MR. BANIAS: Objection.

BY MR. POWELL:

Q Okay. You still answer.

A Okay. I -- I don't think that -- the way I understand the question, it would -- I would answer it much differently than what I had said when I first started talking about it, is again -- and I'm not going to go back through all of the -- the reasons. I mean I feel like we've got authority issues, we've got expertise and resource constraint problems. I think these are not procedural requests. These are affecting substantive rights and benefits of employers and foreign

beneficiaries.

I also said it's not going to be limited to ten. We have 170,000 pending PERM applications right now. I have no earthly idea what the status or personal family circumstances are of each of the foreign workers that are in our backlog. And I just believe there would be no shortage of foreign beneficiaries coming forward, with or without a sponsoring employer, requesting expedited service.

And I think, you know, last -- to answer your question, I -- I do believe there's a moral hazard issue here which is -- this can create incentives for employers to sort of ignore or avoid the processing times that we post and hold these filings because they know that they could have the foreign worker request expedited service based on their visa status. It has nothing to do with the information disclosed on the PERM application.

And I think the larger spillover effect that I tried to communicate earlier was that this isn't limited to a PERM discussion. We have visa status issues with temporary non-immigrant visa holders that are more acute than the PERM ones as well because they're sometimes on six-month work contracts or eight-month work contracts.

And if we start looking at H-2A or H-2B

employers and adjudicating and prioritizing cases based on the visa status of hundreds of H-2A workers or H-2B visa holders, the -- the -- the -- the situation, I think, could be incredibly unmanageable with just people coming at us for -- left and right.

Q Okay. And just to clarify, when we were discussing it at 50 applications a day, an analyst would process a thousand in 20 days, does that -- is that only a thousand that were approved?

A No. I mean the -- the thousand can be certifications and denials. They can take an action to put it into audit. There could be withdrawal actions, as well. So there -- there are case actions related to their production expectations or certifications, denials and withdrawals and -- and -- and sending cases to audit.

Q Okay. And what -- what's the exact role or interplay with OIG on the -- I think you call them "old cases?"

A Yeah. And this doesn't happen very often. But the Inspector General is, you know, required to investigate fraud, abuse, misuse of immigration benefits. They have a whole labor fraud and labor racketing division.

So they do not -- and cannot, for law enforcement reasons, share the specifics of any of -- any

investigation they are engaged in. But they do have the ability to ask us to temporarily hold adjudications on certain cases or certain groups of cases.

And the PERM fraud rule that was promulgated in 2007 does have a 180-day window in which the -- the Inspector General can -- for fraud reasons, we can hold cases. And again, as I was trying to explain, these get caught up in being straggler cases.

So our due diligence -- because the Inspector General can't give us details, our due diligence is for the analysts and/or the team lead to check in with the Inspector General and say are we still on hold, are we not, that sort of thing.

So we just simply lack -- for obvious reasons, for law enforcement purposes, they can't really disclose the merits of their investigation. Yeah.

Q So all you know is the IG has put a hold on the --

A That's all we know. They don't even -- they don't give us any information to -- to do anything with the application. And I -- yeah/they just tell us we need these on hold.

Q Okay. When you eventually get notified of the -- to go forward or what the disposition is, what kind of notice do you get?

A We just get a note that these can be released for processing.
Q Okay.
A The Inspector General --
Q Do they ever -- do they ever --
A -- does not --
Q -- completely -- I'm sorry. Go ahead.
A Oh, it's my fault. See; I did it.
Q Yeah.
A The Inspector General does not direct us to adjudicate in a certain manner.
Q Okay. But do they ever tell you that one can't be -- that it's -- that one can't be approved or has been permanently, from whatever their process is, rejected?
A If they engage I think in some sort of court-ordered settlement that an individual agent or something is debarred, has been debarred from the program, then, yeah. We would -- we would want to know the circumstances of the settlement, work with our lawyers, with -- with the pending cases that were on hold, and make a determination whether those cases should be denied.
Q Do they tell you if a case has been, for instance, referred for prosecution?

A Nope.

Q You just know at some point you can go forward or you can't?

A Yep. That's correct.

Q I know we're now in the February month. Have you been able to through staff or however the process would be determine that the February applications in this case are being processed or --

A Yes.

Q -- otherwise what the status is?

A Yes. My understanding is these cases have been actively reviewed and have had a case action issued against them, just the February 2023 filed cases because we've moved into that month.

Q So they've had one of the three decisions that can be made already?

A They -- they had -- they had that case action issued against them; that's correct.

Q Okay. Now on the case action, whether it's approve, deny, or refer for audit, those all happen during this -- the normal processing cycle for the month that's in review?

A That's correct.

Q Okay. So it's not like the denials are held to the end of the month or anything like that. So do the

files actually -- does the department capture the actual decision date when the Certifying Officer makes one of those three decisions?

A Yes. There -- so there is a sort of a function in the electronic system, the PERM system, that requires the analyst to -- it's a radial button to make the selection for the case action and save that decision. Saving that decision creates a date/time stamp in the database.

Q Okay.

That's all the questions I have.

MR. BANIAS: I just have one quick follow-up, Mr. Pasternak.

R-E-E-X-A-M-I-N-A-T-I-O-N

BY MR. BANIAS:

Q Are any of the Plaintiffs' applications on hold with the OIG?

A To my knowledge, no.

Q Are any of them subject to hold for -- or subject to a -- "match," I think is what the word we're using. Have they matched?

A To my knowledge, no.

Q Okay.

Thank you, Mr. Pasternak. We appreciate it. And unless Mr. Powell has anything else -- it doesn't

look like it.

MR. POWELL: Okay. We reserve reading and signing.

(The deponent was explained his right to read and sign the transcript of the deposition and chose to exercise that right.)

(The deposition concludes at 4:17 p.m.)

CERTIFICATE OF REPORTER

I, Lorraine B. Whiteley, Court Reporter and Notary Public in and for the state of South Carolina, do hereby certify that the aforementioned deposition of U.S. DEPARTMENT OF LABOR, by and through its FRCP Rule 30(b)(6) designee, BRIAN DAVID PASTERNAK, was recorded by me and transcribed through computer-aided transcription by me to the best of my ability.

I FURTHER CERTIFY that the foregoing transcript is a true and correct transcript of the testimony given by the said deponent at the time and place specified.

I FURTHER CERTIFY that I am neither attorney nor counsel for, nor related to nor employed by any of the parties to the action in which this deposition is taken, neither am I financially interested in this action.

IN WITNESS WHEREOF, I have set my hand and seal this 11th day of March 2024.

______________________________

Lorraine B. Whiteley
Notary Public for South Carolina
Commission Expires: 4/7/2027

A-T-T-E-S-T-A-T-I-O-N

In Re: JADIEL BAR CARDOSO, ET AL. v. JULIE SU, ACTING SECRETARY, U.S. DEPARTMENT OF LABOR

Case No.: 1:23-cv-03629-MLB

Deposition of: U.S. DEPARTMENT OF LABOR, BRIAN DAVID PASTERNAK, FRCP RULE 30(b)(6) DESIGNEE

Date Taken: MARCH 4, 2024

Taken Before: LORRAINE B. WHITELEY

Attorneys: BRADLEY B. BANIAS; STEVEN A. BROWN; R. DAVID POWELL; EDWARD WALDMAN

Having read my deposition, no changes are necessary: _______________________

Having read my deposition, I make the following changes:

Page ___ Line ___ Correction _______________________
Page ___ Line ___ Correction _______________________
Page ___ Line ___ Correction _______________________
Page ___ Line ___ Correction _______________________
Page ___ Line ___ Correction _______________________
Page ___ Line ___ Correction _______________________
Page ___ Line ___ Correction _______________________
Page ___ Line ___ Correction _______________________
Page ___ Line ___ Correction _______________________
Page ___ Line ___ Correction _______________________
Page ___ Line ___ Correction _______________________