## [1] Education, Qualifications and Expert Analysis

I am an Associate Professor in the Department of Political Science at the College of Charleston in Charleston, South Carolina. I began my career as an Assistant Professor in the fall of 2011 and was tenured in 2017 with exemplary ratings in teaching, research, and service. I serve in three administrate roles at the College: as the Associate Chair of my department, as the Research Director for the Center for Public Choice and Market Process, and as Director of the American Politics Research Team. I teach undergraduate classes on a range of intersecting topics: American politics, the Congress, American political development, national elections, research methodology, and statistical computing. For example, in the spring of 2023 I taught a senior seminar entitled "Elections, Voting, and Data Science." I also teach graduate courses on statistical analysis in the College's Master of Public Administration (MPA) program.

I received my Ph.D. in political science from the University of Florida in 2011. My graduate coursework spanned two fields: American politics and quantitative research methodology. I was awarded a "high pass" on my quantitative methods qualifying exam and taught statistical analysis, linear models, and statistical computing in my PhD program. Additionally, in both 2006 and 2007, I took graduate classes on statistical methods for social research at the University of Michigan.

My academic work includes over a dozen peer-reviewed articles on national politics, South Carolina politics, the Congress, political parties, public administration, national elections, and political economy. My peer reviewed publications also include two co-authored books: "First in the South: Why South Carolina's Presidential Primary Matters" (2020, *University of South Carolina Press*) and "Congress in Reverse: Repeals from Reconstruction to the Present" (2020, *University of Chicago Press*).

I am frequently asked to provide expert commentary on various issues related to American politics. I have been quoted in *The New Yorker*, *USA Today*, *The Post & Courier*, and *The State* and have appeared on *South Carolina ETV*, *South Carolina Public Radio*, *National Public Radio, Bloomberg TV, Matter of Fact with Soledad O'Brien* and several local news programs. I have published roughly thirty op-eds/editorials in newspapers such as *The Washington Post*, *The Post & Courier*, and *The State*. I am often invited to speak to several organizations and groups. For example, in the fall of 2020 I gave an invited lecture on polarization and the presidential election at Clemson University.

My scholarship includes several forms of consulting, public service, and expert analysis. I have worked as a consultant for local organizations including the City of Charleston Police Department, Charleston County Human Resources, Lowcountry Local First, and the Alliance for Full Acceptance. My work for these organizations involved the statistical analysis of political, social, and administrative data. Currently, I am on the advisory board for a local civil rights and civics educational organization called "C3: Charleston Civil Rights and Civics." I am also currently a teaching fellow in the "Civic Engagement & Voting Rights Teacher Scholars" program at Clemson University.

I was retained by the American Civil Liberties Union (ACLU) from 2021 to 2022 in a federal racial gerrymandering lawsuit in South Carolina (*South Carolina NAACP v. Alexander*). I authored three expert reports, provided deposition testimony, and was accepted by the Court as a qualified expert on congressional elections, South Carolina politics, and quantitative analysis. In the legislative portion of the lawsuit, Plaintiffs secured a pre-trial agreement that resulted in new state House district lines in five counties, and in the congressional phase, Plaintiffs won a unanimous decision by

a three-judge panel striking down Congressional District #1 as a racial gerrymander. My analysis and testimony were cited by the Court as "particularly probative regarding changes in the Charleston County portion of Congressional District No. 1."

I was also retained by the ACLU from 2023 to 2024 in a federal racial gerrymandering lawsuit in Mississippi (*Mississippi NAACP v. State Board of Election Commissioners*). I authored three expert reports, provided deposition testimony, and was accepted by the Court as a qualified expert on American politics, electoral district modeling, and quantitative analysis. A decision in that case is pending.

## [2] Scope of Engagement

I was retained by Plaintiffs' counsel to study the PERM adjudication process. I was asked to render an opinion on two issues: first, whether the Department of Labor uses a "first in first out" adjudication pattern, and second, whether the Department of Labor processes certain applications differently than others. My engagement letter also invites me to conduct "any other assessments, evaluations or conclusions… relevant or pertinent to address issues 1 and 2 above."

I am retained at the rate of $6000 for the following report, $2000 for updated reports, as necessary, and $250 per hour for any deposition testimony, trial testimony, or review of other expert reports. My compensation does not depend on the results of the case, or on the opinions and testimony I may provide. Any opinions expressed in this report are solely my own and do not represent the opinions of my employer.

## [3] Data, Software, and Materials Relied Upon

I obtained the PERM disclosure files from the Department of Labor's (DOL) Office of Foreign Labor Certification's (OFLC) website. I downloaded the disclosure files for 2015 to 2023 using Microsoft Excel, the format used by OFLC. For each disclosure file, I also reviewed the "PERM Record Layout" documentation available on the OFLC's website.

- https://www.dol.gov/agencies/eta/foreign-labor/performance

Plaintiffs' counsel provided me with ten Excel spreadsheets (produced by DOL staff in response to two FOIA requests) that indicate which cases were audited for fiscal years 2014 to 2023.

- 2023-F-09786
- 2023-F-11744

I consulted AILA's 2019 PERM guidebook as necessary.

- Redzic, Sarah K. (2019). "AILA's Guide to PERM Labor Certification: Strategies, Samples, and Guidance for Achieving Success."

All analyses, figures, and graphs were conducted or produced in Stata, a common statistical package used in political science, economics, and other academic disciplines.

- Stata 17.0 (MP Edition)

## [4] Opinions

I discuss three analyses in the pages below. All opinions are based on the data listed in Section 3 above, the bulk of which are publicly available, and the analyses and results described below. My primary analysis examines the length of time it takes DOL staff to adjudicate PERM applications. I do so with data on 380,426 certified and non-audited cases submitted from 2014 to 2022. An analysis restricted to applications that were certified and not audited should reveal an orderly adjudication process with little variation in the average applicant's time in the queue. Several pieces of evidence, however, reveal a highly variable adjudication process that results in unusually long processing delays. I next performed two analyses that examine whether DOL staff follow the queue order when adjudicating cases. I explore this issue from two vantage points: (1) the frequency of line jumping and (2) variation in the decision length of applications submitted on the same day. I find that the average applicant is skipped over 1,200 times and that cases submitted together, on the same day, typically experience a 5-6 week gap between the first and last case to receive a decision. Based on the totality of the evidence, I conclude that DOL staff do not follow a "first in, first out" policy when adjudicating PERM applications.

## [5] Data Preparation

I began by downloading the PERM disclosure files from the Department of Labor's (DOL) website for the years 2015 to 2023.[1] Although DOL provides these files back to 2008, the spreadsheets lack several key variables prior to 2015. Critically, there is no submission variable from 2008 to 2014, making it impossible to compute how long a case sat in the queue before receiving a decision.

It should be noted that the disclosure files are organized by (1) the decision date and (2) the federal government's fiscal year. For example, the 2015 file contains any case that received a decision from October 1, 2014 until September 30, 2015. For this reason, the 2014 data contain only the final quarter of the year (October to December). Although cases from earlier months appear in the 2015 disclosure file, these applications must be omitted from the analysis to not unfairly increase DOL's processing time. Indeed, cases in the 2015 disclosure file submitted in early 2014 have usually long processing times while those that are excluded because they appear in the 2014 disclosure file no doubt received a quicker decision.[2]

After downloading the raw data, I imported each file into Stata 17 and "cleaned" the entire dataset to have common variable names and formatting. Coding and cleaning the data in this manner is a necessary step to assemble a single dataset with a consistent structure.

---

[1] At the present time, the data for the first quarter of 2024 is not available on the DOL website.

[2] An extreme but illustrative example of this point are cases in the 2015 disclosure file that were submitted in January of 2014. For the reasons articulated above, these cases have an average processing time of 513 days, which is extraordinarily long. But this an incomplete and thus misleading statistic—we simply lack the requisite data on the much larger volume of cases that were also submitted in January yet received a decision prior to the October 1, 2014 cutoff. Statisticians refer to this problem as selection bias.

### [6] Initial Decision Length Analysis

For an initial examination of the adjudication process, I created a variable that counts the number of days from when the employer submitted the PERM application to when DOL rendered a decision.[3] For example, if an application was submitted on 5/17/2018 and received a decision on 8/1/2018, the variable has a value of 76 days for this hypothetical case.

I discovered that the only cases with decisions in the 2023 disclosure file (3,104 in total) were withdrawn applications. In other words, there is not a single case that was submitted in 2023 that was certified or denied by DOL staff by the end of the fiscal year. It is therefore impossible to perform any analysis for 2023, though we can infer that the average processing time for these cases is likely a year or more. At the same time, the 2023 processing delays create analytical challenges with the 2022 data. I explain why in Section 8 below. In total, the dataset under examination in this sections contains 894,864 applications submitted from late 2014 to the end of 2022.

For the analysis below I computed various summary statistics for the decision length variable.[4] What follows is a brief description of each statistic and what they may reveal about the PERM adjudication process. Additional details can be found in most econometric textbooks.[5]

Mean/Median—the central tendency of a distribution.

- Both the mean and median reveal how long a "typical" PERM application sat in the queue before receiving a decision.[6] In mathematical terms, the mean is the sum of every observation divided by the sample size, while the median is the observation that divides the sample in half. Critically, the mean and median will tend to produce different values if there are outliers that skew the data in one direction.

Outliers—statistically abnormal datapoints.

- An outlier is any PERM application that took an unusually long time to receive a decision.[7] Although there are several ways to compute outliers, the most common is any observation that is 1.5 times outside the "fence" created by the interquartile range. In other words, to identify outliers you follow three steps: (1) compute the distance between the 75th observation and the 25th observation, (2) multiply that number, the interquartile range, by the value 1.5, and then (3) add the number produced by the second step to the 75th percentile and subtract it from the 25th percentile.

---

[3] In the process of creating the decision length variable, I discovered four errors in the DOL disclosure database: three cases that had a decision date yet no received date and a single case that had a decision date before the received date. I dropped these cases from the dataset.
[4] All computations were conducted in Stata 17 using the *table* command.
[5] See for example: Greene, William H. (2000). "Econometric Analysis" (4th edition). Hoboken, New Jersey: Prentice Hall.
[6] I also compute the mode in a subsequent section. Like the mean and median, the mode measures a distribution's central tendency. Unlike the mean and median, however, the mode is the most common value in a variable.
[7] Although outliers can be usually low values, there are no such observations in present data. In other words, the only outliers in the PERM disclosure files are on the high end of the distribution.

Standard Deviation—a measure of the amount of variability in a distribution.

- Standard deviation compares each datapoint to its mean and is thus a measure of dispersion. A small standard deviation indicates that many observations are close to the mean, while a large standard deviation indicates that many observations are far away from the mean. In this context, a small standard deviation would reveal that DOL staff processes PERM applications in approximately the same time range (i.e. with little variation) while a large standard deviation would reveal substantial variability in the adjudication process.

Skewness—a measure of a distribution's symmetry around the mean.

- Skewness is a measure of a distribution's symmetry (i.e. whether it has a normal bell shape that "looks the same" above the below the mean). A skewness statistic of 0 indicates a perfectly symmetrical, and thus statistically normal, distribution. A large positive skew (i.e. > 0, also known as a right skew) reveals that the distribution is distorted by abnormally large observations. Often this occurs when the mean is substantially greater than the median. A negative skew (i.e. < 0, also known as a left skew) reveals that the distribution is distorted by abnormally small observations. Often this occurs when the mean is substantially smaller than the median.

Kurtosis—a measure of a distribution's largest and smallest values.

- Kurtosis is a measure of a distribution's "tails" (i.e. whether it has normal quantity of large and small values). A kurtosis statistic of 0 indicates regular looking tails and thus a statistically normal distribution.[8] A large kurtosis statistic (i.e. > 0, also known as leptokurtotic) would indicate a long-tailed distribution with extreme values far removed from the mean. A small kurtosis statistic (i.e. < 0, also known as platykurtic) would indicate a short-tailed distribution with an overabundance of large and small values closer to the mean.

| **Table 1: Decision Length Statistics (All Cases, 2014-2022)** | |
|---|---|
| Sample Size | 894,864 |
| Mean | 175 |
| Median | 160 |
| Standard Deviation | 112 |
| Skewness | 3.8 |
| Kurtosis | 43.7 |
| Outliers | 14,305 |

[8] Some software packages compute kurtosis such that the value 3 is evidence of no kurtosis. I follow the Greene textbook cited earlier and compute kurtosis such that 0 is the threshold for no kurtosis.

Table 1 presents the descriptive statistics described above. Looking at Table 1, the analysis reveals two notable features regarding the PERM adjudication process.

First, we can see that the mean decision takes 175 days to complete, while the median decision occurs at 160 days. On the one hand, this indicates that the "typical" PERM application sits in the queue for roughly 5-6 months. On the other hand, the sizable gap between the mean and median (15 days) reveals that the data are plagued by abnormally large delays, a conclusion confirmed by the positive skewness statistic (3.8) and the large number of positive outliers (14,305).

Second, the results contain evidence of substantial variability in the adjudication process. In statistical terms, the standard deviation reveals that the average case's time in the queue differs from the mean decision time by 112 days. In other words, there is roughly 3.5 months of variation in the timing of the typical PERM decision. Relatedly, because the kurtosis statistic is greater than zero, the analysis indicates that the distribution has a "long tail." And because the mean is larger than the median, we know this long tail is on the right side of the distribution, indicating a large quantity of cases that sat in the queue an unusually lengthy period.

Although these summary statistics are necessary to quantify the distribution's precise shape, we can see the above patterns in a simple figure. As they say, a picture is worth a thousand words. Figure 1 is a histogram of the decision length variable. A histogram is a data visualization used by statisticians to plot a variable's distribution.

In the histogram reported below, each bar represents a month from submission to decision, with the height of the bar corresponding to the number of cases falling in month (listed on the y-axis). For example, the largest cluster of cases, roughly 125,000, fall in the 2-3 month range from submission to decision. For simplicity, the final bar (to the far right) groups together all cases that took more than two years to receive a decision.

I added to the histogram three reference lines. A blue line indicates the mean of the distribution (175 days), a green line indicates median of the distribution (160 days), and the red line shows what a normal distribution would "look like" given the mean and standard deviation. Any black bar above or below the red line reference line indicates a deviation from normality. Not only does this reference line tell us whether the distribution has a normal shape, which is does not, but it reveals to us *how* the distribution deviates from normality.

Like the summary statistics above, the histogram reveals the presence of several outliers on the right side of the distribution. Although it is difficult to see given the large sample size and the scale of the y-axis, there are 26,408 cases above 365.25 days (twelve months) and 3,155 cases above 730.5 days (twenty four months). As a result of these outliers, the distribution has an unusually long tail to the right. Another effect of these outliers: the mean (blue line) is far larger than the median (green line) and the distribution has a long tail to the right (i.e. positive skewness and positive kurtosis). Finally, the large standard deviation is reflected in the distribution's significant spread around the mean. For example, while the mean decision occurs at 175 days, which is around 6 months, over half of all cases (51.9%) receive a decision in under 3 months or after 7 months. In other words, fewer than half of all cases receive a decision within a four-month window of the average decision date.




A range of statistical tests can be used to evaluate whether data described in Table 1 and Figure 1 follow a normal distribution. I use a test developed by Royston (1991) that evaluates this question based on the amount of skewness and kurtosis in the distribution.[9] Like the descriptive statistics and histogram, the test indicates that the PERM data are not normal in a statistical sense. Specifically, the test indicates that both the amount of skewness and amount of kurtosis are statistically significant at the p<.01 level. In other words, the skewness and kurtosis documented above represent a significant departure from normality. Alternative tests yield the same conclusion.

## [7] Audits, Denials, Withdrawals and Expirations

A natural explanation for the prior results is the inclusion of audited cases in the analysis. It goes without saying, but audits can delay a case's processing time and thus increase both duration and variability of the adjudication process. For these reasons, I removed audited cases from the forthcoming analyses and computed the same summary statistics as earlier. I was able to identify and remove audits with data provided to me by Plaintiffs' attorneys. Produced by DOL staff in response to two FOIA requests, the data indicate audits that occurred in the years 2014 to 2023.

I do not conduct a separate analysis of audited cases on the grounds that many of these applications, especially targeted audits, have flaws that justify their delay. According to the Tafapolsky and Smith chapter in the PERM guidebook, targeted audits are "triggered by the way a particular set of files in

[9] I used the *sktest* command in Stata 17. See an article by P. Royston (1991) "Comment on sg3.4 and an improved D'Agostino test" in the *Stata Technical Bulletin* (Vol. 1, pp. 1120-112).

the PERM application are completed" (2019, pg. 269). Although it could be beneficial to conduct an examination of random audits to ascertain if they are truly random, the data provided by DOL from the two FOIA requests do not identify which audits were targeted vs. random.

Another explanation for the above results is the presence of denied, withdrawn, and expired applications in the analysis. Denied cases may sit in the queue longer due to heightened scrutiny by DOL staff, while expired applications may have a longer decision length given that the decision date records the last action (i.e. when the application eventually expired). A simple examination of the raw data validates these two claims.[10] On withdrawn cases, it is important to remove these cases because the employer, not DOL staff, are responsible for withdrawing an application.

**[8] Selection Bias**

For reasons described in Section 5, the analysis that follows begins with cases submitted in October 2014. As noted previously, including cases from earlier in 2014 would unfairly increase DOL's processing time because we only observe cases with the longest decisions, and not those with the quickest decisions, a problem statisticians refer to as selection bias.

Unlike earlier, however, the forthcoming analysis ends in July of 2022, rather than extending to the close of the year. Given the significant processing delays in 2022 and 2023, the number of audits per month drops precipitously after July 2022 and ultimately ceases in October. Indeed, the raw data show only nine cases that were submitted in August and only two in September that were audited. By comparison, there were roughly 2,000 audits per month from January to July in 2022. Clearly, July 2022 is the upper bound of the audit data.[11]

As with the 2014 starting point, this decision is conservative from DOL's standpoint. If we were to include cases submitted from August to the end of the year, where audits had yet to be issued, it would unfairly increase DOL's decision timeline (on the grounds that some cases, perhaps many, were in the process of being audited or were delayed because of problems that would ultimately trigger an audit). A simple analysis validates this claim. According to the data, the average time to a decision for cases submitted from January 2022 to the end of July is 266 days, while the mean from August to the end of the year is 309 days.[12] A difference of means test indicates that this is a statistically significant difference at the $p<0.01$ level.

Despite these efforts, selection bias affects the data in an unavoidable way. Given that in an average year dozens or hundreds of cases take a year or more to receive certification, the data for 2021 and 2022 do not contain applications that will have the largest processing delays (i.e. those that have yet to be certified). Ultimately, this effect biases the 2021 and 2022 data downward in a way that favors

[10] According to the data, certified cases sat in the queue 136 days on average. By comparison, expired cases sat in the queue 157 days on average while denied cases sat in the queue 241 days on average. A difference of means test indicates that the greater decision length for expired and denied cases is statistically significant when compared to certified cases at the $p<.01$ level.

[11] Although the significant processing delays in 2022 and 2023 are almost certainly the primary cause of this, the FOIA request for 2023 audits was submitted in July and thus only covers roughly half of 2023.

[12] I performed this analysis in the same manner as the following section by excluding denied, withdrawn, expired, and audited cases, as well as any outliers.

DOL by artificially reducing the average time to a decision as well as the amount of skewness and kurtosis in the distribution.

Table 2 presents evidence to back up this claim. It lists the number of cases that were certified in the 2023 disclosure file, the most recent, based on their submission year.[13] We can see 17 cases received a decision in 2023 file that were submitted back in 2019. Consistent with the point raised above, a hypothetical analysis of processing times in 2019 based on data available at the end of 2020 would not contain these critically important, and hugely significant, observations. Perhaps most notable, however, is the fact that the 2023 disclosure file contains 464 cases that were submitted back in 2021. In other words, these cases took a *minimum* of one year to receive a decision. Although we won't know the true number for years, it is quite likely that an even larger number of cases, perhaps thousands, were submitted in 2022 and will not receive a decision until 2024. Once again, when evaluating the 2022 data it is important to remember that they exhibit a downward bias that works in DOL's favor because we have yet to observe the longest delays.

**Table 2: Cases Certified in 2023 File**

| Year Submitted | Cases Certified |
|---|---|
| 2019 | 17 |
| 2020 | 14 |
| 2021 | 464 |
| 2022 | 10,818 |
| 2023 | 0 |

## [9] Primary Decision Length Analysis

In the initial analysis there were 894,864 cases from late 2014 to the end of 2022. Once we remove audited, denied, withdrawn, and expired cases, and end the analysis after July of 2022 for the reasons described in the section above, we are left with 380,426 cases.[14] I analyze these certified and non-audited cases below.

When audited, denied, expired, and withdrawn cases are omitted from the analysis, the decision length data should have an approximately normal distribution with little variation around the mean. After all, the remaining cases should be processed largely—if not entirely—based on their submission date. Stated differently: an analysis that examines only certified and non-audited cases

---

[13] Audited, denied, withdrawn, and expired applications are omitted from the calculation.

[14] In the process of merging the disclosure files and the audited cases, it was discovered that the disclosure files contain a small percentage of duplicate observations (about 0.25% of the total). Every duplicate has the same case number and same submission date but different case statuses and decision dates. I must omit these cases from the analysis. Further, a small percentage of the cases in DOL's audit list (about 0.15% of the total number of audits) do not match a case number in DOL's disclosure files.

should reveal an orderly adjudication process with low variation in the timing of decisions, consistent with the claim that DOL staff follow a "first in, first out" policy.

Table 3 lists the same summary statistics as earlier but for each year under examination.[15] Computing the statistics by year ensures that any findings are not the result of year-to-year changes in the adjudication process or other time dependent factors.

Despite removing audited, denied, expired, and withdrawn applications, the decision length data exhibit the same unusual features noted above. As with earlier, the data have a sizable positive skew and contain several unusually large outliers. For example, the 4,680 outliers listed in the table below sat in the queue for well over a year on average: 413 days to be specific. Likewise, the large standard deviation and positive kurtosis statistics once again reveal that the adjudication process is highly variable. For example, the average standard deviation across years (SD=48) indicates that there is roughly 1.5 months of variation in the timing of the "typical" PERM decision.

Based on the foregoing evidence, I conclude that the time it takes DOL to adjudicate PERM applications is statistically unusual given the distribution of processing times. Even after audited, denied, expired, and withdrawn cases are removed from the analysis, the data once again indicate that the adjudication process is (1) highly variable with (2) unusually long delays.

**Table 3: Decision Length Statistics (Certified, Non-Audited Cases, 2014-2022)**

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | All |
|---|---|---|---|---|---|---|---|---|---|---|
| Sample | 14,985 | 24,802 | 43,379 | 51,821 | 52,012 | 61,254 | 62,229 | 52,651 | 17,293 | 380,426 |
| Mean | 191 | 182 | 97 | 100 | 94 | 83 | 167 | 186 | 285 | 154 |
| Median | 187 | 190 | 96 | 88 | 92 | 68 | 174 | 182 | 271 | 150 |
| SD | 37 | 72 | 32 | 47 | 30 | 44 | 44 | 63 | 61 | 48 |
| Skewness | 26.9 | 18.5 | 26.4 | 12.9 | 6.6 | 8.0 | 3.3 | 6.8 | 1.9 | 12.4 |
| Kurtosis | 1,094.3 | 480.1 | 1,315.2 | 437.5 | 282.4 | 221.1 | 67.6 | 61.5 | 3.0 | 440.3 |
| Outliers | 116 | 271 | 566 | 194 | 326 | 365 | 314 | 613 | 1,915 | 4,680 |

I took one final step to validate the above conclusions: remove every outlier. After all, outliers can have an outsized influence on statistical results due to their anomalous values.[16] Just to be clear: outliers should *not* exist in the first place if certified and non-audited PERM applications are adjudicated on a simple "first in, first out" basis. Nevertheless, Table 4 below reports the same summary statistics by year but with the 4,680 outliers omitted from the calculations. From a

[15] In the column on the right labeled "All" I compute the average of each statistic across years, except for the sample size and number of outliers, which is the total across years.

[16] Because the decision length variable cannot be less than zero, outliers are not possible on the low end of the distribution. While performing these analyses, however, I discovered eight cases that received a decision in less than a month, which is very unusual. I omitted these anomalous cases as well.

substantive standpoint, this analysis is very conservative and gives DOL staff the benefit of the doubt when it comes to the most extreme cases in the adjudication process.

Looking at the statistics in Table 4, we can see that removing every outlier (in addition to each audited, withdrawn, and expired case) has done a lot to normalize the distribution. Unlike earlier, the mean and median produce roughly similar values in most years, differing by just one day on average in the aggregate. As a result, the skewness statistics are much closer to zero, indicating that the data come from a distribution that is more symmetrical in its shape.

**Table 4: Decision Length Statistics (Certified, Non-Audited, Non-Outlier Cases, 2014-2022)**

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | All |
|---|---|---|---|---|---|---|---|---|---|---|
| Sample | 14,869 | 24,531 | 42,810 | 51,627 | 51,684 | 60,887 | 61,915 | 52,038 | 15,377 | 375,738 |
| Mean | 189 | 178 | 96 | 98 | 93 | 82 | 166 | 180 | 266 | 150 |
| Median | 187 | 190 | 95 | 87 | 92 | 67 | 173 | 181 | 266 | 149 |
| SD | 20 | 33 | 19 | 36 | 26 | 37 | 39 | 31 | 27 | 30 |
| Skewness | 0.4 | -0.3 | 0.1 | 0.6 | 0.1 | 0.8 | 0.3 | 0.3 | 0.5 | 0.3 |
| Kurtosis | -0.6 | -1.0 | -0.5 | -0.7 | -0.8 | -0.8 | -1.1 | -0.8 | -0.3 | -0.7 |
| Outliers | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Despite these improvements, however, the decision length data still exhibit two unusual features that indicate a highly variable adjudication process. First, the average standard deviation across years reveals that the typical case's time in the queue differs from the mean by 30 days on average. In other words, there remains a large degree of variability in the adjudication process, with the typical case experiencing roughly one month of variation in how long it can expect to sit in the queue compared to the average case. Second, we can see that the kurtosis statistic is now less than zero each year (a result of removing outliers in the distribution's right tail) and often substantively large in magnitude. As explained earlier, this indicates that the adjudication process produces an overabundance of both long *and* quick decisions relative to the mean. Both features indicate an abnormal amount of variation in how DOL staff adjudication PERM applications.

I next performed the statistical test for normality, described above, this time doing so for each of the ten years under examination. According to these tests, the degree of skewness and kurtosis in the decision length data remain statistically significant at the $p<.01$ level for every year. Although removing the outlying values vastly improves the shape of the distribution, the conclusion remains the same: the PERM adjudication process produces a non-normal decision length distribution with a significant degree of both skewness and kurtosis.

As with earlier, we can see the above conclusions in a histogram of the raw data. I selected 2021 and 2022 for this visualization: 2021 because the statistics for that year mirror the average skewness and kurtosis for the entire period and 2022 because it is the most recent year under examination. (A series of histograms of every year reveal the same basic patterns.) Like earlier, the red line shows

what a normal distribution would "look like" given the mean and standard deviation.[17] Because the values have a narrower range, each bar represents a week from submission to the decision date.

For a visual reference, I created a second histogram with simulated data from a normal distribution that has the same mean and number of observations for both years.[18] Because the simulated data come from a normal distribution, the mean and median are nearly the same, and the skewness and kurtosis are close to zero. After simulating these data, I performed the normality test described earlier, and the results confirm that the skewness and kurtosis are statistically insignificant. In other words, the two reference distributions are statistically normal in their shape.

Critically, in the simulated data the standard deviation was set at 10 days instead of 31 days (2021) and 27 days (2022). By comparing the actual data (top panel of each figure) to the simulated data from a normal distribution (bottom panel of each figure) we can quite literally see the consequences of negative kurtosis and a high standard deviation on the PERM adjudication process.

Consistent with the summary statistics in Table 4, in the top part of Figures 2 and 3 (on the next page) we can see a substantial amount of variability in the PERM adjudication process. First, the considerable spread around the mean corresponds to the large standard deviations listed in the table. Second, the fact that several bars exceed the red normal distribution line on both the left and right side of the distribution is emblematic of negative kurtosis (i.e. an excess of both large and small values).

By comparison, the simulated data reveal how radically different the adjudication process would appear if the decision length data came from a normal distribution with less variability. First, we can see that the simulated data follow the classic "bell shape" of a normal distribution. Second, the simulated data have a tight cluster of cases around the mean, resulting in a tall "peak" in the middle of the data. In substantive terms, this is what the data would look like if PERM applications were processed in roughly the same time span. And third, the simulated have normal looking "tails" on the left and right side of the distribution, indicating a modest number large and small values.

A key point of comparison is the volume of observations in the tails. In the actual data for 2021, the mean time to a decision for a PERM application is a little under 6 months. In the simulated data from a normal distribution with the same mean, there are 127 observations that are projected to receive a decision in less than 5 months and 25 observations that are projected to receive a decision in over 7 months. Combined, these represent 0.3% of the 52,038 cases. In the actual data, by comparison, there are 11,149 applications in 2021 that received a decision in less than 5 months and 9,361 observations that received a decision in over 7 months. Combined, these represent a whopping 39.4% of the 52,038 cases.

[17] I do not include the mean and median reference lines because they are so close to one another in the actual data once outliers are removed. Further, they are literally the same in the simulated data.
[18] I use the *drawnorm* command in Stata 17 to create the simulated data.

Figure 2: Actual vs. Simulated Data for 2021




Figure 3: Actual vs. Simulated Data for 2022



For 2022, the mean time to a decision for a PERM application is approaching 9 months in the disclosure data. In the simulated data from a normal distribution with the same mean, there are 173 observations that are projected to receive a decision in less than 7 months and 8 observations that are projected to receive a decision in over 10 months. Combined, these represent 1.2% of the 15,377 cases. In the actual data, by comparison, there are 5,252 applications in 2022 that received a decision in less than 8 months and 936 observations that received a decision in over 10 months. Combined, these represent a whopping 40.2% of the 15,377 cases.

Comparing the simulated and actual data points to the following conclusion: though we would expect *some* large and small datapoints even if the adjudication process reflected a normal distribution with no kurtosis and low variation, these extreme observations are relatively *rare* and do not *define* the distribution. In the simulated data, 1% or less of PERM applications are projected to deviate from the mean by one month or more. In the actual data, these cases represent roughly 40% of the sample.

Based on the foregoing evidence, I once again conclude that the way DOL staff adjudicate PERM applications is highly variable and thus inconsistent with the notion that cases are processed in a simple "first in, first out" fashion.

## [10] Queue Order Analysis

I performed two additional analyses that take a closer look at whether DOL staff follow a simple "first in, first out" policy when adjudicating non-audited and certified cases. Although the prior results are wholly inconsistent with this claim, additional metrics can shed further light on this question.

In the pages below I examine (1) the occurrence of line jumping and (2) the decision timeline for applications submitted on the same day. Like in the prior section, all analyses were conducted for cases received between October 2014 and July 2022, with audited, denied, withdrawn, and expired cases removed from the results. I also omitted the 4,680 outliers. As noted earlier, this is a very conservative decision, as outliers should not exist in the dataset if DOL staff simply follow the queue order.

*Line Jumping*

As the name suggests, line jumping occurs when applications are decided contrary to the queue order, with some cases receiving an earlier decision than later submissions. Line jumping should be close to zero if certified and non-audited cases are processed in a "first in, first out" fashion.

For every application in this analysis, I count the number of other cases with a later submission date yet an earlier decision date.[19] For example, if an application was submitted on July 15, 2019, I count the number of cases submitted on or after July 16 that received a decision before the July 15 case.

How common is line jumping in the PERM adjudication process? According to the data, the mean of the line jumping variable is 1,272. In other words, the typical PERM applicant can expect over

[19] I used a *forvalues* loop in Stata 17 to create this variable.

1,200 *other* applicants to skip ahead of them in queue and receive a faster decision. Admittedly, the mean is inflated by several very large values in the line jumping variable. For example, there are 16,242 applicants in the dataset who were skipped over 5,000 times! If we compute the median instead, the typical applicant can expect to be skipped 504 times.

As an example of the above, case number "A-21011-41089" was submitted on January 21, 2021, and received a decision 167 days later, on July 7. According to the disclosure data, 1,182 submissions were received after January 21 yet received a decision before July 7. Among those who skipped ahead of this applicant, the latest submission with an earlier decision was received on January 31st (i.e. ten days after this case was submitted) while the earliest decision occurred on June 22nd (i.e. fifteen days before this case was adjudicated). It should be noted that there are thirteen cases in the dataset exactly like "A-21011-41089." In other words, these thirteen applications were submitted and decided on the exact same days as the case in question, January 21 and July 7, and these thirteen individuals were also skipped by the same 1,182 other applicants.

Although line jumping is a straightforward concept to measure, whether the numbers cited in the prior paragraph are "big" or "small" is a thornier question. While skipping should be close to zero in theory, with roughly ten years of data and over 375,000 cases in the analysis, we would certainly expect *some* applications to be processed contrary to their place in the queue.

I therefore conducted a second analysis that explores the rate of line jumping (i.e. how often the average applicant is skipped as a percentage of some baseline). For the baseline, I count the number of applications that were received the week following each submission. As an example, say an employer submitted a PERM application on July 15, 2019, I then count the number of cases submitted between July 16 and July 22 and compute the percentage that received an earlier decision than the case in question.

According to the data, the mean rate of line jumping is 33% and the median rate is 25%. In other words, the typical applicant can expect anywhere from 1/3rd to 1/4th of applications submitted in the week after them to receive a quicker decision.

Table 5 (on the next page) presents the extent of line jumping per year. At issue is whether line jumping has increased, decreased, or remained the same in recent years. Despite a sizable decline in 2019, we can see that line jumping in 2021 and 2022 is roughly on par with the means/medians for the entire time series. For example, the mean for 2021 (1,340) is just above average for the entire series (1,272) while the mean for 2022 (1,112) is just below the series average. We see roughly the same pattern for the other metrics. In short: line jumping is prevalent over the ten years under examination in this section, and despite some variation over time, the most recent years are no exception.

Based on the foregoing evidence, I conclude that line jumping is an endemic feature of how DOL staff process PERM applications. Given the frequency of line jumping, it is no surprise that the earlier analysis reveals a highly variable adjudication process.

**Table 5: Line Jumping Per Year**

| Year Submitted | Mean Skipped | Median Skipped | Mean Skip Rate | Median Skip Rate |
|---|---|---|---|---|
| 2014 | 1,010 | 565 | 36% | 30% |
| 2015 | 1,387 | 716 | 39% | 37% |
| 2016 | 1,540 | 1,030 | 40% | 38% |
| 2017 | 1,697 | 865 | 39% | 34% |
| 2018 | 1,586 | 557 | 34% | 28% |
| 2019 | 743 | 189 | 26% | 12% |
| 2020 | 991 | 211 | 25% | 11% |
| 2021 | 1,340 | 610 | 34% | 27% |
| 2022 | 1,112 | 372 | 36% | 26% |
| 2014 - 2022 | 1,272 | 504 | 33% | 25% |

*Same Day Applications*

I now focus on applications with the same submission date. Like in the line jumping analysis, the expectation in this section is straightforward: applications submitted together, on the same day, should have the same decision date if they were adjudicated in order of the queue.[20]

I performed this analysis in two steps. First, I identified the mode decision date for every application day.[21] From a statistical standpoint, the mode is the most common value in a variable. From a substantive standpoint, the mode reveals when DOL staff were adjudicating the bulk of cases submitted on a given day. Second, I computed the time between each case's actual decision date and the mode for their submission day. A value of zero would indicate that the applicant received a decision on the same day as most cases in its submission cohort.

An illustrative example of the above is June 14, 2018. On this date, exactly 300 PERM applications were submitted to DOL.[22] According to the data, the mode decision on this day occurred 68 days later, on August 21. On that day, 84 applications (or 28%) were certified by DOL staff, the same mode for the entire dataset.

Figure 4 is a histogram that displays the results. Each bar represents the number of days between the mode decision date (in the center, at zero) and the case's decision date. We can see that a sizable

[20] Once again, the analysis in this section excludes audited, denied, and withdrawn cases as well as every outlier.
[21] A small percentage of cases (2%) have two or more mode decision dates. Because there is no single mode, these cases must be excluded from the analysis.
[22] Note that this represents the total number of certified and non-audited cases (once again, outliers, denied, withdrawn, and expired cases are not included in the analysis).

percentage of cases (28%) indeed received a decision on the same day as those in their submission cohort. Despite this, we can see that 29% of applicants receive a decision more than 3 days after the mode (the furthest right bar) while another 18% receive a decision more than 3 days before the mode (the furthest left bar). So, in total, a whopping 47% of cases receive a decision *outside* a one week interval around of the most common decision date. Given that hundreds of PERM applications are submitted every single day, this amount of variation results in a substantial amount of line skipping and lengthy processing delays.

I next calculated the range between the quickest and longest decision for same day applications. Continuing the example above, of the 300 PERM applications submitted on June 14, 2018, seven cases received a decision on August 14, 2018 (61 days in the queue, the shortest length) while one case received a decision on September 17, 2018 (95 days in the queue, the longest length). In other words, for the 300 PERM applications submitted together on August 14, 2018, there is a 34-day gap between the shortest waiting period and the longest waiting period.

What is the typical decision length range for applications submitted on the same day? According to the dataset, the mean range is 43 days, and the median range is 38 days. In other words, a cohort of applications submitted on the exact same day can expect 5-6 weeks of variation between the first and last case to receive a decision.

Based on the foregoing evidence, I once again conclude that DOL staff routinely process PERM applications contrary to the order of the queue. Consistent with the prior analyses, the data indicate that the adjudication process is highly variable and inconsistent with the notion that DOL staff follow a "first in, first out" adjudication process.



## [11] Pasternak Declaration

*Background*

After submitting my initial report on January 21, 2024, Plaintiffs' attorneys provided me with a declaration submitted by Brian David Pasternak in the above captioned matter. Pasternak's declaration is dated February 14, 2024.

Pasternak's title is "Administrator" in the Office of Foreign Labor Certification (OFLC), a division within the Department of Labor (DOL). He says that he has served in this role since 2019. Pasternak held other senior positions within OFLC from 2006 to 2018. Pasternak writes that, in his current administrative role, he is "responsible for policy and regulatory oversight of OFLC's adjudication of applications for labor certification required for temporary and permanent employment-based immigration" (1, pg. 2). He notes that this includes the Atlanta National Processing Center (ANPC), which is "the processing center that adjudicates "PERM" applications" (12, pg. 7).

Plaintiffs' attorneys asked me to read and evaluate the Pasternak declaration as it relates to the analysis and opinions in my January 21, 2024, report. Sections 1-10, above, contain the text of my initial report without any alterations to the data, analysis, and conclusions. I discuss the Pasternak declaration in the pages below and present several new analyses that evaluate his claims with respect to my analysis and opinions.

Pasternak makes one key claim that falls within the scope of my report.[23] He says that when ANPC receives a PERM application, the case is "assigned to an analyst for review based on the month in which the Form ETA-9090 was filed" (13, pg. 7). He refers to this a "processing month" policy. Notably, he says that the processing month is *not* a strict first in, first out process. Pasternak writes the following:

> PERM applications filed during the "processing month" are not necessarily processed in the order in which they were received by the date or time stamp. For example, in order to achieve efficiency and consistency of results, multiple applications filed by a single employer during the processing month may be assigned to one analyst, or group of analysts, and are processed together even though the employer's PERM applications may have been filed on different calendar days throughout the processing month. (15, pg. 8).

It should be noted that Pasternak's admission that DOL staff do not follow the queue order *confirms* the main conclusion in my initial report. I find in the analyses above that the adjudication process is "highly variable" and results in "unusually long delays" (pg. 10). Further, my analysis indicates that line jumping is an "endemic feature of how DOL staff process PERM applications" (pg. 15). I believe Pasternak's admission validates the methodologies used to reach these conclusions as well.

A thornier question is the extent to which the processing month policy explains these underlying patterns in the data. In other words, is the processing month policy the only reason for the results documented above? I am highly skeptical of this possibility. Simply put: there is far too much

---

[23] Plaintiffs' attorneys also provided me with a document of what appears to be PowerPoint presentation used to train ANPC staff. I read this document as well. In my judgement, none of the items in this training presentation have the potential to challenge or alter my analyses and conclusions.

variability and line jumping in the processing data for one rather simple explanation. Furthermore, a significant amount of the variability documented earlier falls outside a one month interval.

For example, the data discussed above show that the mean time to a decision in 2021 was just under 6 months. Let us assume that variation around this mean is simply a reflection of the processing month policy. We might, very generously, give DOL the benefit of the doubt for any case decided one month before and one month after the 6-month average. And yet the raw show that there were "11,149 applications… that received a decision in less than 5 months and 9,361 observations that received a decision in over 7 months… a whopping 39.4% of the 52,038 cases" (pg. 12). I find the same pattern in the data for 2022. In that year, the mean time to a decision was just under 9 months. And yet there were "5,252 applications in 2022 that received a decision in less than 8 months and 936 observations that received a decision in over 10 months… a whopping 40.2% of the 15,377 cases" (pg. 14).

In other words, when we inspect the data for both 2021 and 2022, roughly 40% of cases received an unusually quick or an unusually short decision relative to the average case. It seems to me that these cases cannot possibly be explained by a processing "month" policy, where analysts simply complete one month's applications before moving onto the next month.

Additional data in my initial report refute the notion that the processing month policy is the sole cause of the significant variability and line jumping. For example, even after removing audited, withdrawn, expired, and denied cases, as well as every outlier, the decision length variable still has a standard deviation of roughly 30 days, according to Table 4 (pg. 12). Consistent with the statistics for 2021 and 2022, this indicates that a large volume of cases were adjudicated outside a one month interval around the mean. Figures 2 and 3 demonstrated this point by comparing simulated data from a normal distribution (with a standard deviation of 10 days) to the actual data for 2021 and 2022. Notably, a distribution with a standard deviation of 10 days would result in very few cases (around 1% or less) receiving a decision outside a one-month interval in either direction of the mean decision (pgs. 12-14).

All in all, the results in my initial report, submitted before the Pasternak declaration, refute the notion that the processing month is the sole explanation for my conclusions. Nevertheless, I discuss several new analyses in the pages below that take a closer look at the processing month policy. At issue is whether the amount of variability and frequency of line jumping are significantly reduced or eliminated entirely once we take the processing month into consideration.

*Multiple Applications*

A core component of the processing month policy is the submission of multiple applications by a single employer in the same month. Pasternak writes that "multiple applications filed by a single employer during the processing month may be… processed together even though the employer's PERM applications may have been field on different calendar days throughout the processing month" (15, pg. 8).

I refer to these cases (multiple applications by the same employer submitted in the same month) as "multiple applications" or "multiple submissions" for brevity. Pasternak suggests that these multiple submissions are free to violate the que order and skip around within the processing month. He says

this is done "in order to achieve efficiency and consistency of results" (15, pg. 8). A natural question arises: does the bulk processing of multiple applications explain the results in my initial report?

An easy way to examine this question is to omit multiple submissions and recalculate the primary decision length statistics above (see pages 9-14). I do so by creating a new variable for the number of submissions per month per employer, dropping any observation greater than one. For example, the disclosure data show that in October of 2022, Google LLC submitted 378 PERM applications. I delete these multiple submissions, in addition to omitting every audited, denied, expired, and withdrawn case and every outlier. What remains in the analysis are single applications that were submitted by one employer and these cases were certified and not audited.

Table 6 contains the new results. It replicates Table 4 in my initial report.[24] Critically, if the unusually high amount of variability in the decision length data is simply a function of multiple submissions, we would expect the standard deviation and kurtosis to decrease once we focus on single applications.[25] Indeed, the processing month policy described by Pasternak permits multiple submissions to skip around in the queue, creating additional variation in the time to a decision. For single submissions, however, we should observe a more orderly adjudication process, presumably one governed by a first in, first out policy.

Comparing Table 6 (below) to Table 4 (pg. 11), not only do we see no decline in these two statistics, the new results are remarkable in how little they change. Although there is certainly some fluctuation in the standard deviation and kurtosis, the averages across years, displayed in the column to the far right, is *exactly* the same in Tables 6 and 4.[26] In other words, whether we include multiple submissions in the calculation, or exclude multiple submissions, the standard deviation is always 30 days and the kurtosis is always -0.7. As noted elsewhere, these two statistics indicate a highly variable adjudication process.

I therefore reach the same substantive conclusions about the PERM adjudication process, even when omitting cases Pasternak suggests are free to violate the que order.[27] Like earlier, the average standard deviation indicates that the typical case's processing time differs from the mean case by 30 days on average. In other words, the typical case experiences roughly a full month of variation in how long it can expect to sit in the queue compared to the average case. Further, the negative and rather large kurtosis statistic reveals that the adjudication process results in an overabundance of both long and quick decisions relative to the mean.

---

[24] Like Table 4, the statistics reported in Table 6 exclude audited, denied, withdrawn, and expired cases, as well as every outlier.

[25] It is unclear how the processing month would affect the mean, median, and skewness. My belief is that these statistics should be unaffected even when removing multiple submissions. After all, the processing of multiple applications in bulk may take slightly longer than average for some cases and slightly shorter than average for other cases, resulting in the same mean and median with no added skew in either direction.

[26] Just to be clear, there is a slight difference between these estimates; the fact that they appear identical in Tables 4 and 6 is due to rounding.

[27] When computing the revised estimates, I performed the same statistical test for whether the degree of skewness and kurtosis is significant. According to this analysis, the degree of kurtosis is statistically significant at the $p<.01$ level for every year under examination. I find the same for the degree or skewness, except for 2016 and 2018. In those two years the mean and median are either the same (with rounding) or nearly the same and thus the degree of skewness is approximately zero.

Like the primary analysis in the pages above, I created a series of histograms that display the raw data for 2021 and 2022 and then compare the raw data to a normal distribution with the same mean and number of cases but with a standard deviation of 10 days. As above, the simulated data show what an orderly adjudication process governed by a first in, first out policy would "look like." I present these figures below.

I won't belabor the point—like Table 6 above, Figures 5 and 6 are nearly an exact match to the patterns uncovered in my initial report. In these two figures, we can quite literally see the consequences of high kurtosis and a high standard deviation on PERM applications. Namely, we can see in the raw data (top panel) that it is not uncommon for cases to be processed *months before* or *months after* the average case is adjudicated. By comparison, an adjudication process following a normal distribution with a standard deviation of 10 days (bottom panel) would result in virtually all cases (roughly 99%) receiving a decision within a month around the mean.

In summary, the multiple applications aspect of the processing month policy does not explain away the statistical results or conclusions in my initial report. Quite the contrary: the results in the above analyses are remarkably consistent with my prior report even when we omit multiple submissions from the calculations. I conclude that my original results and conclusions are highly robust to alternative methodologies and calculations.

**Table 6: Single Submission Statistics (Certified, Non-Audited, Non-Outlier Cases, 2014-2022)**

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | All |
|---|---|---|---|---|---|---|---|---|---|---|
| Sample | 5,170 | 8,879 | 13,947 | 16,726 | 16,116 | 17,958 | 16,865 | 12,670 | 4,012 | 112,343 |
| Mean | 189 | 179 | 97 | 100 | 95 | 84 | 169 | 182 | 268 | 151 |
| Median | 186 | 190 | 97 | 89 | 96 | 70 | 174 | 183 | 267 | 150 |
| SD | 21 | 33 | 19 | 38 | 27 | 36 | 42 | 30 | 28 | 30 |
| Skewness | 0.6 | -0.3 | 0 | 0.6 | 0 | 0.8 | 0.2 | 0.3 | 0.4 | 0.3 |
| Kurtosis | -0.4 | -0.8 | -0.5 | -0.5 | -0.8 | -0.7 | -1.2 | -0.6 | -0.6 | -0.7 |
| Outliers | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Figure 5: Actual vs. Simulated Data for 2021
(Single Applications)




Figure 6: Actual vs. Simulated Data for 2022
(Single Applications)



*Processing Window*

A possible objection to the above is that the multiple applications aspect of the processing month is merely an example that Pasternak provides. Conceivably, there are other policies that fall under the processing month policy, and these policies also permit DOL staff to violate the queue order. At its core, however, the processing month that Pasternak describes implies that cases do *not* skip around *outside* a monthly window. In other words, cases submitted together in the same processing month are adjudicated before DOL staff move on to the next month's submissions.

It is worth reiterating, once again, that my initial report contains evidence of significant variability outside a one month interval, suggesting that the processing month policy is not an adequate explanation for the conclusions in my earlier report. Nonetheless, the next two analyses provide new data on this question.

After omitting multiple applications, like above, I performed a modified version of the "same day applications" analysis in Section 10 of my initial report. I do so by, first, computing the mode decision month for every submission month.[28] Recall that the "mode" is the most common value in a variable. In essence, the mode reveals when cases submitted together, in the same month, were typically receiving decisions. I often refer to cases submitted in the same month as a "submission cohort" or "cohort of cases." For example, the most common decision month for cases submitted in February 2021 was July of that year (which is 5-6 months from submission to decision).

Using the mode decision month, I simply count: (1) the number of cases that received a decision in the same month as the mode, (2) the number of cases that received a decision a month or more before the mode, and (3) the number of cases that received a decision a month or more later than the mode. Critically, cases in the second and third categories cannot be easily explained by a processing month policy. Indeed, the number of cases in #2 and #3 should be close to zero.

Before turning to the results, it should be noted that this analysis allows DOL staff to violate the queue order *at will* provided they do so within a month processing window. So, in this calculation the agency receives the benefit of the doubt for a large volume of line jumping and variability.

Table 7 presents the results. In this first analysis we are looking at the "all cases" heading at the top. In the "earlier month" row are cases that received a decision a month or more before the mode (for example, the mode decision occurred March 12 and the case received a decision on February 12). In the row labeled "later month" are cases that received a decision a month or more after the mode (for example, the mode decision occurred March 12 and the case received a decision on April 12). Finally, the row labeled "within window" are cases that were adjudicated in the same month as the mode decision.

We can see that 77.0% of PERM applications from 2014 to 2022 were indeed decided in the same month as the mode decision. By comparison, 10.1% of cases were adjudicated in an earlier month while 12.9% of cases were adjudicated in a later month. In other words, 23.0% of PERM applications, roughly a quarter of all cases, received a decision outside the processing month window.

[28] I performed the same calculation as in Section 10, just on a day-to-day basis, rather than a monthly basis.

**Table 7: Monthly Processing Window**

| | Cases | Percent |
|---|---|---|
| | All Cases | |
| Earlier Month | 11,384 | 10.1% |
| Within Window | 86,522 | 77.0% |
| Later Month | 14,437 | 12.9% |
| Total | 112,343 | |
| | Middle of Month | |
| Earlier Month | 3,852 | 5.6% |
| Within Window | 54,678 | 79.3% |
| Later Month | 10,432 | 15.1% |
| Total | 71,247 | |

A possible objection to the above is that these processing month violations occur at either the tail end or the very beginning of the month. An example would be if the mode decision occurred on October 31 and the case was decided on November 1. Strictly speaking, this case would be classified as falling in the "later month" category.

I examined this possibility by omitting any monthly submission cohort that had a mode decision that fell within the first or last week of the month. For example, if the mode decision was March 1-7 or March 25-31, every case from that cohort is excluded from the analysis.[29] Critically, this not only ensures that the cases under examination had a mode decision in the middle of the month, but it guarantees that the case in question had a *minimum* eight-day gap from the mode decision .

Table 7 presents these results under the heading "middle of month." We can see that 79.3% of cases were adjudicated within the same month as the mode decision, whereas 20.7% were adjudicated outside the processing month window (either an earlier month or later month). So, while the number of processing month violations is reduced, the reduction is slight and the number of cases that were processed outside the month window remains quite high.

We can see the above patterns in a simple histogram of the raw data. Figure 7 plots the number of days that elapsed between the mode decision and every case. For example, the mode decision for cases submitted together in October of 2021 occurred six months later, on April 13, 2022. In this example, any case decided on April 23 will have the value +10 (ten days after the mode) whereas any case decided on April 3 will have the value -10 (ten days before the mode). Zero on the x-axis is the

[29] I was sure to include leap years in this calculation.

position of the mode decision date for cases submitted each month. Every bar in the histogram represents the size of the gap from the mode in 5-day increments.

As far as the processing month window, the red reference lines indicate ±14 days from the mode (i.e. two weeks removed from the typical decision day for that cohort) while the purple reference lines indicate ±28 days from the mode (i.e. four weeks removed from the typical decision day for that cohort). In other words, the bars to the left/right of the red line are those that were decided outside a *one* month interval around the most common decision date while those to the left/right of the purple line are those that were decided outside a *two* month interval around the mode.

In Figure 7 we can plainly see what is reported in Table 7—a large volume of cases received a decision outside the processing month window. For example, there are 2,917 cases (2.7%) to the left of the red reference line at -14 days and 21,669 cases (19.7%) to the right of the red line at +14 days. In total, 22.4% of cases received a decision outside a (roughly) one window. Note that this lines up almost exactly with the statistics in Table 7. Additionally, it is remarkable how many cases were decided outside a (roughly) two month window. Indeed, there are 363 cases (0.3%) to the left of the purple reference line at -28 days and 5,948 cases (5.4%) to the right of the purple line at +28 days. It perhaps goes without saying, but these cases outside the purple window (5.7% of the total or over 6,000 applications) cannot possibly be explained by the processing month policy.

Figure 7 contains one new result that is not evident in Table 7. Looking at the figure, we can see that the distribution has extraordinarily long tails. On the left side, there are a couple cases (8 total) that received an expedited decision two months or more (< -61 days) before the mode for their processing month cohort. According to the data, one case received a decision roughly three months earlier than the typical decision in its cohort (-85 days to be precise). On the right side of the distribution, there is a very large number of cases (1,163 total) that received a delayed decision two months or more (> +61 days) after the mode for their processing month cohort. According to the data, twelve cases received a decision more than five months later than the typical decision in its cohort (> +150 days).

Regarding the extreme cases in Figure 7, it is important to reiterate the caveats from earlier: these are certified cases that were not audited, outliers have been omitted, and none of these cases were multiple submissions by a single employer.

Figure 7: Montly Processing Windows




*Processing Month Line Jumping*

Lastly, I performed a revised line jumping analysis like the one in Section 10 of my initial report. Consistent with the processing month policy, in this calculation cases are permitted to skip one another at will provided they were submitted in the same month (i.e. to be counted the case must be skipped by a case submitted a subsequent month).

A few caveats before turning to the revised line jumping results. First, it is worth recognizing that this is an *extraordinarily conservative* calculation. For example, say a case submitted on August 1st is skipped by two dozen cases submitted on August 31st. Although the skipped case and the two dozen skipping cases were adjudicated roughly one month out of order, because they are technically within a month interval the analysis does not count them as a skip. All in all, this analysis gives DOL staff a rather large benefit of the doubt in the calculation.

Second, it should be noted that this conservative calculation is in addition to several conservative steps throughout my report. As in each analysis from Section 9 to this section, every audited case is omitted, as are expired, denied, and withdrawn applications. Additionally, all outliers are removed even though these cases experience the longest processing delays and are among the most heavily skipped. And like the other analyses in this section, the results below ignore multiple applications submitted in the same month by the same employer (which, according to Pasternak, are free to violate the queue order under the processing month policy).

A final caveat is that the steps above reduce the sample size substantially. In the primary line jumping analysis in Section 10, there were 375,738 cases under examination. In the revised analysis below, there are only 112,343 cases after the adjustments. A logical consequence is that, because

there are far fewer cases, the frequency of line jumping is reduced considerably, irrespective of whether DOL staff follow the queue order or the processing month policy.

Given these three caveats and steps, skipping should be close to zero. And yet the data indicate that the mean extent of line jumping is 114. In other words, the average applicant can expect 114 cases submitted in a subsequent month to jump ahead of them in the queue order and receive a quicker decision.[30] Given that skipping should be close to zero, this strikes me as a rather large number. Another way to contextualize the extent of line jumping: the data indicate that 19% of applicants are skipped by at least one case submitted in a subsequent month.

Like earlier, a possible objection is that some of these skips occur at either the tail end or very beginning of the month. For example, a case submitted July 31 may be counted as a "skip" even though the case that received a quicker decision was submitted August 1. I addressed this issue by adding a third condition to the algorithm: the skipping case needs to be submitted more than a week after the case in question. In the example above, any case submitted from August 1 to August 7 would not be counted as a skip for the July 31 case (even if it did indeed skip ahead of the case under examination). In summary: in this analysis a skip is any case that was (1) submitted later yet received a faster decision, (2) the skipping case must have been submitted in a subsequent month, and (3) the skipping case needs to have been submitted more than a week after the case in question.

In this second skipping analysis, the mean is 109, which is basically the same as the estimate above. So, even when ignoring cases that skipped within the same cohort, and ignoring skips that were decided in different months but were received within seven days of one another, the average applicant can expect 109 cases submitted in a subsequent month to jump ahead of them in the queue order.[31] Also like earlier, the data indicate that 19% of applicants are skipped by a case submitted in a subsequent month and more than a week away.

In summary, when we take into consideration the processing month policy that Pasternak describes, the data once again reveal that DOL staff do not follow the queue order when processing PERM applications. Line jumping is a frequent occurrence even when we permit applications submitted in the same month to skip one another and omit multiple applications submitted together.

*Conclusions*

After considering the processing month policy described by Pasternak in his declaration, and performing several new analyses that both examine and account for this policy, I arrive at the same conclusions regarding the PERM adjudication process. Given the foregoing results in this section, the processing month policy does not undermine my prior analyses or results. If anything, the new results indicate that the conclusions in my initial report are highly robust to alternative calculations and that the methodologies used to arrive at these conclusions are sound.

---

[30] Given the significant reduction in the sample size, and the caveats which omit a large volume of skips, the median is zero. Why the difference? In the data there are several cases that were skipped by several hundred or even a thousand of other cases.

[31] Like earlier, given the significant reduction in the sample size, and the caveats which omit a large volume of skips, the median is zero.

I reserve the right to amend or supplement my report considering additional facts, testimony and/or materials that may come to light. Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information, and beliefs.

Dr. Jordan Ragusa
March 29, 2024
Charleston, South Carolina